**NO. 21-1753**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

---

CHANDRA BALDERSON,

Plaintiff-Appellee,

v.

LINCARE INC.,

Defendant-Appellant.

---

On Appeal From The United States District Court For
The Southern District of West Virginia
Case No. 2:19-cv-00666 (Chief Judge Thomas E. Johnston)

---

**BRIEF OF DEFENDANT-APPELLANT**

---

David B. Goroff
Andrew Gresik
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 3000
Chicago, Illinois 60654
Tel: (312) 832-4500
Fax: (312) 832-4700
dgoroff@foley.com
agresik@foley.com

Lawrence Kraus
FOLEY & LARDNER LLP
111 Huntington Avenue
Suite 2500
Boston, Massachusetts 02199
Tel: (617) 342-4000
Fax: (617) 342-4001
lkraus@foley.com

*Counsel for Defendant-Appellant Lincare Inc.*

*ORAL ARGUMENT REQUESTED*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-1753 Caption: Chandra Balderson v. Lincare Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Lincare Inc.
(name of party/amicus)

who is the appellant, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☑ YES ☐ NO
If yes, identify all parent corporations, including all generations of parent corporations:

Lincare Inc. is a wholly-owned subsidary of Lincare Holdings Inc.

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☑ YES ☐ NO
If yes, identify all such owners:
Lincare Holdings Inc. is a wholly-owned indirect subsidiary of Linde plc, which is publicly-traded on the New York Stock Exchange and the Frankfurt Stock Exchange.

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐ YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David B. Goroff Date: 7/19/2021

Counsel for: Lincare Inc.



Print to PDF for Filing

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........ i

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iii

I. INTRODUCTION ........ 1

II. JURISDICTIONAL STATEMENT ........ 6

III. STATEMENT OF ISSUES ........ 7

IV. STATEMENT OF CASE ........ 8

A. Lincare Has A Nationwide Compliance Program ........ 8

B. Plaintiff Was A Lincare Sales Representative Whose Essential Duties Included Knowing Medicare Procedures ........ 11

C. Lincare Learns Of Irregularities In Parkersburg Records Through An Audit ........ 14

D. Brady Is Given A Final Written Warning ........ 22

E. The Day After Her Discharge, Lincare Learns Plaintiff Omitted Material Information From Her Job Application ........ 27

F. Pedersen's Correction Of One Word Of Her Rule 30(b)(6) Deposition Testimony Does Not Create a Dispute ........ 31

G. Plaintiff Never Complains Of Gender Discrimination Before Her Termination ........ 35

H. Procedural Background ........ 36

V. SUMMARY OF ARGUMENT ........ 37

VI. ARGUMENT ........ 39

A. Standard of Review ........ 39

B. The Court's Finding That Lincare Is Liable For Gender Discrimination Was Clearly Erroneous ....40

1. Plaintiff Failed To Show A Similarly-Situated Male Was Treated Differently ....41

2. Plaintiff Failed To Identify A Similarly-Situated Comparator ....42

3. The Court Ignored That Plaintiff's Gender Discrimination Claim Is Weakened Because The Decision-Maker Was Also Female ....48

4. Lincare Had Legitimate Nondiscriminatory Reasons For Terminating Plaintiff ....49

5. The Court Committed Clear Error In Finding Pretext ....50

6. The Court Erroneously Substituted Its Business Judgment For Lincare's ....57

7. The Court's Judgment Should Be Reversed ....58

C. The Court's Punitive Damage Award Was Legally Improper And Clearly Erroneous ....59

VII. CONCLUSION ....63

STATEMENT REQUESTING ORAL ARGUMENT ....65

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ....66

CERTIFICATE OF SERVICE ....67

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anderson v. Westinghouse Savannah River Co.*,
406 F.3d 282 (4th Cir. 2005) ....................48

*Barnes Group Inc. v. C & C Press, Inc.*,
716 F.2d 1023 (11th Cir. 1983) ....................59

*Beach v. DXC Tech.*,
2020 WL 3065308 (S.D.W. Va. June 9, 2020) ....................48, 49

*Braveboy v. New Millennium Bldg. Sys., Inc.*,
2009 WL 2997514 (D.S.C. Aug. 3, 2009)....................51

*Bryant v. Aiken Regional Med. Ctr. S. Inc.*,
333 F.3d 536 (4th Cir. 2003) ....................63

*Buko v. Am. Med. Labs., Inc.*,
830 F. Supp. 899 (E.D. Va. 1993) ....................49

*Cole v. Family Dollar Stores of Md., Inc.*,
811 F. Appx. 168 (4th Cir. 2020) ....................43

*Cooper v. Martek Biosciences Kingtree Corp.*,
2013 WL 787670 (D.S.C. Jan. 25, 2013), *aff'd sub nom. Cooper v. DSM Nutritional Prods. LLC*, 540 F. Appx. 206 (4th Cir. 2013)....................43

*Eddy v. Biddle*,
2013 WL 66929 (N.D.W. Va. Jan. 4, 2013)....................50

*EEOC v. Verbatim Corp.*,
1994 WL 749613 (M.D.N.C. Nov. 1, 1994) ....................57

*Elrod v. Sears, Roebuck & Co.*,
939 F.2d 1466 (11th Cir. 1991) ....................48

*Gerristen v. Warner Bros. Entm't, Inc.*
172 F.Supp.3d 1011 (C.D. Cal. 2015)....................32

*Haywood v. Locke*,
387 F. Appx. 355 (4th Cir. 2010) ....................42

*Holland v. Wash. Homes, Inc.*,
487 F.3d 208 (4th Cir. 2007) ....................50

*IGEN Intern., Inc. v. Roche Diagnostics GMbH*,
335 F.3d 303 (4th Cir. 2003) ....................61

*Ingram v. Giant Foods, Inc.*,
187 F.Supp.2d 512 (D. Md. 2002)....................49

*Jefferies v. Harris Cnty. Cmty. Action Ass'n*,
615 F.2d 1025 (5th Cir. 1980) ....................49

*Jiminez v. Mary Washington College*,
57 F.3d 369 (4th Cir. 1995) ....................40, 58

*Kolstad v. American Dental Assoc.*,
527 U.S. 526 (1999)....................59, 60

*Laber v. Harvey*,
438 F.3d 404 (4th Cir. 2006) ....................50

*Lauture v. St. Agnes Hosp.*,
2009 WL 5166253 (D. Md. Dec. 29, 2009), *aff'd*, 429 F. Appx. 300 (4th Cir. 2011) ....................42

*Lewis v. Central Piedmont College*,
689 F.2d 1207 (4th Cir. 1982) ....................58

*Lightner v. City of Wilmington*,
545 F.3d 260 (4th Cir. 2008) ....................42, 47

*Mackey v. Shalala*,
360 F.3d 463 (4th Cir. 2004) ....................39

*McDonnell Douglas v. Green*,
411 U.S. 792 (1973)....................41

*Mereish v. Walker*,
359 F.3d 330 (4th Cir. 2006) ....................50

*Moore v. City of Charlotte*, 754 F.2d 1100 (4th Cir. 1985) .......................................................42, 58

*Popo v. Giant Foods, LLC*, 675 F.Supp.2d 583 (D. Md. 2009).....................................................................46

*Proctor v. Fairfax Cnty. Fire & Rescue Dep't*, 2014 WL 6473712 (E.D. Va. Nov. 14, 2014) ............................................43

*Sherman v. Westinghouse Savannah River Co.*, LLP, 2004 WL 5578724 (D.S.C. July 30, 2004), *aff'd*, 263 F. Appx. 357 (4th Cir. 2008) ........................................................................................48

*Silvera v.* Orange *County Sch. Bd.*, 244 F.3d 1253 (11th Cir. 2001) ...............................................................59

*U.S. v. Welsh*, 879 F.3d 530 (4th Cir. 2018) ...................................................................40

*Ward v. AutoZoners, LLC*, 958 F.3d 254 (4th Cir. 2020) ...................................................................60

*Wordwide Network Serv. LLC v. DynCorp.*, 365 F. Appx 432 (4th Cir. 2010) ...........................................................63

**State Cases**

*Barefoot v. Sundale Nursing Home*, 457 S.E.2d 152 (W. Va. 1995).....................................................................42

*Charleston Town Ctr. Co. v. W. Va. Human Rights Comm'n*, 688 S.E.2d 915 (W. Va. 2009).....................................................................41

*Constellium Rolled Prods. Ravenswood LLC v. Griffith*, 775 S.E.2d 90 (W. Va. 2015).......................................................................59

*Fulton v. Martek Biosciences Kingstree, Corp.*, Civil Action No. 4:11-cv-03239-RBH, 2013 WL 787671, at *4 (D.C.S.C. Mar. 4, 2013) ..........................................................................................46

*Heston v. Marion Cnty. Parks & Recreation Comm'n*, 381 S.E.2d 253 (W. Va. 1989).....................................................................41

*Mayflower Vehicle Systems, Inc. v. Cheeks*,
629 S.E.2d 762 (W. Va. 2006)(cited Op.16) ....................................................50

*Mingo County Equal Employment Opportunity Council v. State Human Rights Comm'n*,
376 S.E.2d 134 (W. Va. 1988)......................................................................51

**Federal Statutes**

28 U.S.C.
§1291.............................................................................................7
§1332.............................................................................................6

31 U.S.C.
§3729............................................................................................34

**State Statutes**

W. Va. Code
§5-11-1 .........................................................................................36
§ 55-7-29(a) ..................................................................................59

# I. INTRODUCTION

After being terminated, following an investigation, for violating Defendant-Appellant Lincare Inc.'s ("Lincare") Compliance Program, Plaintiff-Appellee Chandra Balderson sued for gender discrimination because her male supervisor--who committed a different, lesser violation, and held a different position—was given a final warning but not terminated. After a bench trial, the U.S. District Court for the Southern District of West Virginia ("Court") found for Plaintiff. The Court solely awarded Plaintiff emotional distress damages and one-day's back pay because after-acquired evidence showed Lincare would have terminated her anyway because of misrepresentations in her employment application. The Court then quadrupled actual damages as punitive damages based on post-termination conduct of a non-decisionmaker who followed standard procedure in advising a Regulator, and caused Plaintiff no prejudice. Both in finding liability and in awarding punitive damages, the Court misapplied governing law and the result is clearly erroneous.

Lincare provides respiratory therapy products and services across the nation, including non-invasive mechanical ventilators to in-home patients. Lincare learned through a random audit in May-June 2019 that multiple orders originating in its

Parkersburg, West Virginia business center contained "cloned progress[1] notes" ("cloned notes")— patient-specific documents that are the same from one patient to another or one encounter to another.[2] It is a serious violation of Lincare's Compliance Program for an employee to use or cause others to use cloned notes, which Lincare always punishes by termination. Lincare's Chief Compliance Officer, Jennifer Pedersen ("Pedersen"), and two female colleagues flew to Parkersburg to investigate and determined Plaintiff was responsible. Indeed, Lincare's investigators found a binder of 17 cloned note templates in the trunk of Plaintiff's car. Plaintiff also committed other compliance violations, including directing physicians' offices to add language to orders, modifying patient orders, and causing patient records to have misrepresentations and misdiagnoses. Following the investigation, consistent with her unwavering practice with cloned notes, Pedersen terminated Plaintiff.

During the investigation, Lincare learned that Plaintiff's supervisor, Chad Brady ("Brady"), committed a different compliance violation—he sent one page of "Good Chart Notes" to physicians. These are designed to educate physicians about

[1] A "progress note" is a part of a medical record where healthcare professionals document a patient's clinical status or achievements during the course of care. In this case, a progress note would necessarily contain a statement of medical necessity justifying the need for a ventilator. (Dkt.135,15-16,Appendix("A")00833–00834;Opinion,Dkt.144,5,A01116)("Op.").
[2] *See* Dkt.135,180-81,A00998–00999).

appropriate language they can consider using. Lincare has approved materials for this purpose, but Brady's Good Chart Notes were not in a form approved by Lincare. Unlike cloned notes, these cannot be added "as is" or "cut and pasted" to a patient record and are otherwise materially different. For this less-serious violation, Pedersen disciplined Brady with a final written warning but not termination.

Plaintiff sued for gender discrimination based solely on this different discipline. The Court committed clear error by ignoring facts and law showing Brady was not a proper comparator. Plaintiff caused at least 19 patient records to have cloned notes; she added information to patient records and told physicians what to say. Brady did not expect physicians to use Good Chart Notes "as is" with patients. As a supervisor, he was not responsible for sales and only assisted when Plaintiff was unavailable. Plaintiff, unlike Brady, earned commissions for sales, which soared while she used cloned notes. The Court clearly erred by ignoring these dispositive differences and finding "substantially similar" and "nigh indistinguishable" violations.[3]

The Court also ignored the legal consequence of the fact that the decision-maker—Pedersen—and Plaintiff are of the same gender, as were Pedersen's co-investigators and her direct reports.

---

[3]Op.9,15,A01120,A01126.

The Court rejected Pedersen's uncontested testimony that she had terminated a male for using cloned progress notes because she did not volunteer his name or other information. However, Plaintiff's counsel never sought that information in cross-examination; nor did the Court in questioning Pedersen.

The Court agreed that Lincare had a legitimate non-discriminatory reason for terminating Plaintiff, but erroneously found that Plaintiff had established pretext for discrimination. While the Court listed multiple (erroneous) reasons for finding pretext, none evidence gender discrimination. These include the Court's incorrect conclusion that Lincare shifted its justification for terminating Plaintiff, when, instead, Lincare consistently said it was because of cloned notes, which violated multiple policies. The Court also found that Pedersen's correction of her Rule 30(b)(6) deposition testimony that Plaintiff's conduct "could" violate the False Claims Act ("FCA"), instead of that it "would," somehow showed gender discrimination, when the deposition transcript instead shows that Plaintiff's counsel strayed from asking about violations of the Compliance Program to violations of law, which were outside the deposition's scope. The Court further found pretext because Lincare had not reported Plaintiff's compliance violation the Department of Health and Human Services Office of Inspector General ("OIG"), even though a Corporate Integrity Agreement ("CIA") required Lincare to report FCA and Anti-Kickback Statute ("AKS") violations. Pedersen explained that

because these statutes require scienter, conduct may violate the Compliance Program but not be reportable. The Court not only second-guessed Lincare's interpretation of the CIA, but bafflingly found this evidenced gender discrimination.

As provider in the highly-regulated healthcare industry, Lincare must have discretion to enforce its Compliance Program, including to punish different compliance violations differently. It is not gender discrimination to distinguish between cloned patient notes and unauthorized educational materials, even if both touch on the same broad categories of compliance violations.

The Court agreed it cannot substitute its business judgment for Lincare's but did just that, accusing Lincare of "scorched earth tactics," calling Pedersen cold-hearted, and finding Plaintiff's termination was "unnecessary."[4]

Because Lincare did not commit gender discrimination, any damages award was error. But the Court committed independent error by awarding punitive damages. It found Lincare showed actual malice by advising a Regulator, post-termination, that Plaintiff was practicing on an expired license, information Lincare found on the Regulator's website.[5] The day after terminating Plaintiff, Lincare's National Healthcare Services Manager, Sandra Moreau ("Moreau"),

[4]Dkt.136,40,80,A01065,A01105;Op.30–31,A01141–A01142.

[5]Lincare also noted this as a secondary reason for opposing Plaintiff's application for unemployment compensation, with compliance violations being the first.

followed Lincare's established practices when an employee is terminated for a compliance violation. Pedersen—who terminated Plaintiff—was not involved in this. Moreau verified Plaintiff's license status on the West Virginia Board of Respiratory Care's ("WV Board" or "Regulator") website, which stated it expired. The WV Board's website specifically states that the information on the website is a "primary source" and can be relied upon. Nonetheless, that information was incorrect. Although the WV Board sent notice of this to a Lincare facility in West Virginia, no Lincare employee involved in this matter worked there or knew this before this litigation.

Because Moreau in good faith followed standard practice in communicating with a Regulator, the Court's finding of "actual malice" is legally and factually indefensible. Left standing, the decision would greatly undermine healthcare companies' ability to ensure employee compliance.

This Circuit has reversed findings of discrimination where different conduct justified different discipline and insupportable punitive damage awards, and should do so again here.

## II. JURISDICTIONAL STATEMENT

The Court had jurisdiction under 28 U.S.C. §1332. Diversity of citizenship existed between the parties, in that Plaintiff is a West Virginia citizen and Lincare is a Delaware corporation with its principal place of business in Florida. The Court

entered final judgment on June 7, 2021. Lincare timely filed its notice of appeal on July 2, 2021. This Court has jurisdiction under 28 U.S.C. §1291.

## III. STATEMENT OF ISSUES

1. Whether the Court clearly erred in finding Lincare liable for gender discrimination where: a) Plaintiff identified no similarly-situated male employee who was treated differently from her, and her male supervisor--her lone comparator--committed a less serious compliance violation, warranting a less serious punishment; b) Lincare's Chief Compliance Officer, who made the termination decision, was in the same protected class as Plaintiff; c) the Court ignored that Lincare always terminates employees who use cloned notes and erroneously rejected Lincare's decision-maker's undisputed testimony that she terminated a male employee for this near the time she terminated Plaintiff; d) no evidence showed pretext; rather, Lincare was punished for exercising its business judgment in enforcing its compliance policies.

2. Whether the District Court abused its discretion in awarding Plaintiff punitive damages where: a) the award was based on post-termination conduct by a non-decisionmaker who in good faith followed standard practice and acted without actual malice; b) Lincare’s employee was alerting a Regulator to concerns raised by that Regulator’s records regarding Plaintiff; c) no Lincare employee involved with Plaintiff knew of the Regulator’s subsequent corrective letter.

## IV. STATEMENT OF CASE

### A. Lincare Has A Nationwide Compliance Program

Lincare is a supplier of respiratory therapy products and services, including non-invasive mechanical ventilators, to in-home patients. (Amended Complaint, Dkt.46,¶4,DX35,[6]A00802). Lincare, based in Clearwater, Florida, is a national company with "Centers" in 48 states. (Dkt.135,76,A00894;Op.2, A01113). One is in Parkersburg, West Virginia. (Amended Complaint,Dkt.46,¶2,A00802).

Lincare operates in a heavily-regulated industry, and is dedicated to providing quality service in full compliance with all applicable laws, rules and regulations, including those pertaining to Medicare, Medicaid, and other federal- and state-funded health care programs. (DX6,A00586,1,Op.5,A01116). Lincare has adopted an extensive nationwide Corporate Health Care Law Compliance Program ("Compliance Program") and related Code of Conduct ("Code") to ensure compliance with healthcare laws. (*Id.*; Dkt.135,144-45,162,A00962–A00963, A00980;Op.5,A01116).

Lincare's Compliance Program includes training to ensure Lincare's employees understand proper practice regarding the submission of claims, marketing, and other activity. (Dkt.135,160-61,A00978–A00979).

[6]"DX" refers to Defendant's Trial Exhibits, which are included in the record as Dkt.__,A__. "PX" are Plaintiff's trial exhibits, which are included in the record as Dkt. __,A__.

Lincare's Code prohibits, *inter alia*, "misrepresenting a diagnosis for the patient to justify the services or equipment furnished" (DX6,A00588;Op.5,A01116) and "offering or giving valuable property, equipment, services, gifts or other benefits to a person in exchange for the referral of patients to the Company." (DX6,A00587;Op.5,A01116).

Pedersen has been Lincare's Chief Compliance Officer for 21 years, and oversees its Compliance Program. (Dkt.135,144,161,175,A00962,A00979, A00993;Op.5,A01116). Lincare performs approximately 100 compliance investigations each year. Its Compliance Department investigates any report of an actual or perceived Compliance Program. (Dkt.135,173-74,A00991–A00992).

Pedersen has four direct reports she hired or promoted: a Deputy Compliance Officer, Clinical and Regulatory Affairs Director, Director of Compliance and a Compliance Manager. Each is female. (Dkt.135,188,A01006).

Pedersen does not determine whether employees violate laws. Instead, she ensures they follow Lincare policy and that Lincare has policies and procedures to ensure it follows applicable laws and guidance. (Dkt.135,161,A00979). Conduct may violate Lincare's Compliance Program, yet not violate the FCA or AKS. (Dkt.135,162-63,A00980–A00981).

The Code includes examples of conduct that may violate *the Compliance Program*, but not necessarily violate FCA and AKS, as legal violations depend on many things, including scienter. (Dkt.135,162-63, A00980–A00981).

Every Lincare employee must follow Lincare's Employee Handbook ("Handbook")(DX5,A00574). This describes "Major Infractions," including the "Failure to Comply with the Corporate Compliance Program" and provides examples of major infractions stating that these "or any willful misconduct, may result in discharge without written notice and without prior warning or progressive discipline." (DX5at LIN000532-33,A00584–A00585). The Handbook states this list is not all-inclusive. (*Id*.,A00584).

Plaintiff received annual compliance training from Lincare. (DX7,A00597;Dkt.135,93-95,A00911–A00913;Op.5,A01116). Lincare's training states that it is a violation to "manipulate[e] the patient's diagnosis in an attempt to receive improper payment" and to "offer[] or giv[e] property, equipment, services, gifts or other benefits to a person in exchange for the referral of patients to the Company." (DX8,A00600; Dkt.135,96,A00914).

Plaintiff understood that manipulating a patient's diagnosis in attempt to receive payment violates Lincare policy, as does misrepresenting a diagnosis or offering services in exchange for referrals. (Dkt.135,96-97,A00914–A00915).

Guidance from the Centers for Medicare and Medicaid Services ("CMS") refers to templates and cloned notes. (Dkt.135,153,A00971).[7] Medicare cautions physicians against having these. (Dkt.135,180,A00998;Op.7,A01118).

**B. Plaintiff Was A Lincare Sales Representative Whose Essential Duties Included Knowing Medicare Procedures**

Before Lincare, Plaintiff worked for a medical center and in sales and as a respiratory therapist for a different durable medical equipment company. (Dkt.135,46-47,A00864–A00865;Op.2,A01113). Plaintiff has a degree in Applied Science in Respiratory Therapy. (Dkt.135,46,A00864;Op.2,A01113).

Brady, along with the Area Manager, hired Plaintiff as a "Sales Representative-Commission" on November 30, 2015. (DX2,A00568;Op.2, A01113). (Dkt.135,17,A00835;Op.2,A01113). Plaintiff was Lincare's only Sales Representative in her area. (Dkt.135,54,104,A00872,A00922; Op.2,A01113).

Plaintiff's job description included "[s]ell[ing] Lincare services to referral sources," including physicians and physician office staff, by performing duties including: a)"[e]stablish[ing] and maintain[ing] a relationship with referral sources

[7]*See* CMS Manual System, Pub. 100-08 Medicare Program Integrity;CMS.gov/Medicare-Coordination/Fraud-Prevention/Medicaid-Integrity/Downloads/docmatters-ehr-providerfactsheet/pdf. The Guidance notes that it does not prohibit templates to facilitate record-keeping or assist in documenting medical information. (Op.7,A01118)(citing Guidance at 7). However, the CMS Manual discourages use of "predefined answers" because these "limited space templates often fail to capture sufficient detailed clinical information" to demonstrate that coverage requirements are met." (*Id.*)

in the medical community; b)"[u]nderstand[ing] and provid[ing] information on Medicare and insurance procedures, pricing information, and product information to referral sources," and c)"[a]ssist[ing] the center in the assurance of clean paperwork[8] . . . by conducting follow-up visits to physicians to obtain prescriptions for services." (DX2,A00568–A00569;Dkt.135,91-93,A00909–A00911;Op.3-4,A01114–A01115).

Plaintiff was responsible for marketing to all area referral sources. (Dkt.135,16,A00834).

Lincare paid Plaintiff a salary and commissions. When hired, Plaintiff signed a written commission agreement specifying how she could earn commissions ("Commission Structure"). (DX4,A00572–A00573). Some years she made more than $100,000, mostly in commissions. (Dkt.135,56-57,A00874–A00875).

The Commission Structure provided that Plaintiff remained an at-will employee. Plaintiff was eligible to earn commissions where she met five requirements, including "the earning Sales Representative personally obtains all other billing pre-requisites, including, as applicable, but not necessarily limited to…Certificate of Medical Necessity…." (DX4,A00572). It further provided that

[8]"Clean paperwork" referred to how Sales Representatives process orders and gather documentation. (Dkt.135,93,A00911).

sales representatives were bound by the Compliance Program and that no commissions would be earned or paid for patient set-ups which violated this or any healthcare law. (*Id*.). :

Brady was Parkersburg's "Center Manager Without Sales Responsibility" and was Plaintiff's immediate supervisor. (DX3,A00570;DX2,A00568; Dkt.136,61,A01086). Brady was responsible for the Center's operations. He supervised customer service, sales and service representatives, and healthcare specialists. (DX3,A00571;Op.4,A01115). Sometimes Brady would visit physicians' offices with Plaintiff. (Dkt.135,14-15,A00832–A00833; Op.4,A01115).[9]

Brady described he and Plaintiff as "co-workers." At one point, they shared an office. (Dkt.135,14,A00832;Op.4,A01115).

Plaintiff's and Brady's tasks "were certainly different, but [they] did work together and there was some overlap." (Dkt.135,14,A00832;Op.4,A01115). Reviewing orders was one of Plaintiff's essential duties, but not Brady's. (Dkt.135,37,A00855).

Sometimes an order would come in while Plaintiff was out and Brady would handle it. (Dkt.135,16,A00834;Op.4,A01115). Brady testified "[i]t wasn't often"

[9]The Opinion omits that Brady testified this occurred only "sometimes" and "on occasion."

that he would substitute for Plaintiff's duties—maybe one or two times every couple or three months." It was not part of his normal job duties. (Dkt.135,37,A00855).

Brady and Plaintiff were subject to the same compliance policies established in Lincare's Handbook. (Dkt.135,17 A00855;Op.4,A01115).

### C. Lincare Learns Of Irregularities In Parkersburg Records Through An Audit

In May-June, 2019, during an internal audit ("Audit"), Lincare discovered handwritten cloned notes found in patient records that had been submitted to Lincare. (Dkt.135,145-46,A00963–A00964). The Audit revealed that multiple progress notes had nearly identical language in numerous patient's files. (Dkt.135, 146,A00964;DX9,A00609;Op.5,A.01116).[10]

These irregularities were brought to Pedersen's attention. (Dkt.135,145,A00963). On Sunday June 2, 2019, Pedersen and two other senior Lincare employees, Senior Corporation Counsel Sheila Kalteux ("Kalteux"), and Moreau,[11] traveled to Parkersburg to investigate.

---

[10]The Court refers to these as having "substantial similarities" in "several patients' files" (Op.5,A01116). There are instead 19 examples from patient files (names redacted), many with nearly identical language.

[11]Moreau's primary responsibilities included oversight for clinical policies, procedures, and protocols. (Dkt.136,43,A01068).

DX12[12] is another document Lincare learned of in the Audit and before investigating on-site. DX12 includes a fax cover sheet, along with an order form for a Trilogy ventilator and a progress note.[13] Plaintiff faxed this to a physician on May 2, 2019. She admitted it contains her handwriting. (Dkt.135,98,A00916). On DX12, Plaintiff wrote, "I need face-to-face notes within the last 6 months that mention her COPD dx and chronic respiratory failure dx." She added, "I need the attached statement added[14] or the progress note signed, dated and timed with the patient's name and DOB added, also."[15] Plaintiff further wrote, "The Trilogy order was missing a few things. I added. Just need Dr. [redacted] to sign and date." (DX12;Dkt.135,65,A00883,cited Op.6,A01117).

---

[12]This is also PX6,A00198.

[13]The Court noted that the templates *originated* in physicians' offices under the supervision of physicians. (Op.7,A01118), but Plaintiff violated Lincare's compliance policies by *possessing* and *using* them. Whether she created them in the first place is immaterial.

[14]The Court relied on testimony from non-physician medical practice employees to conclude that "Ms. Balderson never sought to influence a medical opinion or diagnosis, nor did she ever falsify or alter any progress notes." (Op.8,A01119). This concrete evidence shows otherwise.

[15]This evidences that Plaintiff initiated the use of cloned notes, and did not use templates "simply for the physician's convenience," as the Court found. (Op.8,A01119). Of course, even if used for physician convenience, the cloned notes violated Lincare's Compliance Program. Plaintiff's statement to the physician's office "I need the attached statement added" shows the Court erred in concluding that "the progress notes were never required by Ms. Balderson." (Op.8,A01119).

Chronic respiratory failure and COPD are separate conditions. (Dkt.135,111,A00929). The face-to-face notes from the physician's meeting with the patient, dated April 30, 2019, which DX12 includes, do not mention either condition. Instead, the primary diagnosis is "Restrictive ventilatory defect," a distinct condition. (DX12, at LIN000628,A00655; Dkt.135,110-12,A00928–A00930,cited Op.6,A01117). The only reference to chronic respiratory failure in DX12 is in the cloned note Plaintiff sent the physician to sign at 11:50 on May 2, 2019. (DX12, at LIN000626,A00653).[16] The physician signed it at 1:08.

DX32 contains the medical chart for the patient discussed in DX12. DX32 contains no diagnosis of chronic respiratory failure either on the date of the first progress note or the month before. (DX32, at LIN001029, LIN001036,A00758,A00765;Dkt.135,138-40,A00956–A00958).

Plaintiff's fax and the cloned note she asked the physician to add contained contradictory information. (*Compare* DX12 at LIN000626 *with* DX12 at LIN000628;Dkt.135,182-83,A01000–A01001). The cloned note refers to COPD

[16]The Court noted that the cloned notes kept by Plaintiff' "did not contain any patient information or physician signatures, but only a generic statement of medical necessity." (Op.6,A01117). This is inculpating, not exculpating. Rather than sending records tailored to a particular patient's needs, Plaintiff sent pre-written statements which, as Brady testified, are "plugged and played" into numerous patients' records, causing them to read the same. Because they are not patient-specific, they may, as here, result in patient records containing diagnoses errors.

and says that BiPAP was tried and failed, but the electronic medical record ("EMR") states the patient instead has a restricted ventilator defect, and that the patient changed from a BIPAP to CPAP and benefitted. The EMR also mentions obstructive sleep apnea, which also differs from COPD and requires different qualifications to meet Medicare's coverage criteria. Finally, the EMR does not support the note's statement of why a ventilator is required. (Dkt.135,182-84,A01000–A01001).

Pedersen explained why Plaintiff's request that "I need the attached statement added" (referring to the cloned note) was problematic:

> So, she was also asking for the blank progress note that was attached to the back to be completed by the physician's office or physician with the patient's name, signed and dated.

(DX12,A00651; Dkt.135,181-82,A01000–A01001).

As Pedersen also testified, cloned notes "would be characterized as leading [physicians] *and actually providing information to a physician to put in a medical record."* (Dkt.135,153-54,A00971–A00972)(emphasis added).

Brady's Good Chart Notes were not discovered in the Audit. (Dkt.135, 178,A00996).

Pedersen, Kalteux and Moreau had never met Plaintiff before travelling to Parkersburg and had no pre-determined target for this internal investigation. (Dkt.135,129,159,A00947,A00977). In meetings on Monday, June 3, 2019, they

interviewed Plaintiff, Brady and other clinical staff. (Dkt.135,146-47,179,A00964–A00965,A00997). During that investigation, Plaintiff provided Pedersen with progress notes matching those discovered in Lincare's Audit. (Dkt.135,179,A00997;PX2,A00173–A00186;Op.6,A01117). Plaintiff admitted she filled in portions of a physician's order for a ventilator. (DX12,A00651;Dkt.135,68-69,A00886–A00887).

After interviewing Plaintiff, Pedersen discovered the cloned notes in DXs10-11. (DXs10-11,A00628–A00650;Dkt.135,179,A00997). Plaintiff had 17 cloned notes in her binder. (Dkt.135,111,A00929). DXs10-11 included notes for two medical practices—Gondalia and Camden Clark Pulmonary. (Dkt.135,98-99,A00916–A00917). Plaintiff admitted she was keeping physicians' notes. (Dkt.135,65,103,A00883,A00921;Op.6,A01117). Plaintiff admitted DXs10-11 contained cloned notes which were in her binder and were part of DX9. (Dkt.135,98-101,A00916–A00919).

Pedersen testified that DXs10-11 raised concerns because Medicare cautions against physicians using cloned notes, especially when provided to support reimbursement. (Dkt.135,180-81,A00998–A00999). Medicare also states that such documents should not be used to support medical necessity. (*Id.*). Pedersen noted that Plaintiff admitted sending these to physicians, which Lincare worried put physicians' practices at risk and which caused patient records to have contradictory

information. (*Id*). Pedersen believed Medicare guidance supported her conclusion that Plaintiff's use of cloned notes was improper. (Dkt.135,154,A00972).

Plaintiff also provided Pedersen with the same notes which had been sent to physicians and are contained in DX9. (DX9,A00609–A00627;Dkt.135,178-79,A00996–A00997). These redact patients' names and dates of birth, but have a date and time of visit and what should be a prescribing practitioner's signature and date. (DX9,A00609–A00627;Dkt.135,178-79,A00996–A00997).

Plaintiff admitted she sometimes presented physicians with those notes, who then signed them, which is how DX9 originated. (Dkt.135,102,A00920). DX9 contains 19 pages of nearly identical progress notes, which were used with specific patients and signed by physicians. (DX9, at LIN000759-77,A00609–A00627).

Plaintiff admitted in her pleadings that she instructed each physician to include the following language with the ventilator order to facilitate approval:

> Patient is diagnosed with chronic respiratory failure consequent to COPD. Bipap was tried and failed or Bipap was considered and ruled out. The ventilator is required to decrease work of breathing, improve pulmonary status and interruption of respiratory support could lead to serious harm, decline in health status, worsening of condition, increase risk of increasing CO2 retention, untimely readmissions, or death.

(DX34,A00795–A00796,¶¶7,12;DX35,A00803–A00804,¶¶7,12.) Plaintiff admitted this language matched that in her cloned notes. (Dkt.135,106-107,A00924–A00925).

Pedersen testified how Plaintiff "misrepresented a diagnosis" under Lincare's Code (DX6):

> [W]e found in certain cases when we reviewed the physician's medical record that there was no documentation to support the diagnosis that she placed on those notes or that she sent to the doctors to have included in the medical record. [I]f it could not be supported by the physician's medical record, it would be considered a misrepresentation of a diagnosis.

(Dkt.135,164-65,A00982–A00983).

Pedersen testified that DX12 evidenced a misrepresentation of diagnosis. It used a cloned note stating that a ventilator was required, even though the patient has never been set up on a ventilator, but instead has benefitted from a BiPAP. (Dkt.135,181-85,A00999–A01003).

DXs10-12 led Pedersen to conclude that Plaintiff violated Lincare's Compliance Program by sending these documents to physicians who then signed them. She then submitted these to Lincare to set patients up for ventilators even though Medicare coverage criteria were not met. (Dkt.135,183-84,A01001–A01002).

Plaintiff admitted that she used cloned notes to make it easier for the physician when they needed to get a patient set up. (Dkt.135,62,65,99,103-104,A00880,A00883,A00917,A00921–A00922). Plaintiff admitted that the blank progress note was the doctor's note, not Lincare's. (Dkt.135,100,A00918;*see also*

Op.7,A01118). This constitutes providing a benefit to a physician in return for a referral, which violates prohibitions in Lincare's Compliance Program. (Dkt.135,165-66,A00983–A00984).

Plaintiff admitted she had been using template progress notes for 1½-2 years before she was terminated. During that time, her wages jumped from $69,000 to $109,000. (Dkt.135,118-19,A00936–A00937).

While Pedersen did not recall her specific words, she told Plaintiff she was being terminated for violating policies of Lincare Compliance Program, including by using cloned notes. They specifically discussed the cloned notes Plaintiff produced from the trunk of her car. (Dkt.135,147-48,152-53,A00965–A00966,A00970–A00971). Plaintiff admitted possessing and sending cloned notes and that was the basis for her termination. (Dkt.135,154-55,A00972–A00973).

As the Court acknowledged, "at the end of the investigation on June 3, [2019], Ms. Pedersen terminated Ms. Balderson's employment for violations of Lincare's corporate compliance program." (Op.8,A01119, citing Dkt.135,147-48,A00965–A00966). The Court accepted Plaintiff's testimony that she was told she was terminated for "leading" physicians. (Op.8,A01119)(citing Dkt.135,22,27,58,A00840,A00845,A00876).[17] Plaintiff admitted that this leading

---

[17]On June 26, 2019, shortly after her termination, Plaintiff advised Workforce West Virginia "I was discharged by [Pedersen and Moreau] for a violation of company policy." (DX16,A00665; Dkt.135,120-21,A00938–A00939).

was "with the certain language that was being used" with her progress notes and "with other language she provided to the doctors." (Dkt.135,58,A00876). She admitted she was told she was discharged for doing something Lincare deemed improper. (Dkt.135,120–21,134,A00938–A00939,A00952).

Plaintiff was replaced by a female, Tiffanie Mitchem-Craven. (Stip. ¶F(a),A00132).

Pedersen testified she always terminates employees who use cloned notes. (Dkt.135,174,A00992). Pedersen testified she "has never not terminated" anyone for using cloned notes. (Dkt.135,189,A01007). Pedersen had previously terminated men who used cloned notes. She discharged a male "pretty close in proximity in time to when [Plaintiff] was discharged." (Dkt.135,187,A01005). The Court examined Pedersen at the trial, but did not question this. (Dkt.135,189-90,A01007–A01008). Plaintiff's counsel did not object to this testimony. (Dkt.135,187,A01005).

### D. Brady Is Given A Final Written Warning

Brady supplied a number of physicians with one page with three examples of Good Chart Notes, as follows:

> Patient evaluated for COPD. Cough has been getting worse over the past 5 years. Patient requires home ventilator 24/7 to sustain life.
>
> Patient presents with a history of COPD. This has been a problem for some time. It is associated with dyspnea on

> exertion. Nothing seems to improve his/her cough. His/her medication history is remarkable for COPD & Chronic Respiratory Failure. Patient requires home ventilator therapy to sustain life.
>
> Patient has a long-standing history of COPD resulting in Chronic Respiratory Failure. He/she has chronic elevations of his/her CO2 levels. CPAP/BIPAP has been tried but does not lower the CO2 levels in his/her blood. Because of his/her condition, I feel that home ventilator therapy is required for his/her condition to sustain life.

(DX13,A00656;Dkt.135,26,A00844). These were intended to show "the level of detail required by insurance to get approval for a ventilator, but not as a word-for-word copy/paste deal." Brady did not intend physicians to use the document word-for-word. (Dkt.135,26,28-29,32,44,A00844,A00846–A00847,A00850,A00862). For instance, the first example refers to "5 years" but the physician's opinion with an actual patient might be one, two, or any number of years, depending on variables. Similarly, the third example's reference to "CPAP/BIPAP" includes different options. A physician would not typically write "CPAP/BIPAP" in the chart. (Dkt.135,32,43-44,A00850,A00861–A00862). DX13 is the only Good Chart Note examples Brady sent to physicians. (Dkt.135,41-42,A00859–A00860).

Before Brady provided these, physicians lacked knowledge about how to appropriately write chart notes and orders to satisfy insurance companies. (Dkt.135,30,A00848).

Pedersen testified how Good Chart Notes differed from cloned notes:

> The difference between the example [Good Chart N]otes and the cloned progress notes is that the cloned notes were—are used for a physician to add to a patient's—a specific patient's record. [The Good Chart Notes] give chart note examples [which] provide information to a physician about the type of information that should be included in a progress note if most payers are going to reimburse for that service.
>
> . . . [A] doctor can order anything he wants for his patient and he or she should order what the patient needs, but there's very specific criteria that must be met by most payers and it's not specific language in a note. It's just coverage criteria has to be met and the physician has to document that that coverage criteria has been met. And these chart note examples are just information to provide to the physician of things that could be included if applicable to the patient.
>
> That's not to say that this was right. We have educational brochures that could have been used instead of this.

(Dkt.135,186,A01004). Lincare has approved brochures which provide alternatives to the Good Chart Notes to educate physicians on acceptable language. (DXs14-15,A00657–A00664; Dkt.135,30-31,A00848–A00849).

Brady also explained differences between cloned notes and the Good Chart Notes:

> The good chart note examples…are just three examples of adequate detail that a physician would need to document in a patient's medical record to meet the benchmark of an insurance for approval of this therapy. They need to document adequate detail to meet that mark.
>
> In the other two exhibits [DXs10-11] it's a handwritten note. It's on a page that says "progress note". So, . . . the

> three blocks of text are just examples. These are an all-inclusive kind of form statement handwritten on a blank progress note.

(Dkt.135,33-34,A00851–A00852). To Brady, "'progress note' … means chart note, means medical record, means a patient's file…." (Dkt.135,34,A00852).

Brady also testified regarding differences between the Good Chart Notes and DX12:

> Q. And how is this process here different from what you were doing with the good chart note examples?
>
> A. [DX12] is different because it asks in the second arrow, "I need the attached statement added or the progress note signed, dated and times with the physician's name and date." So, taking a blank progress note and asking a physician to sign and date that and just plug and play the template and add it into a record, that—that piece isn't appropriate.

(Dkt.135,35,43,A00853,A00861). Brady "pretty strongly" believed that cloned notes violated a policy. (Dkt.135,34-35,A00852–A00853).

Brady never gave a document to a provider to sign and date that would go right into a patient's file. He never possessed copies of cloned notes or blank physician progress notes. (Dkt.135,36,A00854). He never tried to manipulate a diagnosis. (Dkt.135,27,A00855). Plaintiff admitted she never saw Brady use cloned notes. (Dkt.135,121,A00939).

Moreau reviewed all patient files. In response to the Court's question, she testified that this showed that some[18] providers Brady worked with had used language in the Good Chart Notes in a substantially similar way in actual patient charts. However, the Good Chart Notes were not copied verbatim, word-for-word, sentence-for-sentence. (Dkt.136,74-75,A01099–A01100;Op.9,A01120). Moreau explained how Brady's conduct differed from Plaintiff's:

> [Brady] was presenting information that were examples of notes that may be of assistance for the physician. He wasn't coaching or telling them what to write. He was providing an example[.]

(Dkt.136,72-73,A01097–A01098). Based on her review of the files that contained language substantially similar to the Good Chart Notes, Moreau testified that the vast majority presented no clinical concerns and none misrepresented a diagnosis. (Dkt.136,77-78,A01102–A01103).

Nonetheless, Pedersen disciplined Brady for providing coaching or leading information. (Dkt.135,24-27,159-160,A00842–A00845,A00977–A00978;Op.8,A01119). Brady was issued a final written warning, but not terminated. (DX17,A00666; Dkt.135,23,159-60,A00841,A00977–A00978). In that warning, Lincare also noted that Brady had provided free equipment to physicians. (DX17,A00666;Op.8,A01119).

---

[18] The Court's Opinion refers to "physicians" adding language, omitting that it was only "some." (Op.9,A01120).

Pedersen explained that she gave Brady a final warning because his violation "did not rise to the magnitude of that one of Ms. Balderson." (Dkt.135,186-87,A01004–A01005).

### E. <u>The Day After Her Discharge, Lincare Learns Plaintiff Omitted Material Information From Her Job Application</u>

Plaintiff is a licensed respiratory therapist. (Dkt.135,49,A00867;Op.2,A01113). While at Lincare she wore a name tag stating "RRT"—Registered Respiratory Therapist. (Dkt.135,82-83,A00900–A00901,Op.9,A01120).

Moreau did not know Plaintiff was a licensed clinician until she met her during the on-site investigation. (Dkt.136,70-71,A01095–A01096).

Lincare's practice after a clinical licensed employee is terminated is to ensure they are licensed and to review the rules and regulations of the state they are licensed in. Some states require employers to report a change in a clinical employee's status, and Lincare adheres to such rules. Moreau completes this process in consultation with Lincare's Legal and Human Resources Departments. (Dkt.136,45-46,63-64,A01070–A01071,A01088–A01089). Moreau followed the same process with Plaintiff that she would for any other Lincare employee. (Dkt.136,79,A01104).

As National Healthcare Services Manager, Moreau's responsibilities include issues involving licensure status. (Dkt.135,204,A01022).

Lincare will investigate certain matters post-termination when necessary. Here, Plaintiff represented herself to physicians as a respiratory therapist, implying an active license. (Dkt.135,198-99,A01016–A01017).[19] Accordingly, Lincare reviewed her West Virginia licensure status the day after her discharge—June 4, 2019. Moreau consulted the "primary source verification" from the WV Board's website. That showed Plaintiff's license expired December 31, 2018. (DX21,A00679;Dkt.136,47-49,A01072–A01074;Op.9-10,A01120–A01121).

Because Parkersburg borders Ohio, Moreau also checked whether Plaintiff was licensed there. Moreau learned Plaintiff's Ohio license was also expired and had been the subject of disciplinary action. DX20, which Moreau found on the Ohio Respiratory Care Board's ("Ohio Board") website, showed that Plaintiff entered into a consent agreement with the Ohio Board dated April 22, 2015 ("Consent Agreement"). (DX20,A00674;Dkt.136,50-51,A01075–A01076). The Ohio Board reprimanded her for failing to disclose a prior criminal intoxication matter, placing her on one year of probation beginning April 22, 2015. (DX20,A00676;Dkt.136,52-53,A01077–A01078;Op.3,A01114). Plaintiff admitted

[19]The Court noted that Moreau's duties included verifying whether *clinical* employees were properly licensed (Op.9,A01120(quoting Dkt.136,64,70-71), but omits that Plaintiff *was not* a clinical employee. Rather, it is because she used her respiratory therapist credential in her sales role that Lincare reviewed her license following termination. (Dkt.136,70,A01095).

she should have reported this to the Ohio Board. (DX20,A00675; Dkt.135,51-52,84-90,A00869–A00870,A00902–A00908).

From the list of Parkersburg employees Moreau received, Moreau knew that Plaintiff was hired in October 2015, and would still then have been on probation with the Ohio Board. Therefore, on June 4, 2019, Moreau, following her regular process, reviewed Plaintiff's employment file to see whether Plaintiff had disclosed a respiratory therapist's license when hired. (Dkt.136,53-54,A01078–A01079).

Moreau's review showed Plaintiff applied to Lincare on October 19, 2015, while under probation. (DX18,A00667;Op.10,A01121). Her application asked Plaintiff to list her licenses and "whether there are any current restrictions or disciplinary actions against the license/certification." (DX18, at LIN000131,A00668.) Plaintiff disclosed her Ohio license, but represented it was subject to no "current restrictions or disciplinary actions." (*Id.*,Op.3,A01114). This led Moreau to conclude that Plaintiff may have provided false information on her application. (Dkt.136,55-56,A01080–A01081).

Lying on a job application violates several Lincare policies, including the policy against providing false information on a document. (DX5, at LIN000532,A00584). It also implicates Lincare's compliance policies. Such an infraction would warrant termination. (Dkt.135,203,A01021). Had Lincare known

prior to terminating Plaintiff for her Compliance Program violations that she lied on her application, it might have immediately terminated her. (Dkt.135,196,A01014).

Plaintiff understood she could be discharged if her application contained any misrepresentation. (Dkt.135,88-89,A00906–A00907;DX18,A00671).

Based on what she learned in reviewing Plaintiff's licenses, Moreau, in consultation with Lincare's Human Resources and Legal Departments, thought Plaintiffs' representation of her licensure status might be professional misconduct that the WV Board should be notified about. Moreau also thought it was important to inform the WV Board that Plaintiff had earlier been subject to a probationary period in another state. (Dkt.136,56-58,67,A00874–A00876,A00885). Moreau completed the WV Board's "Complaint Form" to notify it of these issues and faxed it on June 17, 2019. (PX7,A00203;Dkt.136,57-58,A01082–A01083;Op.10,A01121).

The WV Board responded to the Complaint Form on June 27, 2019, stating that Plaintiff's license was still active and its website was erroneous. (PX8,A00206;Op.10,A01121). However, that letter was not faxed to Moreau's correct address in Florida, but to a Lincare office in Williamstown, West Virginia.

Moreau was unaware of this letter until this litigation. (DX22,A00680; Dkt.136,58-59,69,A01083–A01084,A01094). Indeed, it may not have been faxed at all.[20]

Through its unemployment claims contractor (PX12,A00215), Lincare opposed Plaintiff's receipt of unemployment compensation. The contractor's submission referred to both her compliance violations and for failing to notify Lincare her license expired. (PX12,A00215).[21] Yet Pedersen made clear "she was terminated for a compliance violation, it did not have anything to do with [her licensure]." (Dkt.135,173-74,A00991–A00992). Plaintiff received unemployment. (Op.11,A01122).

### F. <u>Pedersen's Correction Of One Word Of Her Rule 30(b)(6) Deposition Testimony Does Not Create a Dispute</u>

The Court emphasized the fact that Pedersen originally stated that Plaintiff's conduct "would" violate federal law and later corrected this to it "could" violate

---

[20]The letter contains no electronic fax confirmation. Because it states it was faxed to a Lincare office, Lincare did not dispute that it as a Company received it. (Op.10,A01121). However, Moreau was unequivocal that she never did. Because no evidence disputed Moreau, the Court erred in stating there exists "conflicting evidence." (*Id*).

[21]The Court faulted Lincare for not notifying the Unemployment Board Plaintiff's license had not expired. (Op.11,A01121). Again, relevant Lincare employees lacked knowledge of this until this litigation, never received anything from the Regulator, and therefore could not have done so.

federal law. (Op.19,A01130).[22] This change of a single word does not evidence any contradiction in the reasons why Pedersen terminated Plaintiff.

Pedersen was deposed as Lincare's Rule 30(b)(6) designee on June 26, 2020. (Dkt.68,A00028). Neither the CIA nor whether Plaintiff violated federal law were enumerated topics.

In that deposition, Pedersen repeatedly testified that Plaintiff was terminated for violating Lincare's Compliance Program, and referred to specific pages of the Program in her testimony. (Dkt.84-1,6-9,13,A00037–A00038). This included:

> Q. So with respect to the compliance program have we discussed all the potential or actual violations Ms. Balderson was terminated for?
>
> A. She misrepresented … a diagnosis to justify payment for a patient. And she falsified a record, and for claims that may have been billed and subsequently refunded. She violated other pieces of the false claims act, and she definitely violated the anti-kickback statute by providing a service that should have been provided by the physician's staff.

(Dkt.84-1,13,A00038).

Plaintiff's counsel then questioned Pedersen about Lincare's Code and showed her Section A, which included provisions regarding the AKS and bullet-

---

[22]The parties included these deposition pages in their summary judgment submissions. (Dkt.84-1,A00035–A00050; Dkt.94-7,A00075–A00084), and the Court was permitted to take notice of these pages and of the errata sheet Plaintiff referenced *See Gerristen v. Warner Bros. Entm't, Inc*. 172 F.Supp.3d 1011, 1034 (C.D. Cal. 2015).

point examples. Plaintiff's counsel asked Pedersen to identify potential and actual violations of *this section of the Code*. (Dkt.84-1,13-15,A00038)(referring to DX6, at LIN001152-53,A00587–A00588). Pedersen's answered regarding the Compliance Program, including pages and bullet points about the AKS and FCA and not the statutes themselves, and explained that the Program violations were the basis for Plaintiff's termination. (Dkt.84-1,13-14,A00038 (citing DX6, at LIN001153,A00588).)

Plaintiff's counsel then shifted from asking about these Program violations to asking whether a Compliance Program violation would *also* violate the FCA or AKS:

> Q. Do you know if that means that she indeed, and I say "she," Ms. Balderson, violated the false claims act?
>
> A. I know that she misrepresented a diagnosis to justify payment for services. For claims that were filed, it would be a violation of the false claims act. For those that had not been filed it would be intent to violate it.[23]

(Dkt.84-1,16,A00038.) Pedersen then reiterated "[so] what I said is *I terminated her for violation of the Compliance Program and Policies*." (Dkt.84-1,20,A00039) (emphasis added)(*see also* Dkt.84-1,23,A00040).

---

[23] There is no provision in federal law for "intent to violate" the FCA. Pedersen is not a lawyer.

After reviewing her deposition transcript prior to trial, Pedersen realized that Plaintiff's counsel's questions switched from discussing whether Plaintiff violated Lincare's *policies* to whether she violated *the law*. Pedersen explained her confusion at trial:

> Q. Now there [in her deposition] you referred to these specific enumerated examples [of the AKS and FCA] as quote, "real life examples that could happen in Lincare's business that would," underscore, "be a violation. Examples of both the anti-kickback statutes and the False Claims Act." So now, you're saying that if you violate one of these, it could be a violation of federal law.
>
> A. So, as I read my deposition transcript and looked back at previous questions and how we got into the conversation, I realized that I had gone from talking about examples of things that *could* happen in Lincare to you were asking questions about the actual law. At the time that I terminated Ms. Balderson, I did not know if there was a violation of the law or not. I knew that she violated the Lincare healthcare compliance policies and the program in general. So, I should not have specifically said that she violated a law because I did not know that. I should have said could, which is how I corrected it. [24]

(Dkt.135,163-64,A00981–A00982)(emphasis added).

---

[24]The Code appropriately speaks of what *may* violate the FCA, stating "[t]his may include instances where the person has actual knowledge of the false information, acts deliberately in ignorance of the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information." (PX15, at LIN001153,A00318). As Pedersen testified, Plaintiff's conduct violated Lincare's Policy, irrespective of intent. FCA violations require scienter. 31 U.S.C. §3729.

Pedersen submitted an errata sheet on August 10, 2019, which Plaintiff attached to her Opposition to Lincare's Motion for Summary Judgment. (Dkt.94-7,A00075–A00084). Pedersen corrected one word, that Plaintiff's conduct which violated bullet 5 of the Code "indeed" *would* violate the law to that it *could* do so. Pedersen left intact her testimony that Plaintiff violated Lincare's Compliance Program concerning the FCA and AKS. (*Compare* Dkt.84-1, 6-9, 13-15, 23,A00036–A00037,A00038, *with* Errata Sheet, Dkt.94-7,A00082 (referencing Dkt.84-1,16,A00038).

Separately, because the CIA[25] was not an enumerated subject for the Rule 30(b)(6) deposition, Lincare's counsel objected to Plaintiff's counsel's questions about this. *See* Dkt.68,A00028;Dkt.84-1,28,A00041). Pedersen testified she did not review the CIA or any reportable events before the deposition. (Dkt.84-1,28,A00041).

Lincare did not conclude that Plaintiff's Compliance Program violations violated law and did not report these to the OIG. (Dkt.135,169,A00987).

### G. Plaintiff Never Complains Of Gender Discrimination Before Her Termination

While employed by Lincare, Plaintiff never complained to Brady or anyone that she was treated differently because of gender.

[25] Lincare timely objected at trial to the introduction of the CIA under Fed. R. Evid. 401 and 402, which the Court denied. (Dkt.135,5,A00823).

(Dkt.135,38,128,A00856,A00946). Plaintiff admitted Lincare management made no gender-related comment to her and that she never had problems with anyone at Lincare. (Dkt.135,125-28,A00943–A000946).[26]

Plaintiff admitted that nothing about Pedersen, Kalteux, or Moreau's conduct during the investigation led her to believe she was being treated differently because of her gender. (Dkt.135,128,A00946).

**H. Procedural Background**

Plaintiff filed her complaint in the Circuit Court of Wood County, West Virginia on August 12, 2019. (Dkt.1-1, DX34,A00794). Lincare removed the action based on diversity jurisdiction. Plaintiff originally alleged no claim for gender discrimination. She amended her complaint to add a claim for wrongful termination under the West Virginia Human Rights Act ("HRA"), W. Va. Code §5-11-1 *et seq.*, on January 15, 2020. (Dkt.46, DX35,A00802).

Following discovery, Lincare moved for summary judgment (Dkt.84), which the Court denied. (Dkt.119). On October 27-28, 2020, the matter was tried in a bench trial. (Dkt.135-36,A00819–A001111). Lincare moved for judgment as a matter of law at close of plaintiff's case, which the Court denied. (Dkt.136,32-42,A01057–A01067).

[26] Indeed the first time she ever alleged anything about gender discrimination in any context was when she amended her complaint, 7 months after her discharge and 5 months after she filed her original lawsuit.

Following trial, the parties submitted written closing arguments and proposed findings of fact and conclusions of law. (Dkts.140, 141). On June 7, 2021, the Court issued its Memorandum Opinion And Findings Of Fact And Conclusions Of Law. (Dkt.144,A01112–A01145). The Court found Lincare liable for gender discrimination. The Court awarded Plaintiff $30,000 for emotional distress and $141 for one day's back pay. The Court otherwise denied Plaintiff back and front pay because it agreed the "after acquired evidence" would have supported termination once Lincare learned Plaintiff lied in her application. The Court awarded Plaintiff punitive damages against Lincare in the amount of four times her actual damages.

## V. SUMMARY OF ARGUMENT

Both the Court's finding of liability and its punitive damages award are clearly erroneous as to facts and misapply the law.

The Court clearly erred in finding Plaintiff and Brady engaged in violations which were "nigh indistinguishable." Instead:

- Only Plaintiff used cloned notes; Brady did not;
- Only cloned notes are intended to be used with specific patients' records. Good Chart Notes are not;
- Only Plaintiff directed a physician to add cloned notes to specific patient records to support orders. Brady did not;
- Plaintiff caused 19 orders to have improper cloned notes;

- Brady did not intend any physician to use Good Chart Notes "as is," nor can they be, as they must be modified to eliminate alternative examples (*e.g*, cpap v. bipap);
- Only Plaintiff caused actual patient records to falsely say they needed equipment and suffered from conditions they did not;
- Only Plaintiff received commissions for increased sales;
- Lincare always terminates employees using cloned notes. It punishes other violations—like the use of unauthorized educational materials—differently.

The Court's belief that gender motivated the difference in Brady's and Plaintiff's treatment makes no sense when the decision-maker, her assistants and her co-investigators were all female.

Plaintiff, who bore the burden, produced no evidence to dispute that for 20+ years Pedersen always terminated employees who used cloned notes, including males. Besides this general practice, Pedersen testified she terminated a male for this in the same relevant time period. While it was Plaintiff's burden to disprove this, Plaintiff never challenged this testimony. Nonetheless, the Court just rejected it.

The Court found pretext because Pedersen purportedly changed her justification for Plaintiff's termination. But Pedersen was completely consistent that she terminated Plaintiff for using cloned notes. Pedersen's errata sheet correction and Lincare's choice not to report to OIG did not change this. Moreover, nothing about these instances related to gender.

The Court abused its discretion by awarding punitive damages. There is no authority supporting a punitive damage award for reporting to a regulator what a company believed to be true. Moreover, the post-termination conduct was Moreau's, not Pedersen's, the decision-maker, and related to distinct acts of Plaintiff unrelated to cloned notes.

Nor was there any basis to find malice. Moreau followed standard practice, and nothing shows she thought she was violating any law or acting for a discriminatory purpose. The Court faulted Lincare for not telling WorkForce West Virginia Plaintiff's license had not expired, even though Lincare did not know this before readying for trial in 2020. Finding punitive damages here is unprecedented and indefensible.

## VI. ARGUMENT

### A. Standard of Review

The Court's factual determinations are viewed for clear error, while its application of legal standards is reviewed de novo. *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004). The Court's evidentiary rulings are reviewed for abuse of discretion. The Court's award of punitive damages is reviewed for abuse of discretion. A court abuses its discretion where it "has acted arbitrarily or irrationally[,]… has failed to considered judicially recognized factors constraining

its exercise of discretion, or when it relies on erroneous factual or legal premises." *U.S. v. Welsh*, 879 F.3d 530, 536 (4th Cir. 2018)(citation omitted).

### B. **<u>The Court's Finding That Lincare Is Liable For Gender Discrimination Was Clearly Erroneous</u>**

The Court's finding of discrimination was clearly erroneous because a) Plaintiff showed no similarly-situated male who was treated differently than her; b) what the Court found to be pretext was proper conduct which, in any case, had nothing to do with gender discrimination; and c) the Court erroneously rejected unrebutted testimony that the decision-maker terminated males for also using cloned notes, including during the same period she terminated Plaintiff.

In *Jiminez v. Mary Washington College*, 57 F.3d 369 (4th Cir. 1995), this Court noted that factual determinations may be clearly erroneous where a district court does any of the following:

> (1) district court labored under an improper view or misconception of appropriate legal standard; (2) district court's factual determinations are not supported by substantial evidence; (3) district court disregarded substantial evidence that would militate a conclusion contrary to that reached; and (4) district court's conclusion is contrary to clear weight of evidence considered in light of entire record.

57 F.3d at 379. The Court made each of these errors below.

#### 1. **<u>Plaintiff Failed To Show A Similarly-Situated Male Was Treated Differently</u>**

Plaintiff based her gender discrimination on alleged disparate disciplinary treatment. Unable to show any direct evidence of discrimination, she relied on the Title VII framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973):[27]

> a. A complainant must prove a prima facie case for discrimination.
>
> b. Once a complainant proves a prima face case of unlawful discrimination, the complainant's prima facie case can be rebutted if the respondent presents a nondiscriminatory reason for the act in question sufficient to overcome the inference of discriminatory intent.
>
> c. The complainant may still prevail if it can be shown that the reason given by the respondent is merely a pretext for a discriminatory motive.

*Charleston Town Ctr. Co. v. W. Va. Human Rights Comm'n*, 688 S.E.2d 915, 920-21 & Syls. 1, 2 (W. Va. 2009).

Plaintiff bore the burden of showing, by a preponderance of evidence, that:

> 1) the complainant is a member of a group protected by the [WVHRA]
>
> 2) the complainant was discharged or forced to resign from employment; and

[27]Courts construe the WVHRA consistent with Title VII. *Heston v. Marion Cnty. Parks & Recreation Comm'n*, 381 S.E.2d 253 (W. Va. 1989).

> 3) a non-member of the protected group was not disciplined or was disciplined less severely, than the complainant, though both engaged in similar conduct.

*Barefoot v. Sundale Nursing Home,* 457 S.E.2d 152, 162-63 (W. Va. 1995).

Plaintiff failed to prove the third element.

### 2. Plaintiff Failed To Identify A Similarly-Situated Comparator

In this Circuit, "plaintiffs are required to show that they are similar in all relevant respects to their comparator." *Haywood v. Locke*, 387 F. Appx. 355 (4th Cir. 2010)(finding that plaintiff failed to show valid comparator). There, this Circuit explained what a plaintiff must show:

> Such a showing would include evidence that the employees "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Id*. (citation omitted). In *Moore v. City of Charlotte*, 754 F.2d 1100 (4th Cir. 1985), this Court held that "the most important variables in the discriminatory context and the most likely sources of different but non-discriminatory treatment, are the nature of the offense committed and the nature of the punishment imposed."

#### a. Plaintiff's And Brady's Violations Differed Both In Kind And Magnitude

There is no comparator where violations are different. *See Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008)(holding "the similarity between

comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful"); *Lauture v. St. Agnes Hosp*., 2009 WL 5166253, at *5 (D. Md. Dec. 29, 2009)(same)(citation omitted), *aff'd*, 429 F. Appx. 300 (4th Cir. 2011). Under similar circumstances, courts have held that a plaintiff failed to carry the burden of establishing a comparator. *See Cole v. Family Dollar Stores of Md., Inc*., 811 F. Appx. 168, 173 (4th Cir. 2020)(no comparator where plaintiff "has identified only employees with unexcused absences . . . rather than with no call/no show absences like [plaintiff]."); *Cooper v. Martek Biosciences Kingtree Corp*., 2013 WL 787670, at *8 (D.S.C. Jan. 25, 2013)(no comparator where "conduct did not involve the falsification of test results."), *aff'd sub nom. Cooper v. DSM Nutritional Prods. LLC*, 540 F. Appx. 206 (4th Cir. 2013); *Proctor v. Fairfax Cnty. Fire & Rescue Dep't*, 2014 WL 6473712, at *2 (E.D. Va. Nov. 14, 2014)(no comparators where "back to work" agreement violations differed).

The Court found Plaintiff's and Brady's relevant conduct to be "nearly indistinguishable." (Op.14,A01115)(*see also* Op.15,A01116)(finding conduct "nigh indistinguishable"); Op.21,A01122(stating they presented "strikingly similar occurrences"). Despite recognizing that Brady was Plaintiff's supervisor, the Court found he was "similarly situated" to her "in the context of these actions." Each finding is clearly erroneous.

The conduct was different. Brady used one page of unauthorized educational materials to educate physicians on appropriate language for orders. The Court acknowledged that Brady "never intended physicians to use his example language as a "word-for-word copy/past template." (Op.14,A01115).

Lincare permits sending physicians examples of good language to use and has approved marketing materials for this purpose. Brady violated policy by using unapproved materials.

Brady testified he did not use cloned notes, and Plaintiff admits she never saw him do so.[28] Plaintiff, however, *admitted* she used cloned notes. Unlike Good Chart Notes, these are intended to be "plugged and played" into a patient record to support an order. Plaintiff caused this to happen 19 times. (DXs9-11,A00609–A00650). Plaintiff kept cloned templates handy in her car trunk. (Dkt.135,65,A00883).

A visual comparison of DX13,A00656(the Good Chart Notes) and DXs9-12,A00609–A00655(Plaintiff's cloned notes and templates) disproves they are "nigh indistinguishable."

Plaintiff also committed other violations. Unlike Brady, as DX12 shows, she filled in information on patient charts, directed physicians to add language to

---

[28] Plaintiff's statement that Brady sent the same language she used could not have meant cloned notes. (Op.14,A01115).

patient records and caused inaccurate information to appear in patient records, including regarding medical conditions and need for treatment.

The Court noted that Brady never told a physician's office *not to use* the Good Chart Notes. (Op.14,A01125). This failure to so advise does not make Brady similar to Plaintiff, who violated Policy by affirmatively telling physicians' offices to use language. (*See* DX12,A00651–A00655). The Court miscites Brady's testimony in finding there was an "understanding between [Brady] and the physicians…to 'use this language.'" (Op.14,A01115)(citing Dkt.135,26-27). Rather, Brady testified the understanding was to use that language "*or something like it*, *if true for that patient*." Brady emphasized he never intended physicians to use the language "as is." (Dkt.135,31-32,A00849–A00850)(emphasis added).[29] The Court also cited Plaintiff's statement that Brady sent language similar to hers when she was out of the office, referencing DX6. (Op.14,A01115)(citing Dkt.135,72-73,A00890–A00891). Brady denied he sent anything like this. (Dkt.135,42,A00860).

Brady denied knowing that Plaintiff used cloned notes and explained why these differed from Good Chart Notes. He agreed that using cloned notes was wrong. (Dkt.135,33-35,A00851–A00853)(referencing DXs10-11,A00628–

[29]The Court erred in dismissing the difference between educational materials that may be adapted and notes intended to be included with patient records as merely "semantic[]." (Op.14,A01115); *see supra* at 23–25.

A00650). Brady was unaware of DX12 and explained that he did nothing similar to it. (Dkt.135,35-36,A00853–A00854).

The Court found that both Plaintiff and Brady were told that they had violated Lincare's Compliance Program by leading physicians. But this general conclusion ignores the evidence that although Good Chart Notes and cloned notes may each lead a physician, they do so in different ways and degrees. (Dkt.135,33–34,A00851–A00852). Being tardy to a job and absent from that job are both not being at work at a particular time, but courts reject that they are substantially similar conduct. *Fulton v. Martek Biosciences Kingstree, Corp.*, Civil Action No. 4:11-cv-03239-RBH, 2013 WL 787671, at *4 (D.C.S.C. Mar. 4, 2013). Moreover, Pedersen testified that cloned notes pose additional concerns besides leading. (Dkt.135,153–154,A00971–A00972).

**b. <u>Because Brady Held A Different Position He Is Not A Proper Comparator</u>**

Brady was Plaintiff's supervisor. The Court noted he was only one step removed from Plaintiff (Op.14,A01125), but ignored that step was legally significant. A supervisor and subordinates are, by definition, not alike.[30] *Popo v. Giant Foods, LLC*, 675 F.Supp.2d 583 (D. Md. 2009). Brady's job differed significantly from Plaintiff's. As Center Manager, he supervised not only Plaintiff,

[30]That they may be "co-workers" in that they work alongside one another, (Op.4,A01115), obviously does not change this fact.

but "Customer Service Representatives, Healthcare Specialists; Sales Representatives and Service Representatives." (DX4,A00572–A00573). Brady had hiring authority, and, along with the Area Manager, hired Plaintiff. (DX4,A A00572–A00573). The Court noted Brady had a duty, like Plaintiff, to educate referral sources about billing and insurance procedures. (Op.,14-15,A01125–A01126)(citing Dkt.135, 26,A00844). Yet, unlike Good Chart Notes, cloned notes were not designed to educate referral sources. Brady's position included no sales responsibility. Plaintiff, by contrast, was the "Sales Representative," with responsibility for sales to doctors. Brady had no duty to review sales orders, while Plaintiff did. (Dkt.135,36-37,A00854–A00855).

As the only commissioned employee at Parkersburg, Plaintiff had a financial incentive to increase sales. (Dkt.135,93,A00911). Most of her income came from commissions. Brady had no such incentive.

The Court overstated Brady's testimony in finding that his and Plaintiff's duties "would overlap." (Op.14,A01125). Brady instead stated there was "*some* overlap" and elaborated "it wasn't often" that he would substitute in for Plaintiff's duties, "just a couple of times maybe of a month, or few months, maybe one or two times every couple." (Dkt.135,37,A00855).[31]

---

[31]The Court noted that Brady and Plaintiff were subject to the same Compliance policies. (Op.15,A01126). Every Lincare employee is. (Dkt.135,17,A00835).

These differences prove that Plaintiff failed to carry her burden of establishing that Brady was a proper comparator. *See Lightner*, 545 F.3d at 265 (two officers with different titles and roles were not comparable); *Anderson v. Westinghouse Savannah River Co*., 406 F.3d 282 (4th Cir. 2005)(different positions meant alleged comparators were dissimilar); *Sherman v. Westinghouse Savannah River Co.*, LLP, 2004 WL 5578724 (D.S.C. July 30, 2004)(employees with different job responsibilities were not comparators), *aff'd*, 263 F. Appx. 357 (4th Cir. 2008).

**3. The Court Ignored That Plaintiff's Gender Discrimination Claim Is Weakened Because The Decision-Maker Was Also Female**

The Court committed legal error by ignoring that the decision-maker accused of discrimination, Pedersen, her fellow investigators and her direct reports, are all, like Plaintiff, female. It is difficult for a plaintiff to establish discrimination when she and the allegedly discriminatory decision-makers share the same protected class. *Elrod v. Sears, Roebuck & Co*., 939 F.2d 1466, 1471 (11th Cir. 1991); *Beach v. DXC Tech*., 2020 WL 3065308 (S.D.W. Va. June 9, 2020)(citing *McNeal v. Montgomery Cnty.*, 307 F. Appx. 766 (4th Cir. 2009)).

The claim that Pedersen would discriminate on sex was particularly unfounded where Plaintiff admitted that neither Pedersen nor her colleagues said

anything while investigating or terminating her that indicated discrimination and where Plaintiff's replacement is female.

Because Plaintiff failed to prove that she was treated differently than a similarly-situated male, her discrimination claim failed, requiring judgment for Lincare.

#### 4. **Lincare Had Legitimate Nondiscriminatory Reasons For Terminating Plaintiff**

The Court properly recognized that Plaintiff's compliance violations were a nondiscriminatory reason for Lincare's termination decision. *See Beach*, 2020 WL 3065308, at *2; *Jefferies v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025, 1036 (5th Cir. 1980)(belief that employee violated company policy is not discrimination under Title VII); *Ingram v. Giant Foods, Inc*., 187 F.Supp.2d 512, 516 n.9 (D. Md. 2002)( legitimate justification where plaintiff violated company policy); *Buko v. Am. Med. Labs., Inc*., 830 F. Supp. 899, 903-904 (E.D. Va. 1993)(falsifying physician documents justified termination). As the Court acknowledged, an employer seeking to rebut a *prima facie* showing of discrimination is not required to persuade the court that "the proffered reason was the actual motivation for . . . [the] decision, but must merely articulate a justification that is legally sufficient to justify a judgment in his favor." (Op.15,A01126)(citing *Mereish v. Walker*, 359 F.3d 330, 335 (4th Cir. 2006)). As the Court recognized, "[e]mployers retain the right to restructure jobs and exercise business judgment, including even bad

judgment. Employees can be let go for any reason or for no reason, provided that the reason is not a prohibited one." (Op.16,A01127)(quoting *Skaggs v. Elk Run Coal Co*., 479 S.E.2d 561, 589 (W. Va. 1996)).

#### 5. The Court Committed Clear Error In Finding Pretext

Lincare's nondiscriminatory reason shifted the burden to Plaintiff to prove pretext. She failed.

To demonstrate pretext a plaintiff must show "by a preponderance of the evidence that the legitimate nondiscriminatory reasons offered by a defendant were not its true reasons, but were a pretext for discrimination." *Holland v. Wash. Homes, Inc*., 487 F.3d 208, 214 (4th Cir. 2007)(cited Op.16,A01127). A pretext for discrimination "means an ostensible reason or motive assigned as a color or cover for the real reason or motive, or false appearance, or pretense." *Mayflower Vehicle Systems, Inc. v. Cheeks*, 629 S.E.2d 762, 773 (W. Va. 2006)(cited Op.16,A01127).

A plaintiff can prove pretext by showing that the alleged nondiscriminatory explanation is "unworthy of credence or by offering other evidence sufficiently probative of [sex] discrimination." *Mereish,* 359 F.3d at 336 (cleaned up). However, a plaintiff may not "simply show that the articulated reason is false; [s]he must also show that the employer discriminated against her on the basis of [sex]." *Laber v. Harvey*, 438 F.3d 404, 430-31 (4th Cir. 2006)(emphasis added);

*Eddy v. Biddle*, 2013 WL 66929, at *10 (N.D.W. Va. Jan. 4, 2013)(belief can be erroneous so long as non-discriminatory).

An employer's reasonable determination that an employee violated its policies precludes finding pretext. In *Mingo County Equal Employment Opportunity Council v. State Human Rights Comm'n*, the Supreme Court of Appeals of West Virginia overturned the WVHRC's decision finding that an employer engaged in age discrimination against a Head Start teacher where the teacher failed to show that the stated reasons for suspension—that she violated Head Start policy by spanking a child and leaving children unattended—were pretexts for age discrimination. 376 S.E.2d 134 (W. Va. 1988). *See Braveboy v. New Millennium Bldg. Sys., Inc.*, 2009 WL 2997514, *4 (D.S.C. Aug. 3, 2009)(plaintiff's policy violation precluded pretext finding).

There is no evidence that gender motivated Lincare's decision to discipline Plaintiff and Brady differently. Again, Pedersen explained why using unapproved educational materials differs from causing cloned notes to be used with individual patient orders. Pedersen testified that the use of cloned notes always results in termination. That Lincare responded to learning of the cloned notes by flying three senior employees to Parkersburg to investigate shows how serious Lincare thought this was. Plaintiff admitted she was terminated for compliance violations. The investigation proved that Plaintiff was responsible. Plaintiff admitted that she

possessed cloned notes matching those on DX9,A00609–A00627, which the Audit identified. Plaintiff admitted that DX12 contained her handwriting. Plaintiff admitted that compliance violations are terminable without further notice.

The Court's finding of pretext was clearly erroneous. The Court found that Lincare had "shifted its justification" for terminating Plaintiff because in the meeting in which she was terminated Pedersen told her it was for leading, and did not mention misrepresenting a diagnosis or falsifying documents, which were mentioned later. Yet the Court disregards that Pedersen was always consistent that the reason for termination was Plaintiffs use of cloned notes, which Plaintiff acknowledged. (*See* Dkt.135,58-59,A00876–A00877)(acknowledging that the leading information was with language used "with your progress notes" and "with other language that you provided to doctors.").[32] Pedersen testified that besides leading, Plaintiff also violated other Compliance Rules. (Dkt.135,153-54,158,A00971–A00972,A00976).

While the Court cited Lincare's Answers to Interrogatories as evidencing a shift, it shows the opposite. (Op.16,A01127)(citing PX26,5-6,A00530–A00531). In

[32]The Court found that it was "much later in this action" that Lincare mentioned misrepresenting a diagnosis as a reason she was terminated. This miscites what Brady and Plaintiff said. The Court relies on Plaintiff's response to the question: "Did anyone at Lincare at any time prior to your termination suggest—or at the day of your termination suggest that you were being terminated for misrepresenting a diagnosis." (Dkt.136,58,A01083).

answering Interrogatory No. 9, which asked Lincare to "[s]tate the reasons that Lincare terminated Balderson's employment," Lincare stated that "Lincare terminated Plaintiff's employment including without limitation by inappropriately utilizing leading templates for plaintiff set-ups." In answering Interrogatory No. 10, which asked for "the factual basis" for each time Lincare reprimanded of disciplined Plaintiff during the course of her employment, Lincare stated that "Lincare terminated Plaintiff's employment because she violated Lincare's corporate compliance program, including without limitation by inappropriately utilizing 'templates' for patient set-ups." This is wholly consistent with Pedersen's testimony.

The Court also states erroneously that Plaintiff's "misrepresentation *came to be based*" on DX12. (Op.16,A01127)(emphasis added). Rather, Lincare always relied on DX12 as support for Plaintiff's termination. As Pedersen[33] explained, DX12 evidences that Plaintiff misrepresented a diagnoses because the patient did not suffer from the conditions or need the device stated in the cloned note.[34]

---

[33]The Court noted that the assertion of misrepresentation "seems to originate with Ms. Pedersen, a lay witness and she based this conclusion on a contradiction in the patient file." (Op.17,A01128)(citing Dkt. 135,164,A00982). To call Pedersen a "lay witness" unduly diminishes her 20-plus years running Lincare's Compliance Program, but the point is also irrelevant. What matters is whether Pedersen's stated reasons for termination were instead a pretext *for gender discrimination*. No evidence supports this.

[34]It also indisputably showed leading. Plaintiff told the physician "I need face to face notes within the last 6 months that mention her COPD dx and chronic

(Dkt.135, 111-16;164-65,181-85,A00929–A00934,A00982–A00983,A00999–A01003). In finding that "Occam's Razor" leads to the conclusion that Plaintiff was just assisting a physician, the Court ignores this testimony. In fact, Occam's Razor supports the opposite, as the logical explanation here is that Plaintiff improperly used cloned notes to increase her commissions.

Even if Pedersen misunderstood the facts, nothing suggests her belief was insincere or that gender was the real reason for terminating Plaintiff, negating a finding of pretext.

The Court also erred in finding pretext because Lincare did not report Plaintiff's violation to the OIG. (Op.17,A01128). As Pedersen explained, she concluded unequivocally that Plaintiff violated the Compliance Program, including ***policies*** *relating to the FCA*, but did not determine she violated the FCA itself. (Dkt.135,169,A00987). The Court points to Pedersen's testimony as a Rule 30(b)(6) witness, but ignores that the noticed topics for that deposition did not include the CIA, OIG, or whether violations of law occurred. *Supra*, __. Moreover, the deposition testimony the Court quotes confirms Pedersen's point—she was speaking about "Bates Stamp Number 1153" (Op.18,A01129), which is a *Code* page listing Lincare's rules regarding the FCA.

---

respirator failure dx" and "I need the attached statement added or the progress note signed dated and times with patients name and dob added also." (DX12,A00651).

The Court stated that Pedersen's experience as Chief Compliance Officer made it was "implausible" that she would not know if a legal violation occurred. (Op.20,A01131). This ignores: *first*, Pedersen is not a lawyer; *second*, conduct may violate Lincare's Compliance Program but not the FCA itself, which requires, *inter alia*, scienter.[35] Even if the Court were correct that the CIA required a report (and it was not), that does not establish that a decision not to report Plaintiff's conduct evidences gender discrimination.

Pedersen gave Brady a lesser penalty than Plaintiff because their compliance violations were materially different. Because Brady's final written warning also referred to "leading," the Court erroneously concluded that he was disciplined for the "exact same reason" that Plaintiff was terminated. (Op.20-21,A01131–A01132).[36] Yet, as Pedersen explained, the nature of such leading and magnitude of violations differed between Brady and Plaintiff. As Pedersen testified, cloned

[35]The Court found that Lincare Representatives' testimony indicates they believed Plaintiff engaged in conduct which "would violate the [FCA]." (Op.18,A01129). Pedersen instead testified that "Lincare doesn't know that [Plaintiff] violated FCA. Lincare knows that [Plaintiff] violated compliance policies and procedures set forth by Lincare." Pedersen also explained why she corrected any suggestion in her deposition testimony that Plaintiff violated the law itself. (Dkt.135,168-69,A00986–A00987).

[36]In fact, the Court suggests Brady committed greater violations because he also provided free equipment. (Op.21, A01132). This disregards that Plaintiff, too, was found to have violated the Compliance Program by providing a benefit to physicians in exchange for referrals. (Dkt.135,165-66,A00983–A00984).

notes do lead, but also cause other violations and are more serious than Good Chart Notes. (Dkt.135,153-54,A00971–A00972).

The Court further found evidence of pretext because Moreau agreed that physicians utilized Brady's Good Chart Notes in a substantially similar way to the cloned notes in actual patient charts. (Op.21,A01132).[37] Critically, Moreau explained that the Good Chart Notes "weren't like copied verbatim or written down verbatim, word for word, sentence for sentence." (Dkt.136,75,A01100). Importantly, Brady did not expect physicians to use these in actual patient charts. Brady stressed these were not to be "plug[ged] and play[ed] " into patient records, as are cloned notes. DXs9-11 evidence that *the same* language ended up in actual patient charts, exactly as Plaintiff intended. (*See* DX12, A00651 ("I need the attached statement added…")).[38]

Finally, the Court cast doubt on whether the male Pedersen testified she terminated near the time of Plaintiff's termination for using cloned notes actually

---

[37]The Court misapprehends cited testimony in finding that Brady's written warning contradicts Pedersen's testimony that the internal Audit did not reveal problems with these. The Audit *did not* turn up the Good Chart Notes, but *did* reveal Plaintiff's cloned notes. Pedersen and her co-investigators first learned of the Good Chart Notes on-site; Brady was disciplined thereafter.

[38]Similarly, the Court found that the fact that Plaintiff and Brady received different punishments to belie Pedersen's claim that she had a "zero tolerance" policy for compliance violations. (Op.22,A01132). Zero tolerance means all violators are punished, not that they get the same punishment. The significance of a final warning should not be minimized.

existed. (Op.22,n.7,A01133). Irrespective, Plaintiff introduced no evidence to rebut Pedersen's statement that cloned notes always result in termination.

### 6. The Court Erroneously Substituted Its Business Judgment For Lincare's

The Court correctly acknowledged it could not substitute its business judgment for Lincare's where there is no discrimination, even if it believed a decision was unfair or harsh. *See EEOC v. Verbatim Corp*., 1994 WL 749613 (M.D.N.C. Nov. 1, 1994)("Absent some showing of discrimination, 'the choice of discipline is a matter best left to the employer's business judgment.'")(citation omitted).

Here, Lincare (though Pedersen) had discretion to determine the appropriate penalty for Plaintiff's compliance violation. Pedersen followed her established practice of terminating any employee who uses cloned notes. The Court substituted its judgment when it expressed its belief that this appeared cold-hearted and mean-spirited and that Lincare should not have terminated Plaintiff, saying this was "unnecessary." This conclusion clearly evidence the Court's substitution of its judgment for the business judgment of Lincare's Chief Compliance Officer.

Likewise, Moreau testified that she followed her standard practice in investigating Plaintiff's licensure following her termination and in reporting what she believed may be a violation. The Court improperly second-guessed and punished this standard practice.

Both of these decisions were within Lincare's standard practice, did not reflect gender discrimination or violate the WVHRA, and were therefore judgements the Court was required to respect.

### 7. <u>**The Court's Judgment Should Be Reversed**</u>

In similar circumstances, this Court has reversed judgments finding discrimination. In *Moore,* 754 F.2d 1100, this Circuit reversed a trial court's judgment in a race discrimination case, holding that trial court was clearly erroneous in finding that plaintiff police officer made a *prima facie* case. The plaintiff had asked subordinate police officers for "help" in undermining a case against a drunk driver, and the subordinates encouraged witnesses not to appear and urged the district attorney to drop the case. Plaintiff was thereafter demoted.

The District Court found race discrimination. In reversing, the Court held:

> In this case the district court erred in its evaluation of disciplinary violations within the department of police. It equated greater and lesser offenses in a manner that would discourage a department from acting on the reasonable belief of corruption in its midst.

*Id. See also Lewis v. Central Piedmont College*, 689 F.2d 1207 (4th Cir. 1982)(reversing; trial court erred in finding plaintiff was better qualified than others who got position); *Jiminez*, 57 F.3d at 384.

Other Circuits have similarly reversed judgments for plaintiffs for alleged discrimination in discipline. *See Silvera v.* Orange *County Sch. Bd.*, 244 F.3d 1253

(11th Cir. 2001)(reversing jury verdict in favor of black maintenance employee fired for lewd assault on minor when white employee with similar violation had not been, because School Board had a non-discriminatory reason for the different treatment).

### C. **The Court's Punitive Damage Award Was Legally Improper And Clearly Erroneous**

Because Plaintiff failed to prove that Lincare discriminated against her, all damages should be reversed. *Cf. Barnes Group Inc. v. C & C Press, Inc.*, 716 F.2d 1023 (11th Cir. 1983)(reversal on liability required vacatur of punitive damages). Irrespective, the award of punitive damages was improper.

Under West Virginia law, a party may only recover punitive damages if they "establish[] by *clear and convincing evidence* that the damages were the result of the conduct that was carried out by the defendant with *actual malice*." W. Va. Code § 55-7-29(a)(emphases added). In gender discrimination cases, West Virginia law only permits punitive damages against an employer where the employee shows "*criminal indifference* to the rights of women in the workplace recognized by the [HRA]." *Constellium Rolled Prods. Ravenswood LLC v. Griffith*, 775 S.E.2d 90, 100 (W. Va. 2015)(emphasis added).

To determine whether an employer displays the state of mind, *Constellium* looked to *Kolstad v. American Dental Assoc.*, 527 U.S. 526 (1999). There, the U.S. Supreme Court held that such intents must "pertain to the employer's knowledge

that it may be acting in violation of federal law" or engaged in "egregious or outrageous acts" which supported an inference of the requisite evil motive. *Id.* at 538. The Supreme Court explained "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law" before it faces punitive damages. *Id.* at 536. Because this rests on a defendant's state of mind, "a positive element of conscious wrongdoing is always required." *Id.* (citation omitted).

Moreover, the WVHRA is interpreted consistent with Title VII, which provides that to recover punitive damages, a plaintiff must show the employer: (1) "engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact)" and (2) "engaged in the discriminatory practice 'with *reckless indifference* to the federally protected rights of an aggrieved individual.'" *Ward v. AutoZoners, LLC*, 958 F.3d 254, 263 (4th Cir. 2020)(quoting 42 U.S.C. §1981a(b)(1))(emphasis added). In other words, the criminal indifference must pertain to the acts claimed to legally discriminate.

Here, the acts that the Court found supported punitive damages had not occurred as of when Plaintiff was terminated, the adverse employment action found to violate the WVHRA. Rather, the Court awarded punitive damages based on conduct of non-decision-makers at Lincare, occurring post-termination, in alerting a Regulator, based on a belief that Plaintiff engaged in misconduct

unrelated to her use of cloned notes. This cannot support punitive damages as a matter of law. *See IGEN Intern., Inc. v. Roche Diagnostics GMbH*, 335 F.3d 303 (4th Cir. 2003)("A defendant's dissimilar acts, independent from acts upon which liability was premised, may not serve as the basis for punitive damages")(citation omitted). There appears to be no case awarding punitive damages on similar facts.

The Court accuses Lincare of pursuing a "vindictive and retributive investigation." (Op.30,A01141). As noted, the Court's findings are irrelevant to the issue of punitive damages, since these actions occurred, *inter alia*, after the termination.

Putting that aside, Lincare showed no criminal indifference in investigating Plaintiff's license. Moreau testified her standard practice is to investigate the licensure status of terminated employees who hold out such credentials. She testified that she did not investigate Plaintiff's licensure earlier because she was apparently not a clinical employee. When Moreau later learned that Plaintiff wore a badge stating she was a Registered Respiratory Therapist, Moreau followed the standard practice. Lincare likewise followed standard practice in reporting to the WV Board or WorkForce West Virginia what the WV Board stated on its primary source verification[39]--that Plaintiff's license had expired. Lincare also reported the

[39]The Court acknowledged that Lincare relied on incorrect information on the Regulator's own website in advising it about Plaintiff's license. (Op.31,A01142).

truthful information that Plaintiff had several years before entered into a consent agreement regarding her Ohio license.[40] A report to a regulator about a regulated person on the subject of a regulated license does not show criminal indifference.[41]

Likewise, because no relevant Lincare employee ever saw the WV Board's corrective letter until preparing for trial in August 2020,[42] Lincare did not and could not have shown any criminal indifference in failing to act upon that letter. The Court's imposition of punitive damages based on that amounts to essentially strict liability, which fails the relevant standard for malice and indifference, which, as the Court acknowledged requires a state of mind that demonstrates intent to injure plaintiff without just cause or excuse. (Op.30,A01141). No case supports this. Importantly, there is no evidence that Lincare's complaint to the Board impacted Plaintiff at all.

Lincare also followed standard practice in contesting the request by an employee terminated for a compliance violation for unemployment. While Lincare

---

[40]The Court rejected Moreau's explanation for why she advised the WV Board of this—it reflected "potential[] …professional misconduct," finding this to be a hollow excuse to cover [Lincare's] malice." (Op.31-32,A01142–A01143). Yet to lie to a Licensure Board is professional misconduct and Plaintiff was disciplined for this. It was reasonable for Lincare to inform the WV Board of this and let it judge its importance. This was not malice.

[41]There is always a risk that a regulator faults an entity for not advising it of information that might be of interest to it.

[42]The Court mistakenly believed Moreau testified she learned of this in August 2019. (Op.32,A01143)(citing Dkt.136,69,A01094). The Trial was October 2020.

noted the licensure issue in doing that (which reflected its belief) its first reason for challenging unemployment was that "[t]his individual was discharged for violation of a company policy." (PX12,A00215) That independently supported Lincare's challenge to her unemployment, precluding a finding of malice.

This Court has reversed insupportable punitive damage awards. *See Bryant v. Aiken Regional Med. Ctr. S. Inc.*, 333 F.3d 536 (4th Cir. 2003); *Wordwide Network Serv. LLC v. DynCorp.*, 365 F. Appx 432 (4th Cir. 2010), and should do so here.

## VII. CONCLUSION

For the foregoing reasons, the District Court's judgment finding Lincare liable for sex discrimination and awarding punitive damages should be reversed.

Dated: September 30, 2021

Respectfully submitted,

By:/s/ David B. Goroff

David B. Goroff
Andrew Gresik
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 3000
Chicago, Illinois 60654
Tel: (312) 832-4500
Fax: (312) 832-4700
dgoroff@foley.com
agresik@foley.com

Lawrence Kraus
FOLEY & LARDNER LLP
111 Huntington Avenue

Boston, Massachusetts 02199
Tel: (617) 342-4000
Fax: (617) 342-4001
lkraus@foley.com

*Counsel for Defendant-Appellant Lincare Inc.*

## STATEMENT REQUESTING ORAL ARGUMENT

Lincare believes that oral argument in this case will assist this Court in addressing the issues presented and will give the parties the opportunity to address any questions the Court may have regarding the numerous trial exhibits and extensive trial record and the way the District Court applied existing Fourth Circuit precedent to the evidence. Accordingly, Lincare believes the Count's consideration will be assisted by oral argument.

**CERTIFICATE OF COMPLIANCE WITH RULE 32(A)**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,979 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010, 14 point Times New Roman font.

Dated: September 30, 2021

*/s/ David B. Goroff*
*David B. Goroff*

*Counsel for Defendant-Appellant Lincare Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2021, the foregoing Brief of Defendant-Appellant was filed electronically with the Court, and counsel of record will receive a copy of the foregoing Brief through electronic notification of such filing.

Dated: September 30, 2021

*/s/ David B. Goroff*
*David B. Goroff*

*Counsel for Defendant-Appellant Lincare Inc.*