# RECORD NOS. 21-1753(L), 21-1765 (XAP)

In The

# United States Court Of Appeals
## For The Fourth Circuit

## CHANDRA BALDERSON,

*Plaintiff – Appellee/Cross-Appellant,*

v.

## LINCARE INC.,

*Defendant – Appellant/Cross-Appellee,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WEST VIRGINIA
AT CHARLESTON

———————————

## BRIEF OF APPELLEE/CROSS-APPELLANT

———————————

**J. Zak Ritchie**
**Ryan McCune Donovan**
**Andrew C. Robey**
**HISSAM FORMAN DONOVAN RITCHIE PLLC**
**P.O. Box 3983**
**Charleston, WV 25339**
**(681) 265-3802** *office*
**(304) 982-8056** *fax*

*Counsel for Appellee/Cross-Appellant*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _21-1753_     Caption: _Balderson v. Lincare, Inc._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Chandra Balderson_
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Andrew C. Robey                        Date:        7/16/2021

Counsel for: Chandra Balderson

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ....................................................................iv

INTRODUCTION ...........................................................................1

JURISDICTIONAL STATEMENT .........................................................2

STATEMENT OF THE ISSUES ...........................................................3

STATEMENT OF THE ISSUE ON CROSS APPEAL ...........................4

STATEMENT OF THE CASE .............................................................5

    I.    Lincare terminates Ms. Balderson for "leading" physicians ..........................................................................6

    II.    Physicians' offices created the templates and dictated their use ......................................................................7

    III.    A male comparator, Chad Brady, is merely reprimanded for substantially identical conduct ............................................9

    IV.    Lincare falsely reports Ms. Balderson to a state professional licensing authority and contests her unemployment claim on the basis of that false report .............10

    V.    The District Court holds a bench trial and finds in favor of Ms. Balderson ..........................................................12

SUMMARY OF ARGUMENT ...........................................................13

ARGUMENT .................................................................................18

    I.    The District Court did not clearly err in finding Lincare liable for employment discrimination .......................................18

A.    The scope of appellate review is narrow...................... 18

B.    The District Court did not clearly err in finding
      evidence showing that the disparate treatment of
      Ms. Balderson was the result of discriminatory
      animus.................................................................... 19

      1.    The District Court did not clearly err in
            finding that Balderson and Brady were
            similarly situated in all relevant respects.......... 21

      2.    The District Court did not clearly err by
            rejecting Lincare's same-group inference........... 27

      3.    The District Court did not clearly err by
            refusing to credit Lincare's reference to a
            "mystery male character" ................................... 29

      4.    The District Court did not clearly err in
            finding that Lincare's stated reason for
            termination was pretextual ............................... 31

II.   The District Court did not abuse its discretion in
      awarding punitive damages.................................................... 41

      A.    Lincare persists in applying the wrong legal
            standard ............................................................ 41

      B.    The District Court did not clearly err in finding
            evidence of actual malice ............................................ 43

      C.    The District Court properly considered Lincare's
            post-termination conduct ............................................ 49

III.  The District Court erred in applying the after-acquired
      evidence doctrine.................................................................... 54

      A.    The District Court's error is reversible ...................... 54

B.    The District Court erroneously applied the after-acquired evidence doctrine............................................55

      1.    The District Court erred as a matter of law by accepting only evidence that Lincare "could have" terminated Balderson on the basis of the supposed omission—rather than evidence that it "would have" .............................59

      2.    Lincare's after-acquired evidence defense must fail for want of "severe" or "serious wrongdoing" .......................................................62

      3.    Disclosure of the probationary period was not required by Lincare's application.................66

CONCLUSION ........................................................70

STATEMENT ON ORAL ARGUMENT ...............................................71

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Anderson v. City of Bessemer City, N.C.,*
  470 U.S. 564 (1985) ........................................................... 1, 18, 41

*Anderson v. Westinghouse Savannah River Co.,*
  406 F.3d 248 (4th Cir. 2005) ........................................ 25

*Babby v. City of Wilmington Dep't of Police,*
  614 F. Supp. 2d 508 (D. Del. 2009) ............................... 30

*Balderson v. Lincare Inc.,*
  No. 2:19-CV-00666,
  2020 WL 6051266 (S.D. W. Va. Oct. 13, 2020) ..................... *passim*

*Barefoot v. Sundale Nursing Home,*
  457 S.E.2d 152 (W. Va. 1995) ..................................... 19, 20, 40, 52

*Barlow v. Hester Indus., Inc.,*
  479 S.E.2d 628 (W. Va. 1996)..................................... 16, 55

*Campbell v. Boston Scientific Corp.,*
  882 F.3d 70 (4th Cir. 2018) ........................................ 42

*Colli v. Wirth,*
  1996 WL 442835 (S.D.N.Y. Aug. 6, 1996).................... 30

*Constellium Rolled Prod. Ravenswood, LLC v. Griffith,*
  235 W. Va. 538 (2015) ................................................ 42

*Dotson v. Pfizer, Inc.,*
  558 F.3d 284 (4th Cir. 2009) ...................................... 61

*E.E.O.C. v. PVNF, L.L.C.,*
  487 F.3d 790 (10th Cir. 2007) .................................... 21

iv

*Equinor USA Onshore Properties, Inc. v. Pine Resources, LLC,*
    917 F.3d 807 (4th Cir. 2019) ................................................. *passim*

*Eriline Co. S.A. v. Johnson,*
    440 F.3d 648 (4th Cir. 2006) ....................................................... 54

*Haywood v. Locke,*
    387 Fed. App. 355 (4th Cir. 2010) ................................................ 21

*Helton v. AT & T Inc.,*
    709 F.3d 343 (4th Cir. 2013) .................................................... 1, 46

*IGEN Intern., Inc. v. Roche Diagnostics GMbH,*
    335 F.3d 303 (4th Cir. 2003) ....................................................... 50

*Jordan v. Jenkins,*
    859 S.E.2d 700 (W. Va. 2021) ..................................................... 42

*Lathem v. Dep't of Children & Youth Servs.,*
    172 F.3d 786 (11th Cir. 1999) ..................................................... 26

*Lee v. Kansas City S. Ry. Co.,*
    574 F.3d 253 (5th Cir. 2009) ....................................................... 26

*McKennon v. Nashville Banner Pub. Co.,*
    513 U.S. 352 (1995) ........................................................... *passim*

*Molloy v. Blanchard,*
    115 F.3d 86 (1st Cir. 1997) ......................................................... 21

*Oncale v. Sundowner Offshore Servs., Inc.,*
    523 U.S. 75 (1998) .................................................................... 27

*Pennell v. Vacation Rsrv. Ctr., LLC,*
    2011 WL 6960814 (E.D. Va. Sept. 20, 2011) ................................. 56

*Popo v. Giant Foods, LLC,*
    675 F. Supp. 2d 583 (D. Md. 2009) .............................................. 25

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989) ........................................................................ 28

*Reeves v. Sanderson Plumbing Prod., Inc.*,
    530 U.S. 133 (2000) ........................................................ 20, 40, 41

*Rodgers v. White*,
    657 F.3d 511 (7th Cir. 2011) ...................................................... 26

*Russell v. Microdyne Corp.*,
    65 F.3d 1229 (4th Cir. 1995) ...................................... 55, 56, 59, 63

*Scrimgeour v. Internal Revenue*,
    149 F.3d 318 (4th Cir. 1998) ...................................................... 41

*Sneed v. Swarthmore Coll.*,
    2017 WL 3279231 (E.D. Pa. Aug. 2, 2017)................................. 26

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) ...................................................................... 50

*United States v. Kobito*,
    994 F.3d 696 (4th Cir. 2021) ...................................................... 65

*United States v. Shea*,
    989 F.3d 271 (4th Cir. 2021) .................................................. 18, 46

*United States v. U.S. Gypsum Co.*,
    333 U.S. 364 (1948) ...................................................................... 19

*Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*,
    618 F.3d 417 (4th Cir. 2010) ...................................................... 54

*West v. Tyson Foods, Inc.*,
    374 Fed. App. 624 (6th Cir. 2010)............................................. 51

*Westmoreland v. TWC Admin. LLC*,
    924 F.3d 718 (4th Cir. 2019) ...................................................... 40

**Statutes:**

28 U.S.C. § 1291 ....................................................................... 2

28 U.S.C. § 1332 ....................................................................... 2

42 U.S.C. § 1981a(b)(1)....................................................... 51, 52

W. Va. Code § 5–11–1, *et seq.*........................................... 12, 19

W. Va. Code § 55–7–29............................................... *passim*

**Rule:**

Fed. R. Civ. P. 30(b)(6) ............................................................ 36

**Other:**

https://www.merriam-webster.com/dictionary/severe
    (last visited October 29, 2021) ...................................... 65

W.V. Pattern Jury Instr. Civil § 1500 (West) .................................. 43, 53

## INTRODUCTION

This is an appeal from the District Court's findings of fact and conclusions of law following a multi-day bench trial on a single, state-law claim for employment discrimination. The District Court's decision, which found Chandra Balderson's former employer Lincare liable and awarded damages, is largely sound and should be affirmed in nearly every respect, save a narrow cross-appeal necessary to correct a misapplication of law that reduced Ms. Balderson's lost wages.

But Lincare now seeks to retry its case before the Court of Appeals based on the pages of a cold record. Contrary to Lincare's urging, however, so long as the District Court's "account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985). And where—as here—the District Court's findings "turn on assessments of witness credibility or the weighing of conflicting evidence during a bench trial," such findings are entitled to "even greater deference." *Helton v. AT&T Inc.*, 709 F.3d 343, 350 (4th Cir. 2013).

Paying only lip service to this highly deferential standard of review, Lincare's appeal rests on a broadside attack on the District Court's factual findings. Lincare's brief speaks past the critical credibility determinations made, and close attention paid, by the District Court in real-time during trial—exemplified by the incisive questioning of witnesses by Chief Judge Johnston himself and the detailed opinion that followed. Ultimately, what is clear from the record is that *the District Court simply did not believe Lincare*. Neither should this Court—particularly on clear error review.

Accordingly, Lincare's pursuit of a sweeping do-over must be rejected. Except as to the discrete legal issue presented on cross-appeal, the District Court's judgment should be affirmed.

## JURISDICTIONAL STATEMENT

This is an appeal from final judgment after a bench trial conducted by Chief Judge Thomas Johnston of the U.S. District Court for the Southern District of West Virginia. The District Court had diversity jurisdiction, 28 U.S.C. § 1332, and entered a final judgment on June 7, 2021. JA 1112. Appellant Lincare noticed an appeal on July 2, 2021. Appellee/Cross-Appellant Balderson noticed a cross appeal on July 12, 2021. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    This Court may not reverse bench trial findings where the District Court's "account of the evidence is plausible in light of the record viewed in its entirety"—even if this Court is "convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Equinor USA Onshore Props., Inc. v. Pine Res., LLC*, 917 F.3d 807, 813 (4th Cir. 2019) (cleaned up). Rather, reversal is only justified when this Court is "left with the definite and firm conviction that a mistake has been committed." *Id.* (cleaned up). Here, the District Court found that Ms. Balderson was unlawfully punished more severely than a male comparator where (1) their conduct was nearly identical; (2) they were similarly situated in all relevant respects; and (3) Lincare's stated reason for Ms. Balderson's termination was pretextual and contrary to the evidence. Is this Court left with the "definite and firm conviction" that the District Court's account of the evidence showing Lincare's liability for employment discrimination is implausible and clearly erroneous?

2.    Under West Virginia law, punitive damages may be awarded when there is clear and convincing evidence of "actual malice," W. Va.

Code § 55–7–29. An award of punitive damages is reviewed for abuse of

discretion, with underlying factual findings reviewed for clear error.

Lincare engaged in what the District Court described as a "vindictive"

post-termination campaign that included falsely reporting that

Balderson's professional license had expired and continuing to contest

Balderson's unemployment claim on that basis long after Lincare

learned that it was false (and which it never retracted). Is this Court

left with the "definite and firm conviction" that the District Court's

account of the evidence supporting a punitive damages award is

implausible and clearly erroneous?

## STATEMENT OF THE ISSUE ON CROSS APPEAL

The after-acquired evidence doctrine can limit relief to a

wrongfully terminated plaintiff. For an employer to invoke this defense,

it must prove that "the wrongdoing was of *such severity* that the

employee in fact *would have* been terminated on those grounds alone if

the employer had known of it at the time of the discharge." *McKennon v.

Nashville Banner Pub. Co.*, 513 U.S. 352, 362–63 (1995) (emphasis

added). Lincare presented no evidence that it "would have" terminated

Ms. Balderson had it discovered that she had failed to note on her

employment application that her Ohio respiratory therapy license was subject to a one-year probationary period—only that Lincare "could have" done so. Regardless, a respiratory license was not a job requirement for Balderson's position, or a consideration during hiring. Nor was the disclosure even required by the application in the first place, much less did its nondisclosure constitute "sever[e]" misconduct. The District Court concluded that Lincare satisfied the elements of the after-acquired evidence doctrine as defined by *McKennon*. Did the District Court misapply the elements of the after-acquired evidence doctrine to limit Ms. Balderson's lost wages?

## STATEMENT OF THE CASE

Lincare is a supplier of non-invasive mechanical ventilators. JA 802. In November 2015, Lincare hired Ms. Balderson as a sales representative at its Parkersburg, West Virginia-location. JA 568. In that capacity, Balderson was responsible for making weekly sales calls to Lincare's referral sources, establishing and maintaining relationships with those referral sources, educating physicians about the use of Lincare's products, preparing sales plans, and understanding insurance and billing procedures. *Id.*

## I.     Lincare terminates Ms. Balderson for "leading" physicians.

In 2019, Lincare performed a voluntary audit of its Parkersburg office. JA 963–64. Among other things, Lincare reviewed the office's patient "progress notes"—the part of a medical record in which healthcare professionals document a patient's clinical status or achievements during the course of care. JA 1116. Lincare discovered that similar handwritten progress notes appeared in multiple patient orders; specifically, the body of each note contained nearly identical statements of medical necessity. JA 609–31. The results of the audit were reported to Sandra Moreau, Lincare's Healthcare Services Manager, and Jennifer Pedersen, Chief Compliance Officer, who began an investigation. JA 964.

On June 3, 2019, Moreau and Pederson, along with Lincare's Senior Corporation Counsel, Sheila Kalteux, traveled to the Parkersburg location to investigate the findings of the audit. JA 964. The trio interviewed Balderson; Chad Brady, the manager of the Parkersburg location and Balderson's supervisor; and several other Parkersburg employees. JA 179. During Lincare's investigation, Balderson provided Pederson with "template" progress notes that

6

matched the handwritten notes Lincare uncovered during the audit. *Id*.

The template notes did not contain any patient information or physician

signatures, but only a generic statement of medical necessity. JA 609–

31, 1117.

At the end of her one-day investigation, Pedersen

unceremoniously terminated Balderson for supposed violations of

Lincare's corporate compliance program. JA 965–966, 1119. Morrow,

Kalteaux, and Brady were also present for the termination meeting.  JA

970, 1119. At the meeting, Pedersen explained to Balderson that she

was being fired for "leading" physicians. JA 840, 845, 876, 1119. At no

point did Pedersen ever suggest that Balderson had misrepresented a

patient diagnosis or engaged in any other misconduct. JA 840, 876,

1119.

## II.  Physicians' offices created the templates and dictated their use.

The progress notes that Ms. Balderson provided contained

"handwritten template language for ventilator orders" from two

different doctor's offices. JA 609–31. Though Lincare originally accused

Balderson of generating these templates herself, they were in fact

created by the respective physicians' offices under the supervision of the

7

physicians themselves. JA 880–83, 1119; *see also* Dist. Ct. Dkt. No. 139-2 at 7–8.[1] While the physicians created and maintained copies of these templates at their respective offices, they also asked Balderson to keep copies with her in case the physician needed to place an order while out of the office, such as when treating a patient in a hospital. JA 880–83, 1118–19; *see also* Dist. Ct. Dkt. No. 139-2 at 7–8. When making an order, the physician would fill out the missing patient information and review the language to ensure that the note would be appropriate for that patient's diagnosis and needs. JA 1119; *see also* Dist. Ct. Dkt. No. 139-1 at 10–12.

Ms. Balderson did not manipulate the progress notes in any way. Indeed, the authors of both templates in question testified that (1) the handwriting in the progress notes was theirs, not Balderson's, *see* JA 1119, Dist. Ct. Dkt. 139-1 at 8 & 139-2 at 7–8; (2) the templates were used simply for the physicians' convenience, *see* JA 1119, Dist. Ct. Dkt. 139-1 at 16 & 139-2 at 8; (3) the templates were never required by Balderson, *see* JA 1119, Dist. Ct. Dkt. 139-1 at 16 & 139-2 at 12; (4)

---

[1] The parties stipulated to submitting the deposition transcripts of Stacey Northrop-Spear and Robin Pursley into trial. *See* Dist. Ct. Dkt. No. 126; Dist. Ct. Dkt. No. 139-1 (Northrop-Spear) & 139-2 (Pursley).

they knew of no instances where Balderson sought to influence a medical opinion or diagnosis, *id.*; and (5) they knew of no instances where Balderson falsified or altered any progress notes. *Id.* Lincare presented *no evidence* to even suggest that the templates were used for improper purposes or that any orders were fraudulently submitted.

## III. A male comparator, Chad Brady, is merely reprimanded for substantially identical conduct.

Lincare's investigation further revealed that Brady, another Parkersburg employee, had also been "leading" or "coaching" physicians in the same way. JA 666, 977–78, 1119. Specifically, Lincare's investigation revealed that Brady had sent physicians an unapproved document titled "Good Chart Notes Examples," which provided exemplar language to be included in patient notes for ventilator orders, and which, according to Lincare, "could be considered coaching or leading information." JA 656, 666, 1119–20. Indeed, Lincare's investigation revealed that, like Balderson's referral sources, physicians were adding *Brady's* proposed language to patient files in substantially similar form. JA 1100, 1120. In addition, Brady was found to have provided "free equipment." JA 666, 1119.

Unlike Balderson, however, Brady *kept* his job and was merely issued a written warning. JA 845, 1120.

## IV. Lincare falsely reports Ms. Balderson to a state professional licensing authority and contests her unemployment claim on the basis of that false report.

Even after her firing, Lincare engaged in a drawn-out, post-termination campaign against Ms. Balderson. Although Lincare had never once attempted to confirm Balderson's status as a licensed respiratory therapist during her employment, JA 1090, a senior Lincare employee spent weeks scouring various licensure registries only to uncover a page on the West Virginia Board of Respiratory Care's website that seemed to indicate Balderson's licensure had lapsed. JA 206, 1085. Without so much as a phone call to Balderson or the Board to confirm, Lincare immediately lodged a formal complaint, accusing Balderson of misrepresenting her status. JA 203, 1085–86, 1121.

Within days, the Respiratory Board sent a letter to Lincare advising that the complaint was unfounded because the information on the Board's website was inaccurate. JA 206. Although there was some debate at trial as to who reviewed the Board's letter, Lincare does not dispute that it received it. JA 1121, 1083–84.

Despite the mailed and faxed letters from the Respiratory Board, Lincare went on to oppose Balderson's application for unemployment benefits on the basis of the licensure information it now *knew* to be false. JA 210, 212, 215, 895–96, 1122.[2] In a letter to the state's unemployment office, Workforce WV, Lincare wrote that Ms. Balderson had been terminated because she had failed to notify Lincare that her respiratory license had lapsed. JA 215. Indeed, Lincare's statement to the state was doubly false—not only was the license up-to-date, but its supposed expiration *had never been* Lincare's stated basis for Balderson's firing. JA 215, 1122.

Notably, Lincare's letter to Workforce was dated July 2, 2019— several days *after* the Respiratory Board had put Lincare on notice that Balderson's license had *not* lapsed. *Compare* JA 206 *with* JA 215. And, in an email dated July 10, 2019, Lincare *again* suggested that Balderson's license was not up to date. JA 212, 1122. Despite being notified about the erroneous information, Lincare *persisted* in contesting Balderson's receipt of benefits based on it. JA 1143.

---

[2] Inexplicably, Lincare also "failed to pay Plaintiff her final wages due and owing to her at the time of her discharge." *Balderson v. Lincare Inc.*, 2020 WL 6051266, at *3 (S.D.W. Va. Oct. 13, 2020).

11

Remarkably, at no point did Lincare *ever* correct the record with the state. *Id.*

## V. The District Court holds a bench trial and finds in favor of Ms. Balderson.

Because Ms. Balderson executed a jury waiver in the course of her employment with Lincare, this case was tried to the District Court on October 27 and 28, 2020. Chief Judge Thomas Johnston presided. JA 1112. At issue was a single, state law claim for employment discrimination on the basis of sex under the West Virginia Human Rights Act, W. Va. Code § 5–11–1, *et seq. Id.* Following trial, the parties submitted written closing arguments and proposed findings and conclusions. JA 1113.

In its 34-page *Memorandum Opinion and Findings of Fact and Conclusions of Law*, entered June 7, 2021, the District Court found by a preponderance of the evidence that the disparate treatment of Balderson and Brady was a result of discriminatory animus by Lincare in violation of the West Virginia Human Rights Act. JA 1134. In calculating lost wages, the District Court accepted Lincare's after-acquired evidence defense, limiting Balderson's lost wages to just a single day of back-pay in the amount of $141.00. For emotional pain and

suffering, the District Court awarded $30,000. JA 1140. And having found clear and convincing evidence that Lincare's "vindictive and retributive" investigation, licensure complaint, unemployment contest and related conduct were intended to deliberately harm Balderson, the District Court awarded punitive damages. JA 1140–45.

This appeal followed.

## SUMMARY OF ARGUMENT

The District Court's bench opinion is fundamentally sound and should be affirmed in nearly every respect.

For its part, Lincare's sweeping challenge to the District Court's factual findings simply restates the version of events that Lincare presented at trial—which wholly failed to persuade Chief Judge Johnston. As it did below, Lincare does not actually grapple with contrary evidence or adverse credibility determinations. Rather, Lincare's approach to this appeal is to simply claim "clear error" whenever it disagrees with the District Court's resolution of a disputed fact. That is not how clear error works.

Mistaking the standard of review, Lincare would have the court of appeals substitute its own views of the evidence—that is, *Lincare's*

version of events, inferences, credibility determinations and all—for those made by the District Court. Yet Chief Judge Johnston actively engaged with the evidence throughout the trial and—but-for a discrete legal error that resulted in a mistaken reduction of Ms. Balderson's lost wages—authored a detailed and well-reasoned decision that is not only plausibly supported by the record but is demonstrably correct on its own terms.

With respect to the issues raised by Lincare and the cross-appeal:

**I.** The District Court did not clearly err in finding sufficient evidence to hold Lincare liable for employment discrimination under the West Virginia Human Rights Act. Under the applicable burden-shifting framework, the District Court concluded that Ms. Balderson established a prima facie case of disparate treatment because, among other things, she and Mr. Brady were similarly situated in all relevant respects, yet Balderson was fired for the same conduct for which Brady received only a reprimand. The District Court also did not clearly err in finding that the legitimate reason articulated by Lincare for its adverse employment action was insincere in light of Lincare's "shifting" explanations and "inconsistent practices." As a result, the District Court

did not err by inferring the ultimate fact of discrimination based on the weight of the evidence and Lincare's lack of credibility.

**II.** The District Court did not abuse its discretion by ordering Lincare to pay punitive damages where its findings of actual malice evidence were not clearly erroneous. West Virginia law authorizes an award of punitive damages where there is clear and convincing evidence of "actual malice." Here, the District Court did not err in finding sufficient evidence of actual malice by Lincare based primarily on its "vindictive and retributive" post-termination investigation into Balderson, which culminated in Lincare (1) filing a complaint against her with a state licensing board based on false information and (2) contesting Balderson's unemployment benefits based on a lie about the reason she was terminated, and information about Balderson's licensure status that Lincare by-then knew was false—which Lincare never retracted. Based on this evidence, and in light of Lincare's shifting excuses for its conduct and lack of credibility, the District Court properly inferred that Lincare's campaign against Ms. Balderson was improperly motivated by a desire to punish.

15

**III.** The District Court committed legal error by misapplying the elements of the after-acquired evidence doctrine, which caused the court to drastically reduce the award of lost wages to Ms. Balderson to a single day of back pay. Under the after-acquired evidence doctrine, the burden is on the employer to prove that "the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 361–63 (1995); *see Barlow v. Hester Indus., Inc.*, 479 S.E.2d 628, 643 (W. Va. 1996) (adopting *McKennon*). In a reasoned memorandum decision, the District Court properly rejected application of the doctrine on summary judgment, *Balderson v. Lincare Inc.*, No. 2:19-CV-00666, 2020 WL 6051266, at *8–9 (S.D. W. Va. Oct. 13, 2020). But even through Lincare's evidence at trial did not meaningfully change the record, the District Court reversed course by accepting evidence that Lincare "could have" terminated Balderson on the basis of the after-acquired evidence—a supposed omission from her employment application— rather than evidence that it "would have," as *McKennon* requires. Nor does the record plausibly show that Lincare presented evidence

16

sufficient to sustain the District Court's conclusion had it applied the legal standard correctly.

What is more, the District Court erroneously applied the "severity" legal requirement, accepting Lincare's explanation only that the supposed omission affected Balderson's general credibility, even though the evidence showed it was at worst a trivial infraction. Finally, the District Court was right the first time when it concluded that Ms. Balderson's supposed application omission was no omission at all because the application prompt did not require disclosure of the information in the first place. Since the evidentiary record did not change at trial, the District Court's application of the after-acquired evidence doctrine barring all-but-one-day of Balderson's back pay rested on legal error and should be corrected.

*    *    *

Accordingly, this Court should reverse the District Court's judgment regarding its misapplication of the after-acquired evidence doctrine and affirm the judgment in all other respects.

## ARGUMENT

**I.    The District Court did not clearly err in finding Lincare liable for employment discrimination.**

### A.    The scope of appellate review is narrow.

This Court "review[s] a judgment following a bench trial under a mixed standard of review—factual findings may be reversed only if clearly erroneous, while conclusions of law . . . are examined de novo." *Equinor USA Onshore Props., Inc. v. Pine Res., LLC*, 917 F.3d 807, 813 (4th Cir. 2019) (cleaned up).

"The scope" of review is "narrow" because this Court does not "exercise de novo review of factual findings or substitute our version of the facts for that found by the district court." *Id*. (cleaned up). "Rather, '[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *Id*. (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985)) (cleaned up). When a factual finding is based on witness credibility, this Court affords "even greater deference." *United States v. Shea*, 989 F.3d 271, 278 (4th Cir. 2021). Nonetheless, this Court may "reverse a district court's factual

finding if, 'on the entire evidence,'" this Court is "'left with the definite and firm conviction that a mistake has been committed.'" *Equinor*, 917 F.3d at 813 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

> **B.    The District Court did not clearly err in finding evidence showing that the disparate treatment of Ms. Balderson was the result of discriminatory animus.**

Lincare challenges the factual findings made by the District Court supporting its decision to hold Lincare liable on Ms. Balderson's claim of employment discrimination under the West Virginia Human Rights Act, W. Va. Code § 5–11–1, *et seq.* that was tried below. Under the burden-shifting framework that applies under state law for analyzing pretext claims, the plaintiff must first create an inference of discrimination by establishing a prima facie case. *See Barefoot v. Sundale Nursing Home*, 457 S.E.2d 152, 160–61 (W. Va. 1995). In a disparate treatment, discriminatory discharge case like this, a plaintiff meets the prima facie standard by showing that (1) that the complainant is a member of a group protected by the Act; (2) that the complainant was discharged, or forced to resign, from employment; and (3) that a nonmember of the protected group was not disciplined, or was

disciplined less severely, than the complainant, though both engaged in similar conduct. *See id*. at 160, 162–63. If the plaintiff makes out these elements, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment decision. *See id*. at 160.

If the proffered reason is nondiscriminatory, then the plaintiff must show by a preponderance that the articulated reason is merely pretextual, which it may show through "direct or circumstantial evidence of falsity or discrimination." *Id*. at 160; *id*. at 164 ("[T]he plaintiff *need not* show more than that the defendant's articulated reasons were implausible and, thus, pretextual.") (emphasis added); *accord Reeves v. Sanderson Plumbing Prod., Inc*., 530 U.S. 133, 146–47 (2000).

Ms. Balderson, who is female, advanced a theory of sex discrimination based on disparate treatment vis-à-vis her male co-worker, Chad Brady. The District Court found that the elements of the prima facie case were satisfied. But Lincare only challenges the District Court's findings on the third element —whether Balderson was punished more severely than a nonmember of the protected class, Brady.

      **1.    The District Court did not clearly err in finding that Balderson and Brady were similarly situated in all relevant respects.**

Lincare argues that the District Court clearly erred in concluding that Brady and Balderson were appropriate comparators. A comparator need not be identical, but similar in all "relevant respects." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010); *see also Molloy v. Blanchard*, 115 F.3d 86, 91 (1st Cir. 1997) ("The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated."); *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 801 (10th Cir. 2007) ("Individuals are considered 'similarly-situated' when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of 'comparable seriousness."). Applying this fact-intensive standard to the evidence, the District Court found that Brady and Balderson were appropriate comparators. JA 1125. Lincare fails to show that this finding was clearly erroneous.

*First*, the District Court found that Brady's and Balderson's relevant conduct was "nearly indistinguishable." JA 1125. Both parties

had provided exemplar language to physicians: Balderson's "templates" and Brady's "Good Chart Notes Examples." *Compare* JA 174 *with* JA 197. In doing so, Brady and Balderson shared a common goal: to provide physicians with language that, *if true*, could be used by physicians to ensure third-party payment for ventilator orders. JA 844–46, 880.

The District Court correctly found that Lincare's attempt to distinguish between Balderson's "templates" and Brady's "examples" was a semantic distinction with no meaningful difference. JA 1125. Indeed, *before* the lawsuit, *Lincare* used exactly the same term— "leading"—to describe the conduct that gave rise to Balderson's termination and Brady's warning. *Compare* JA 530, 840, 845, 876 *with* JA 666, 845. Brady acknowledged that while he never intended physicians to use his example language as a "word-for-word copy/paste" template, he *never* told the physicians not to do so and admitted that the understanding between him and the physicians was to "use this language." JA 844–45. Indeed, as Balderson testified (and Brady did not dispute), the two employees sometimes sent physicians the exact same form titled "Sample documentation for Trilogy Astral," which likewise contained exemplar language for ventilator orders. JA 654, 860, 891.

Based on this evidence, the District Court did not clearly err in finding that Brady and Balderson's conduct was "nigh indistinguishable." JA 1126.

*Second*, the District Court found that Balderson and Brady were, in all relevant respects, similarly situated within Lincare. JA 1125. Lincare claims that Brady and Balderson are incomparable primarily because they have different job titles. But this distinction is superficial and fails to account for the substantial overlap in *duties actually performed*. While Brady was Balderson's most-immediate supervisor, Brady was only one step removed from Balderson in a large national company. JA 571, 894, 1125. Despite the formal title, Brady himself described he and Balderson as "co-workers" with overlapping responsibilities. JA 832, 1125.

The proof bears this out. As a sales representative, Balderson was responsible for making sales calls and visits to referral sources. JA 568. As a center manager, Brady often also attended these office visits and fielded calls from physicians trying to order ventilators. JA 833–84, 1125. Balderson was charged with accepting, reviewing, and processing physician orders. JA 834. Likewise, Brady accepted, reviewed and

processed physician orders. JA 834, 1125. When Balderson was out of the office visiting referral sources, Brady would take physician phone calls, review their orders and supporting documents, and process the orders. *Id*. In addition, Balderson was charged with understanding insurance and billing procedures and educating referral sources as to the same. JA 568. And, as demonstrated by Brady's conduct—continuously sending "Good Chart Notes Examples" to referral sources—he too was charged with understanding insurance and billing procedures and educating referral sources as to the same. JA 834, 1125–26. Indeed, the same person, Pedersen, was responsible for evaluating both Brady's and Balderson's conduct and levying their respective punishments. JA 977, 1126.

Critically, concerning the conduct at issue, both Brady and Balderson were subject to the same corporate compliance policies. JA 835, 1126. Neither the compliance program nor federal healthcare laws make any distinction between their positions, and violations by Brady or Balderson would result in identical consequences to Lincare. JA 316–26. Lincare's attempt to distinguish Brady and Balderson based solely on differing job titles elevates form over substance and hardly demonstrates a clear error by the District Court.

24

Lincare offers no authority, including from West Virginia, for its categorical argument that "a supervisor and subordinates are, by definition, not alike." Appellant's Br., at 46. Although Lincare cites *Popo v. Giant Foods, LLC*, 675 F. Supp. 2d 583, 589 (D. Md. 2009), that case, even if controlling state law, did not adopt the de facto rule urged by Lincare. It merely found that a "supervisor and his subordinates are, by definition, *not alike in qualifications*"—an important caveat omitted by Lincare's brief. *See id.* (emphasis added). Recognizing that "qualifications" is but one of several factors, the *Popo* court proceeded to consider whether the same decision-maker evaluated the two employees' comparative conduct. *Id.*

Nor do any of the other cases cited by Lincare support the categorical rule it advocates. For example, Lincare cites *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272–73 (4th Cir. 2005), for the proposition that "different positions meant alleged comparators were dissimilar." Appellant's Br., at 48. But the case stands only for the unremarkable proposition that title and position are *relevant* when evaluating an employer's decision to promote one employee but not the other—not that they are *dispositive*.

In fact, many courts have reached the opposite conclusion urged by Lincare, rejecting the notion that a supervisor and her subordinate are *never* comparable. *See, e.g.*, *Rodgers v. White*, 657 F.3d 511, 518 (7th Cir. 2011) (concluding that "when a plaintiff and his supervisor were accused of making similar mistakes, were equally responsible for avoiding those mistakes, and were disciplined by the same superior, the plaintiff can make a realistic comparison with his supervisor for purposes of establishing a prima facie case of discrimination"); *Sneed v. Swarthmore Coll.*, 2017 WL 3279231, at *2 (E.D. Pa. Aug. 2, 2017); *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999); *see also Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260–61 (5th Cir. 2009).

Despite the fact that Balderson and Brady were similarly situated with respect to both their role in the company and their relevant conduct, they inexplicably received different punishments: Brady was reprimanded, whereas Balderson was terminated. For this reason, the District Court properly found that Balderson had established a prima facie case of discrimination based on disparate treatment.

### 2. The District Court did not clearly err by rejecting Lincare's same-group inference.

Lincare argues that a female, Pedersen, could *never* discriminate against another female, Balderson. But this ignores workplace realities. The same biases that can cause men to discriminate against women often lead female supervisors to do the same. That is why Lincare's "same-group" presumption has been rejected by the Supreme Court. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.").

Though *Oncale* does not categorically prohibit consideration of same-group evidence, it makes clear that such evidence does not, on its own, render unreasonable an inference of discriminatory intent.  Lincare argued the "same group" inference on summary judgment (Dist. Ct. Dkt. 85 at 19), at trial (JA 1063), and again in its post-trial briefing (Dist. Ct. Dkt. 141 at 55). That the District Court refused to accept Lincare's "same-group" defense does not mean that the issue was ignored, as Lincare suggests. Even if Pedersen benefited from an inference of nondiscrimination, the sum of the evidence, as discussed in the District Court's decision, plainly rebutted that inference.

Lincare also claims that Balderson's discrimination claim is undermined because her replacement was a female. Appellant's Br., at 58. But this argument is beside the point, as the open position was created and filled by two different people: Pedersen terminated Balderson's employment, whereas Chad Brady hired Balderson's replacement. *Compare* JA 132 *with* Dist. Ct. Dkt. 94-12 at 136–37. That Brady hired a female replacement does not absolve Pedersen or others of discriminatory conduct; the District Court did not clearly err in refusing to credit Lincare's protests to the contrary.

Lincare also argues that Balderson's discrimination claim is undermined because "neither Pedersen nor her colleagues said anything while investigating or terminating her that indicated discrimination." Appellant's Br., at 57–58. That Lincare's representatives never made overtly discriminatory comments, however, is of no consequence.[3] The burden-shifting framework exists because direct evidence of discrimination is rarely available. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 271 (1989) (O'Connor, J., concurring) ("[T]he entire purpose of the *McDonnell Douglas*

---

[3] Although Lincare asserts that Balderson never complained about discrimination during her employment, Lincare fails to explain how this should have precluded a finding of disparate treatment by the District Court in light of the entirety of the evidence.

28

prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by."). Brady and Balderson received disparate punishments for nearly identical conduct. That Lincare's representatives never made overtly discriminatory comments does not change this fact, and the District Court did not clearly err in refusing to credit this argument.

Regardless, neither of Lincare's arguments is dispositive of the ultimate question of discrimination. Rather, they are factors to be weighed against the sum of the evidence. This Court should refuse Lincare's invitation to re-weigh the evidence de novo.

> **3.    The District Court did not clearly err by refusing to credit Lincare's reference to a "mystery male character."**

In two sentences, Lincare suggests that the District Court should have accepted as true Pedersen's testimony that an unidentified male employee was terminated for similar conduct. Appellant's Br., at 56–57. Lincare suggests that the District Court was required to credit this testimony for the simple reason that there was no evidence to rebut it.[4]

---

[4] The paucity of evidence presented by Lincare about the "mystery male character" made it practically impossible to rebut.

But the District Court refused to credit Pedersen's gratuitous comment regarding a "mystery male character," because Pedersen's passing reference provided "absolutely no detail" upon which a reasonable trier of fact could use to compare to Balderson's circumstances. JA 1133. Pedersen provided no name, age, location, or any other details regarding the supposed mystery male comparator. *Id.* And without more, Pedersen's unadorned assertion left the District Court to "sincerely question whether this mystery male ex-employee actually exists." *Id.*

Indeed, this mystery male comparator came as a surprise to both the District Court and Plaintiff because *at no earlier point* in the litigation— including multiple pleadings, witness disclosures, motions for summary judgment, integrated pretrial orders, motions for judgment as a matter of law—had Lincare ever even suggested the existence of an alternative male comparator.[5] Lincare's spurious, last-second reference to a "mystery male

---

[5] With the benefit of Pedersen's testimony, Lincare twice moved for judgment as a matter of law. Yet it *never* mentioned an alternative male comparator. Even accepting Pederson's statement at face value, Lincare waived this theory by failing to raise it in the pretrial order. *Babby v. City of Wilmington Dep't of Police*, 614 F. Supp. 2d 508, 510 (D. Del. 2009) ("Legal theories and issues not raised in the pretrial order are considered waived"); *Colli v. Wirth*, 1996 WL 442835, at *1 (S.D.N.Y. Aug. 6, 1996) (same).

character" further underscores the lack of candor exhibited by Lincare at trial and justifies the District Court's decisions finding that Lincare lacked credibility across the board.

> **4.    The District Court did not clearly err in finding that Lincare's stated reason for termination was pretextual.**

Lincare tries to justify its disparate treatment of Brady and Balderson by accusing Balderson of deliberately misrepresenting a patient diagnosis. However, "due to Lincare's shifting explanation and its own inconsistent practices," the District Court found that "Lincare's explanation is simply not credible" and the stated reason for discharge was "merely pretextual." JA 1126, 1133. This credibility finding is due "even greater deference" by this Court. *Equinor*, 917 F.3d at 815.

However, even if this Court is inclined to scrutinize the District Court's credibility determinations for itself, Lincare's insincerity is reflected throughout the record.

*First*, Lincare's explanation for its termination of Balderson has shifted over the course of this litigation. That Balderson supposedly misrepresented a diagnosis is only Lincare's *most recent* excuse.

On the day she was fired, and for months after, Lincare represented that Balderson had been terminated for "leading" physicians. JA 530, 840, 845, 876. *At no point* had Lincare accused Balderson of misrepresenting a patient diagnosis. This is shown by the testimony of both Brady and Balderson, who each confirmed that Balderson was terminated for "leading" physicians and that *no one* had accused Balderson of misrepresenting a patient diagnosis the day she was terminated. JA 840, 876. When later asked in discovery the reason for Balderson's termination, Lincare again affirmed (under oath) that she was terminated "because she violated Lincare's corporate compliance program, including without limitation by inappropriately utilizing leading 'templates' for patient set-ups." JA 530. Had Lincare *sincerely* believed that Balderson had been submitting fraudulent orders, surely Lincare would have mentioned that. But it did not.

Notably, Lincare's candid response to the written interrogatory was sworn to on December 11, 2019. JA 533. Lincare did not accuse Balderson of misrepresenting patient diagnoses until *after* Balderson moved, on December 19, 2019 to amend her complaint to allege sex discrimination, when it became tactically necessary for Lincare to try to

distinguish Brady and Balderson's conduct. *See* Dist. Ct. Dkt. 34. But this calculated move came at the expense of Lincare's credibility.

Lincare's post hoc, made-for-litigation explanation that Balderson misrepresented patient diagnoses is also inconsistent with the earlier explanations it provided to the state unemployment agency, providing simply that "[t]he claimant was discharged for a compliance violation. She failed to notify Respiratory licensed [sic] lapsed"—which, to reiterate, was knowingly false on its own terms. JA 215. Given that Lincare now asserts that Balderson's alleged misrepresentation was the critical factor in her termination, one might expect it to have raised the issue on at least one of those earlier occasions if it was actually true.

*Second*, not only did Lincare's explanation change over time, but its conduct was entirely inconsistent with its explanation. Lincare had previously entered into a Corporate Integrity Agreement ("CIA") with the U.S. Department of Health and Human Services' Office of Inspector General (the "OIG"). JA 135–72. Pursuant to the CIA, Lincare was legally mandated to report all conduct "that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program." JA 145–46. Lincare is

required to report all such instances, whether an isolated event or a series of occurrences. JA 146.

Notably, Lincare's failure to report known or suspected violations of federal healthcare laws is a *material breach* of the CIA, which carries considerable consequences, including, but not limited to, exclusion from federal healthcare programs. JA 158. If Lincare *sincerely* believed that Balderson violated various healthcare laws by submitting fraudulent orders, those suspected violations should have been reported under the CIA. Thus, the question was posed to Lincare: Did it report Balderson's supposed violations to the OIG, as required under the CIA?

It did not. JA 986–87.

In both its Code of Conduct and related Compliance Training Slides, Lincare identifies specific conduct that would violate the False Claims Act—including, "submitting a claim containing information known at the time to be false," "misrepresenting a diagnosis for the patient to justify the services or equipment furnished," and "manipulating the patient's diagnosis in an attempt to receive improper payment." JA 318. Lincare purportedly terminated Balderson for this exact conduct, *yet it never reported the supposed violations to the OIG.*

34

JA 986–87. Failure to report could mean one of two things: Lincare breached its duty to the OIG by failing to report suspected healthcare fraud, or Lincare *did not genuinely believe* Balderson had misrepresented a patient diagnosis. It certainly was not clearly erroneous for the District Court to find that the evidence showed the latter.

Pedersen attempted to explain away the clear contradiction created by the CIA, but her testimony on this score was wildly inconsistent, which the District Court further weighed against Lincare's credibility. JA 1130–31. Anxious to justify the termination in her deposition, Pedersen originally accused Balderson of *committing federal crimes*—in particular, asserting under oath that Ms. Balderson "violated the other pieces of the false claims act, and she *definitely* violated the anti-kickback statute." JA 77–78, 1130 (emphasis added). This was, of course, *before* Pedersen was confronted with the CIA.

Realizing the clear contradiction created by the CIA, Pedersen then attempted to alter the substance of her testimony by way of a four-page errata sheet to suggest that Ms. Balderson *could* have

violated federal law. JA 81–84, 1130.[6] Then, at trial—with Lincare's

credibility on the line—Pedersen feigned ignorance, suggesting instead

that she did not know whether Balderson violated any federal laws at

all.[7] JA 981–82, 987.

The reason for Pedersen's ever-changing testimony is manifest:

Lincare hopes to erase the contradiction created by its failure to report

under the CIA. But Pedersen's shifting testimony further underscores

the insincerity of Lincare's claims and arguments.[8] What is more,

---

[6] Lincare suggests that Pedersen simply corrected "one word" of her
Rule 30(b)(6) deposition testimony. Appellant's Br., at 31. More
accurately, Pedersen changed this "one word" in at least *six different
places* throughout her testimony, in addition to several other sweeping
substantive changes.

[7] Lincare ties itself in knots defending Pedersen's ever-changing
testimony. On one hand, Lincare argues that Pedersen, the Chief
Compliance Officer, could not have known whether Balderson's actions
were indeed violations of federal law because she is "not a lawyer."
Appellant's Br., at 64. But on the other, Lincare *touts* Pedersen's
expertise reflected by her "20-plus years running Lincare's Compliance
Program." *Id.* at 53 n.33.

[8] Lincare also tries to explain away Pederson's revisions by suggesting
that the relevant topic—whether Pedersen believed Balderson violated
federal healthcare laws—was outside the scope of the Rule 30(b)(6)
notice. Appellant's Br. at 63. *First*, the questions were plainly within
the scope of the deposition notice, as the following topics were noticed:
"the supposed reasons and factual basis for [Balderson's] termination,"
"findings of that investigation specific to Plaintiff," "specific instances of
fraud, misrepresentation, or falsification of documents by Plaintiff,"

Pedersen's attempts to distinguish between violations of federal law and the compliance program are equally unavailing. Lincare claims that Balderson "misrepresent[ed] a diagnosis for the patient to justify the services or equipment furnished." JA 982–83. Lincare's Code of Conduct identifies this specific conduct as an actual violation of the False Claims Act. JA 318.

Lincare seeks to evade this damning contradiction by arguing that the element of intent, which is necessary to state a False Claims Act violation, somehow *prevented* Lincare from categorically stating that Balderson had violated the law. Appellant's Br., at 55. This is a dubious excuse, for at least two reasons.

*First*, Lincare has consistently argued that Balderson *purposefully* misrepresented diagnoses to increase her commissions, JA 60, 65–67, 71, which it persists doing on appeal, Appellant's Br., at 54. At no point has Lincare suggested that Balderson's alleged misrepresentations were

---

"any statutory or regulatory basis for those [compliance] policies," and "how violations are reported and investigated." Dist. Ct. Dkt. No. 68. *And second*, if Lincare actually believed those questions were beyond the proper scope, then its counsel should have objected. But he didn't. JA 77–80. The argument is thus clearly waived.

37

accidental. There is no reason, therefore, that the element of "scienter" should have prevented Lincare from making a report.

*And second*, Lincare mischaracterizes its obligations to the OIG. Lincare's reporting requirement is not limited to *known* or *certain* violations of the law. Rather, the CIA requires that Lincare report any matter that "a reasonable person would consider a *probable* violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized." JA 146 (emphasis added). Lincare's own compliance policy identifies Balderson's alleged conduct—"misrepresenting a diagnosis for the patient to justify the services or equipment furnished"—as conduct that would violate federal healthcare laws. JA 318.

As a result, Lincare cannot credibly contend that Balderson's alleged conduct was not, at least, a "probable" violation reportable under the CIA. But Lincare did not report the conduct because it did not sincerely believe that Balderson misrepresented a diagnosis to justify the services or equipment furnished. That excuse is simply a made-for-litigation response to Balderson's discrimination claim, which the District Court properly discredited.

*Finally*, no evidence suggests that Balderson misrepresented a patient diagnosis in the first place. To justify the termination, Lincare attempts to impute fraudulent intent into an otherwise innocuous fax in which Balderson advised a physician that his order was incomplete and additional information was needed. JA 651.

But the language in the fax does not support Lincare's sinister interpretation. At no point did Balderson ask the physician to alter or otherwise misrepresent the diagnosis. JA 651, 878-79. At no point did Lincare present any evidence that Balderson believed the diagnosis to be inappropriate. And at no point did Lincare present any evidence that the diagnosis was indeed inappropriate. In fact, it is unclear whether Lincare ever rescinded the ventilator order or took any corrective action at all in response to the order it now claims was fraudulent.

Lincare's assertion that Balderson misrepresented the patient's diagnosis rests solely on Pedersen's lay opinion. JA 982. The District Court found that Pedersen—who is neither a physician, respiratory therapist, nor a particularly credible witness—was not competent to opine on the medical necessity of a ventilator order, and Lincare has offered no other evidence in support of its theory. JA 1128. Lincare

would simply have this Court substitute its own judgment for not only that of the District Court, but that of the physician—which, ironically, is precisely what Lincare accused Balderson of doing.

Rather than accepting Lincare's lay medical analysis and conjecture that Balderson, a physician, and the physician's staff were engaged in a grand conspiracy to commit healthcare fraud, the District Court found that the simplest explanation was also the most likely. JA 1128. As Balderson testified, the purpose of the fax was simply to help a trusted physician complete a presumptively valid order. *Id*.

For these reasons, the District Court was more-than-justified in finding that "Lincare's explanation is simply not credible" and "merely pretextual." JA 1126, 1133.[9] Again, rather than actually identify a

---

[9] Lincare also suggests that Ms. Balderson was required to put forth something more, such as direct or overt evidence of discrimination. Appellant's Br., at 51–54. But the District Court was right not to apply a "pretext-plus" standard, which has been rejected by West Virginia's highest court, as well as the U.S. Supreme Court. *See Barefoot*, 457 S.E.2d at 164 ("[T]he plaintiff need not show more than that the defendant's articulated reasons were implausible and, thus, pretextual."); *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 146–47 (2000); *accord Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 727 (4th Cir. 2019). Although "the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not compel judgment for the plaintiff, *it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's*

40

clearly erroneous conclusion of law or fact, Lincare simply disagrees

with how the District Court weighed the evidence. Far more is required

to reverse the District Court's well-reasoned decision.

## II.    The District Court did not abuse its discretion in awarding punitive damages.

Lincare's challenge on punitive damages concerns only the

findings of the District Court that provided the basis for its award, not

the amount. Appellant's Br., at 7, 59–63. As Lincare concedes, this

challenge is also subject to clear error review. *Id*. at 59; *see Scrimgeour*

*v. Internal Revenue*, 149 F.3d 318, 324 (4th Cir. 1998). Once again,

despite Lincare's effort to have this Court scrutinize the evidence with

fresh eyes, the District Court's findings supporting the punitive award

are plainly "plausible in light of the record viewed in its entirety."

*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985).

### A.    Lincare persists in applying the wrong legal standard.

In service of its attempt to have this Court reverse the District

Court's punitive damages findings, Lincare continues to advocate for a

superseded legal standard, despite clear instruction from West

---

*explanation*." *Reeves*, 530 U.S. at 147 (emphasis added). It was not clear
error for the District Court to have done precisely that in this case.

Virginia's highest court months before Lincare filed its brief. *See Jordan v. Jenkins*, 859 S.E.2d 700, 723 (W. Va. 2021). Whether due to carelessness or sleight-of-hand, Lincare's arguments must be rejected.

Lincare argues that Ms. Balderson may only recover punitive damages if she can establish "criminal indifference." Appellant's Br., at 68 (citing *Constellium Rolled Prod. Ravenswood, LLC v. Griffith*, 235 W. Va. 538 (2015)). That is wrong. As the District Court rightly recognized, Lincare's arguments are predicated on an archaic legal standard. JA 1144, at n.10. Indeed, the *Constellium* case *predates* the enactment of the governing statute, W. Va. Code § 55–7–29 (effective June 8, 2015), which now exclusively controls the awarding of punitive damages under state law.[10] *Cf. Campbell v. Boston Scientific Corp.*, 882 F.3d 70, 81 (4th Cir. 2018) (observing that the "standard for punitive damages in West Virginia" changed upon enactment of W. Va. Code § 55–7–29).

West Virginia's highest court has also confirmed Lincare's persistent error. *See Jordan*, 859 S.E.2d at 723 (explaining the

---

[10] The *Constellium* Court's June 10, 2015 opinion reviewed a September 3, *2013* trial court order.

substantive change in the standard for awarding punitive damages caused by the enactment of W. Va. Code § 55–7–29); *accord* W.V. Pattern Jury Instr. Civil § 1500 (West) (by enacting that statute, the legislature established a "**new definition and standard of proof**" for punitive damages) (emphasis in original).

The District Court applied the correct standard, which provides that punitive damages may be awarded when there is clear and convincing evidence of "actual malice." W. Va. Code § 55–7–29; *see also* W.V. Pattern Jury Instr. Civil § 1500 (West) ("Actual malice may be found where the defendant acted with a state of mind shown by conduct that was intended to or was substantially certain to injure the plaintiff, without any just cause or excuse.") (cleaned up).

### B.   The District Court did not clearly err in finding evidence of actual malice.

The District Court's factual findings are not only "plausible in light of the record viewed in its entirety," they are demonstrably correct. It was thus not an understatement when Chief Judge Johnston observed *during trial itself* that there was "abundant evidence" of actual malice. J.A. 1105. For its part, Lincare simply seeks to relitigate the factual underpinnings of the District Court's punitive award. But it fails

43

to point to any findings that are clearly erroneous, offering instead only alternative interpretations of the evidence. The standard of review requires far more. *See Equinor USA Onshore Props., Inc. v. Pine Res., LLC*, 917 F.3d 807, 813 (4th Cir. 2019). Here, the District Court's award was grounded on at least four principal findings of fact.

"First and most egregiously," the District Court found that Lincare's spurious investigation into Balderson's licensure status could "only be described as a vindictive and retributive." JA 1141. For example, Balderson identified herself as a licensed respiratory therapist on her employment application JA 391, identification badge, and business cards, JA 1069–70, 1141. Yet, *not once* during Balderson's nearly four-year tenure did Lincare *ever* attempt to confirm that she was a licensed respiratory therapist. JA 1019-20, 1090. Only after Balderson was terminated did Lincare spend two to four weeks scrutinizing her employment application and scouring various licensing websites, only to discover a decade-old public intoxication charge in another state and a false report that her respiratory therapist's license had expired. JA 1085, 1090, 1141–42. Seizing on this, Lincare fired off a formal complaint to the West Virginia Respiratory Care Board—which

Lincare *never retracted* even after it learned that its allegations were

undisputedly false. JA 203, 1094, 1143.

Though true that the information displayed by the West Virginia

Board's website was incorrect, the District Court found that "Lincare's

'investigation' utterly failed to thoroughly and accurately uncover

factual information relating to its erroneous findings." JA 1142. For

example, despite spending weeks investigating Ms. Balderson's license,

*Lincare never bothered to simply call Balderson*—a process Moreau,

Lincare's Healthcare Services Manager, conceded would have taken no

more than 15 minutes. JA 1085, 1142. Nor did Lincare call Brady, with

whom Balderson was close to both personally and professionally, to see

if he had any relevant information concerning Balderson's license. *Id*.

The District Court found that "one 15-minute phone call to either would

have prevented the continued mean-spiritedness that followed." JA

1142.

In view of the body of evidence and Lincare's dubious credibility,

the District Court found that Lincare's scorched-earth investigation was

not motivated by "standard practice," but rather animus toward

Balderson. These findings of credibility and intent must be left to stand.

45

*See Helton v. AT & T Inc.*, 709 F.3d 343, 350 (4th Cir. 2013) (credibility determinations deserve the highest degree of deference on appeal); *United States v. Shea*, 989 F.3d 271, 278 (4th Cir. 2021) (affording "even greater deference" to credibility determinations made during bench trials).

*Second*, the District Court found that Lincare's "vindictiveness" was "further amplified" by the gratuitous comment included in its complaint to the West Virginia Board: "It has also come to our attention that Ms. Balderson entered into a Consent Agreement with the Ohio Respiratory Care Board April 22, 2015." JA 203, 1142. The District Court found that this information was wholly irrelevant to the apparent expiration of Balderson's license and that the Consent Agreement had long been expired, yet Lincare mentioned it anyway. JA 396, 1142. Initially, Lincare suggested that it had a legal obligation to undertake this investigation and make a report. JA 1070, 1142. Upon cross examination, however, Lincare shifted positions once again, conceding that it had no such duty. JA 1089, 1094–95. The District Court rejected Lincare's bald assertion that this was all just "standard practice" as mere pretext. JA 1142–43. The complaint, the District Court ultimately

found, was spurred only by a malicious desire to further punish Balderson "by instigating a formal inquiry into her West Virginia license." *Id*. There is no clear error here.

*Third*, the District Court drew further negative inferences from Lincare's decision not to retract the licensure complaint when it discovered that Balderson's license had not actually expired. JA 1143. The District Court's finding is based on both documentary evidence and testimony. The West Virginia Board responded to Lincare complaint, advising Lincare that the information on its webpage was incorrect and that Balderson was indeed actively licensed. JA 206. The letter was properly addressed to the Lincare office in which Balderson worked. The letter contained an annotation, noting that the Board had also faxed the letter. *Id*. Lincare never actually disputed receiving the letter, claiming only that *Moreau* never *saw* the letter. The District Court correctly observed that "Lincare has not put forth any evidence, convincing or otherwise, that no one saw the letter." JA 1143. Lincare fails to show that this finding is not clearly erroneous.

*Fourth*, the evidence shows that Lincare continued its scorched-earth campaign against Ms. Balderson by contesting her unemployment

47

benefits with state agency (Workforce WV) that she had been
terminated because "[s]he failed to notify Respiratory licensed [sic]
lapsed." JA 215. For starters, this accusation was false on its own terms
because that was *not* the stated reason for Lincare's termination of
Balderson—which Lincare well-knew. *See supra*, Statement of the Case,
Part I. That Lincare knowingly lied to the state's unemployment office
further demonstrates an intentional effort to harm Balderson.

For another thing, Lincare's representation was made on July 2,
2019, several days *after* receiving the June 27 response letter from West
Virginia's Board. *Compare* JA 206 *with* JA 215. And again on July 10,
2019, Lincare represented that that Balderson "had been holding
herself out to the Company and the Company's referral sources as a
licensed respiratory therapist, when she was no longer licensed." JA
212. Like its complaint to West Virginia's Board, Lincare *never*
*corrected* the record before Workforce. JA 991. That Lincare sought to
deny Balderson her unemployment benefits based on knowingly false
information underscores the malicious intent supporting the District
Court's findings and award.

In contesting the District Court's award, Lincare tries to relitigate on a cold record several factual issues: (i) whether Lincare received the June 27, 2019 letter from the Board of Respiratory Care; (ii) whether Lincare's "investigation" was improperly motivated by a desire to punish Balderson; (iii) whether the unemployment challenge, which was based on erroneous information, was improperly motivated by a desire to punish; and (iv) whether Lincare's reporting of the April 2015 Consent Agreement was improperly motivated by a desire to instigate a formal inquiry into Balderson's license. As the finder-of-fact, the District Court answered each of these questions in the affirmative. This Court should decline Lincare's invitation to make findings de novo, particularly where the District Court repeatedly explained how it found Lincare's behavior and shifting explanations to simply lack credibility.

## C.    The District Court properly considered Lincare's post-termination conduct.

If it cannot relitigate the District Court's factual findings, then Lincare asks this Court to simply ignore its misconduct altogether. Lincare argues that its post-termination conduct cannot form the basis for an award of punitive damages. For this proposition, Lincare offers a single quote, shorn of any explanation: "a defendant's dissimilar acts,

49

independent from the acts upon which liability was premised, may not

serve as the basis for punitive damages." Appellant's Br., at 61 (quoting

*IGEN Intern., Inc. v. Roche Diagnostics GMbH*, 335 F.3d 303 (4th Cir.

2003)) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S.

408 (2003)). This is not persuasive for several reasons.

To begin with, the evidence considered by the District Court is

hardly "dissimilar" or "independent" from the acts upon which liability

was premised—here, Lincare's unlawful termination of Ms. Balderson.

The Supreme Court's point was simply that *due process* requires that

the proof supporting a punitive award have "bor[n]e" some "relation" to

the plaintiff's "harm." *State Farm*, 538 U.S. at 422. In short, "[a]

defendant should be punished for the conduct that harmed the plaintiff,

not for being an unsavory individual or business." *Id*. at 423.

The findings below are entirely consistent with *State Farm*. The

conduct forming the basis for punitive damages was (i) directed

squarely at Balderson, (ii) arose out of the employment relationship,

and (iii) related to the circumstances of her termination. For that

reason, the District Court concluded that "the temporal proximity

between Balderson's discharge from employment and Moreau's

50

investigation inextricably ties the actions together, which Lincare
continued to pursue over the entire summer of 2019." JA 1144.

What is more, Lincare points to no West Virginia law categorically
prohibiting courts from considering an employer's continuing bad acts
when making a punitive damage award under W. Va. Code § 55–7–29.
That should be the end of the analysis.

Regardless, precedent demonstrates that a former employee is
still protected from continuing bad acts. JA 1144; *see, e.g.*, *West v. Tyson
Foods, Inc.*, 374 F. App'x 624, 636 (6th Cir. 2010) (providing that post-
termination evidence also may be relevant to a plaintiff's claim for
punitive damages under Title VII). A plausible reading of the record,
deferring to the District Court's credibility determinations in particular,
demonstrates that Lincare's discriminatory conduct did not begin and
end on the day she was fired—it continued.

Lincare also relies on 42 U.S.C. § 1981a(b)(1), which defines the
punitive damages standard for Title VII claims, claiming that the West
Virginia Human Rights Act should be "interpreted consistent with Title
VII." Appellant's Br., at 60. This is meritless.

51

For starters, Lincare uses sleight-of-hand to suggest that *the Human Rights Act* should be read consistently with Title VII—but the question is whether the state's generally applicable punitive damage statute, W. Va. Code § 55–7–29, should be "interpreted consistent with" Title VII. Lincare offers no West Virginia authority for this—and there is none. To do so would be to judicially rewrite a state legislative enactment by engrafting federal statutory standards.

But even if this Court should try to interpret Title VII and W. Va. Code § 55–7–29 "consistently"—whatever that means—Lincare's argument is still wrong because the statutes are wholly dissimilar in what they require. *See Barefoot v. Sundale Nursing Home*, 457 S.E.2d 152, 160 n.9 (W. Va. 1995) ("Where . . . there are substantive distinctions between the language used by the two statutes, *we have inferred a State legislative intent to diverge from the federal law* and have ruled accordingly.") (citing cases) (emphasis added). Here, Title VII requires that the discriminatory act itself be carried out with malicious intent, 42 U.S.C. § 1981a(b)(1), whereas the West Virginia's statute imposes no such limitation and focuses more broadly on conduct that caused injury—whether it be the initial act of discrimination or subsequent conduct that compounded that injury, W. Va. Code § 55–7–29.

If immediate post-termination acts could not categorically be considered—which has no support under state law—it would undermine the essential purpose of punitive damages: "(1) to punish a wrongdoer for conduct that has harmed another party; and (2) to discourage a wrongdoer and others from acting the same way in the future." W.V. Pattern Jury Instr. Civil § 1500 (West). The new standard proposed by Lincare—that wrongdoing should simply be ignored if it occurred after the termination date—creates a perverse incentive. If immune for all post-termination conduct, Lincare and others like it will be emboldened to pursue similar scorched-earth tactics in the hopes of discouraging employees from pursuing valid claims. But this Court need not go down this rabbit hole, since Lincare's argument is completely untethered from West Virginia law.

Accordingly, the District Court did not clearly err in awarding punitive damages to Ms. Balderson on this record, giving particular deference to the District Court's credibility determinations and resolution of conflicting evidence during a bench trial.

## III. The District Court erred in applying the after-acquired evidence doctrine.

The only reversible error to be found in the District Court's order is a narrow and easily corrected one. The District Court erred by misapplying the after-acquired evidence doctrine, which directly resulted in the undue reduction of Ms. Balderson's lost wages. Thus, a limited vacatur and remand is appropriate.

### A. The District Court's error is reversible.

To be sure, a district court's "calculation of damages 'is a finding of fact and therefore is reviewable only for clear error, but to the extent those calculations were influenced by legal error, review is de novo.'" *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 427 (4th Cir. 2010) (cleaned up).

Here, the District Court's decision to drastically limit Ms. Balderson's lost wages to one day of back pay in the amount of $141 was exclusively "influenced by" its misapplication of the after-acquired evidence doctrine. *Id.*; *see* JA 1136–39. And it is well-established that "[w]hether a district court properly considered" a legal defense is a "question of law" is reviewed de novo. *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 653 (4th Cir. 2006). Regardless, this Court need not resolve

54

which standard of review applies because the District Court's error here

is manifest, thus warranting correction upon even clear error review.

**B.    The District Court erroneously applied the after-acquired evidence doctrine.**

The after-acquired evidence doctrine concerns the effect of

evidence of employee misconduct acquired by the employer after the

employee's termination. *See McKennon v. Nashville Banner Pub. Co.*,

513 U.S. 352, 361–63 (1995); *see Barlow v. Hester Indus., Inc.*, 479

S.E.2d 628, 643 (W. Va. 1996) (adopting *McKennon*). When properly

applied, the doctrine renders front pay inappropriate and dictates that

back pay be calculated from the date of the unlawful discharge to the

date the new information was discovered. *See McKennon*, 513 U.S. at

361–62; *see also Russell v. Microdyne Corp.*, 65 F.3d 1229, 1238, 1240–

41 (4th Cir. 1995).

The test is straightforward. Under the after-acquired evidence

doctrine, the burden is on the employer to prove that "the wrongdoing

was of such severity that the employee in fact would have been

terminated on those grounds alone if the employer had known of it at

the time of the discharge." *McKennon*, 513 U.S. at 362–63. Following

*McKennon*, this Circuit recognized the "emphasis on the need for

55

*serious wrongdoing*" in applying the doctrine. *Russell*, 65 F.3d at 1240 (emphasis added). The doctrine can be distilled to the following elements: (1) the employee was guilty of serious misconduct; (2) the employer did not know about the misconduct when the challenged employment-related decision was made; and (3) the employer "*would have*" terminated the employee if that information had been known. *See McKennon*, 513 U.S at 362–63 (emphasis added); *Russell*, 65 F.3d at 1240; *accord Pennell v. Vacation Rsrv. Ctr., LLC*, 2011 WL 6960814, at *2 (E.D. Va. Sept. 20, 2011) (outlining elements).

In the proceedings below, Lincare argued that the doctrine limited Ms. Balderson's lost wages based on a single supposed infraction: that Balderson failed to note on her employment application that her Ohio respiratory therapy license was subject to a one-year probationary period (which itself stemmed from a $5 fine for public intoxication she received more than a decade before). Lincare raised this argument twice: first on summary judgment, Dist. Ct. Dkt. 86, and later in its post-trial proposed findings and conclusions, Dist. Ct. Dkt. 141.

The District Court correctly rejected Lincare's argument for numerous reasons on summary judgment in a well-reasoned

memorandum opinion, observing outstanding disputes "as to how serious this violation was *and* whether Defendant would have chosen to not hire or terminate Plaintiff had it known of the omission earlier." *Balderson v. Lincare Inc.*, No. 2:19-CV-00666, 2020 WL 6051266, at *8 (S.D. W. Va. Oct. 13, 2020) (emphasis added). Supporting this conclusion, Chief Judge Johnston found that Lincare "essentially admitted" that a respiratory therapist license is "*not necessary* for the sales representative position," and that whether Ms. Balderson possessed such a license "was *not considered* in her hiring." *Id.* (citing record evidence; emphasis added). What is more, the District Court found that Lincare's corporate representative could *not* state "with *any* certainty that the omission was disqualifying or whether the probationary period had any impact on Defendant's operations or Plaintiff's performance." *Id.* (emphasis added).

Finally, the District Court concluded that it was altogether "unclear" whether disclosure of the Ohio respiratory license probationary period was even "technically required pursuant to Defendant's application process"—indicating that the alleged omission was no omission at all. *Balderson*, 2020 WL 6051266, at *9. As Chief

57

Judge Johnston explained, "Defendant's application asks for 'current' restrictions or disciplinary actions against such licenses," yet "the imposition of a probationary period did not affect the license or Plaintiff's ability to practice under such license; instead it could only potentially affect the license if some future misconduct occurred." *Id*. Looking to the Ohio Board's description of its own powers, the District Court further held that "the imposition of a probationary period is not against the license, but against the holder of a license." *Id*. As explained below, however, the evidence presented at trial *did not* meaningfully change from the time of the District Court's summary judgment opinion.

Following trial, Lincare submitted 76 pages of proposed findings and conclusions—of which only two short paragraphs sought application of the after-acquired evidence doctrine. Dist. Ct. Dkt. 141, at 66. Nonetheless, when calculating damages, the District Court concluded that the doctrine applied, limiting Ms. Balderson's lost wages to a single day of back pay. JA 1138–39. This was error.

1.    **The District Court erred as a matter of law by accepting only evidence that Lincare "could have" terminated Balderson on the basis of the supposed omission—rather than evidence that it "would have."**

The cross-appeal can and should be resolved for the simple reason that the District Court misinterpreted the after-acquired evidence doctrine to require only proof that the employer "could have" terminated the employee based on the alleged misconduct. This legal error compelled the District Court's conclusion that Lincare had satisfied its burden with evidence showing *only* that it "could have" terminated Balderson due to the supposed application omission. JA 1138–39. But it is not enough to satisfy the after-acquired evidence doctrine, as a matter of law, that Lincare "could have" terminated Balderson on the purported basis it identified—only that it "would have." *McKennon*, 513 U.S at 362–63; *Russell*, 65 F.3d at 1237–40. To hold otherwise, as the District Court implicitly did, directly conflicts with *McKennon*.

We can be sure of the District Court's misapprehension of the legal standard because Lincare failed to present any evidence that it "would have" terminated Ms. Balderson for the supposed omission. In concluding that "[the omission] would have led to her immediate

termination," the District Court cited *only* page 196 of the trial

transcript. JA 1138. But at no point on page 196—or anywhere else in

the record—did Lincare's representative actually testify that it *would*

*have* terminated Balderson for this ostensible infraction. *See* JA 1014,

1010–24. Though the District Court recited the proper standard, it did

not apply it.

Nor does the record plausibly show that Lincare presented

evidence sufficient to sustain the District Court's conclusion, even had it

applied the correct legal standard. At trial, Lincare's counsel never

asked about—and Lincare never testified regarding—whether it *would*

*have* terminated Ms. Balderson for the supposed application omission.

Lincare and its counsel focused instead on whether the charged offense

was of the *terminable type* such that firing would be justified. Yet

Balderson has never disputed this point. JA 1138. If an employment

application contains false information, then Lincare's policies certainly

provide for, among other disciplinary measures, termination. But proof

of *that fact* simply does not satisfy the legal rule properly interpreted.

When pointedly asked if disclosure of the probationary period

would have "necessarily led to her immediate termination," Lincare's

60

representative testified that, "[i]t *may have* led to her immediate termination by revealing the omission and that would be something that would be *discussed internally*, as I had previously testified." JA 1014 (emphasis added). And again, when asked if the omission would "necessarily lead" to Balderson's termination, Lincare's representative testified that, "I think *it depends* on the facts and the review of those facts. If it was an omission versus a falsification, it still *would be reviewed internally*." JA 1014–15 (emphasis added).[11] Based on this testimony— which, again, is consistent with the record on summary judgment—any decision to terminate was *purely discretionary*. And when presented with the question of whether Lincare "would have" indeed terminated Balderson, Lincare steadfastly refused to say. JA 1014.

The critical question under the rule is whether Lincare *"would have" indeed terminated Balderson under the circumstances*. The District Court thus misapplied the legal standard in concluding that Lincare satisfied its burden even though Lincare clearly failed to

---

[11] Nor did Lincare even try to present evidence showing that it had terminated other employees for substantively similar reasons. *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 298 (4th Cir. 2009) (in evaluating an after-acquired defense, a court "must look to the employer's *actual employment practices*") (emphasis added).

present any such evidence. The District Court's conclusion was error—clear or otherwise—as the record also lacks proof of this essential element.

This makes sense. After all, Lincare's trial testimony is *consistent with* its prior sworn testimony on the subject, on which basis the District Court correctly refused to apply the doctrine on summary judgment. *Balderson*, 2020 WL 6051266, at *8–9. In short, the District Court got it right the first time and, given no change in the relevant evidence, it should have stuck to its original, well-reasoned application of *McKennon*'s rule.

In sum, the District Court misapprehended the legal standard because it allowed Lincare to satisfy its burden with only evidence that it "could have" terminated Balderson had it known of the supposed omission—not that it "would have," as *McKennon* requires. 513 U.S at 362–63. Reversal is thus warranted on this ground alone.

### 2.  Lincare's after-acquired evidence defense must fail for want of "severe" or "serious wrongdoing."

Even if this Court concluded that the District Court did not err in accepting evidence only that Lincare "could have" terminated Ms. Balderson as a result of the supposed omission, the Supreme Court has

made clear that the misconduct purportedly justifying application of the after-acquired evidence doctrine must be "sever[e]." *McKennon*, 513 U.S. at 362. Using different wording, this Court emphasized "the need for serious wrongdoing." *Russell*, 65 F.3d 1240.

And for good reason. Allowing employers to escape liability based on a trivial infraction would encourage employers to comb through former employee's personnel file for hyper-technical, minor transgressions or, like Lincare, manufacture post hoc grievances against their former employees. By requiring "serious wrongdoing," *id.*, these perverse incentives are tempered.

At trial, the District Court improperly applied the "severity" element of the rule, as Lincare failed to present any evidence that Ms. Balderson's supposed omission could have even plausibly constituted "serious wrongdoing" or "misconduct" *Russell*, 65 F.3d 1240, or that it was "sever[e]." *McKennon*, 513 U.S. at 362.

This also stands to reason. For if Lincare was unable—under repeated questioning by friend or foe—to present testimony that it "would have" terminated Ms. Balderson for the supposed application omission, it's quite unlikely that the supposed omission itself constituted

"serious wrongdoing" in the first place. Aware of the "severity" standard, *McKennon*, 513 U.S. at 362, Lincare's meager discussion of this issue in its proposed post-trial findings indicates that *even Lincare* did not take the alleged omission seriously. *See* Dist. Ct. Dkt. 141, at 66.

Even apart from the District Court's misapplication of the "severity" legal element, here's what the evidence *does* show. *First*, the omission was wholly inconsequential to Lincare's operations or Balderson's performance. JA 1013–14. There was *no evidence* presented at trial plausibly showing otherwise—just as the District Court rightly observed on the record at summary judgment. *Balderson*, 2020 WL 6051266, at *8. *Second*, the undisputed testimony of Chad Brady, the Lincare area manager who hired Balderson, was that a respiratory license was not a job requirement; nor was the license even a consideration during her hiring. JA 835, 1013. Again, there was no contrary evidence presented at trial on this score, just as at summary judgment stage. *Balderson*, 2020 WL 6051266, at *8–9.

Lincare's representative could only say that the omission went to Balderson's *credibility*, which the District Court echoed. JA 1138. When asked *how* this credibility issue might have affected Lincare's operations or Balderson's performance, Lincare's representative failed to provide any

concrete or coherent explanation or examples. JA 1021. Neither did the

District Court. That the Ohio respiratory license was utterly irrelevant to

Lincare during Balderson's onboarding as a salesperson only *confirms* the

trivial nature of the supposed omission.

Yet the after-acquired evidence doctrine requires "sever[e]" or "serious

wrongdoing," and the supposed omission falls well-short of this high bar as

a matter of law. Lincare's bald assertion that Ms. Balderson's supposed

omission satisfies the "severity" requirement because the evidence went to

Balderson's general tendency to be credible cannot succeed as a matter of

proper legal interpretation. Otherwise, *McKennon*'s "severity" requirement,

also characterized by this Court as "serious wrongdoing," *Russell*, 65 F.3d at

1240, is a dead letter. The "severity" requirement cannot reasonably be read

to encompass anything that may have the effect of reducing one's general

tendency to be credible. *Severity*, Merriam-Webster (defining as "the

condition of being very bad, serious, unpleasant, or harsh").[12]

---

[12] https://www.merriam-webster.com/dictionary/severe (last visited
October 29, 2021); *see United States v. Kobito*, 994 F.3d 696, 702 (4th
Cir. 2021) (relying on Merriam-Webster online dictionary for everyday
terms).

Here too, the District Court got it right the first time. *Balderson*, 2020 WL 6051266, at \*8, and nothing in the law or record materially changed from the time of summary judgment.

### 3. Disclosure of the probationary period was not required by Lincare's application.

Lincare's invocation of the after-acquired evidence doctrine fails for a third, independent reason: Lincare's employment application did not *require* Ms. Balderson to disclose the one-year Ohio probationary period in the first place. Once again, the District Court's reasoning when resolving this issue on summary judgment was demonstrably correct and remains so, as the record evidence simply did not change at trial. *Balderson*, 2020 WL 6051266, at \*9. The District Court's bench opinion does not even address this issue, much less reverse its prior, well-reasoned decision on the same, which only confirms its error. JA 1136–39.

The employment application, which Balderson completed on October 19, 2015, prompted her to disclose "current restrictions or disciplinary actions."

JA 392. At the time Ms. Balderson completed the application, it was accurate that there were no "current restrictions or disciplinary actions" pending against her Ohio respiratory therapy license. Lincare argues otherwise, but those claims are contrary to the record evidence and, as the District Court previously explained, a reasonable reading of the application prompt itself. *Balderson*, 2020 WL 6051266, at *9.

When processing Ms. Balderson's licensure application in Spring 2015, the Ohio Respiratory Care Board noted her failure to report a youthful indiscretion: in 2005, at the age of twenty-one, Balderson was convicted of misdemeanor public intoxication, resulting in a $5 fine. JA 402. The omission was unintentional, yet it prompted a response from the Board. "In lieu of a hearing before the Board" and "in lieu of formal proceedings," the Board and Balderson entered into a Consent Agreement, which provided for a 1-year probationary period (April 2015 to April 2016). JA 396. With its execution, dated April 22, 2015, the

67

matter was closed. *Id*. As such, there were no "current" "disciplinary"
actions" pending at the time Balderson completed the application.

Nor were there *ever any* "restrictions" against Balderson's license,
"current" or otherwise. The Consent Agreement makes clear that
Balderson could practice *completely uninhibited and without*
*supervision*. JA 396. She was simply reprimanded and given a one-year
probationary period wherein any *future* misconduct would result in
trebled repercussions. *Id*. Balderson thus had no disclosure obligation,
as there were no "current restrictions or disciplinary actions" pending.

Lincare's defense comes from a familiar playbook. In a last-ditch
effort to differentiate Brady's and Balderson's conduct, Lincare
attempted to impute fraudulent intent into an otherwise innocuous fax.
*See supra*, Argument Part I.B.4. But the District Court found this
argument "not credible," concluding that the language in the fax could
not possibly bear Lincare's sinister interpretation. JA 1127. Now, in
order to exploit the after-acquired evidence doctrine, Lincare attempted
to manufacture wrongdoing in the application process. But, like before,
Lincare's accusations are not borne out by the evidence. The prompt in
the application is clear: applicants need only disclose "current

68

restrictions or disciplinary actions." JA 392. Critically, Lincare did

not provide *any* evidence at trial to define or otherwise expand the

meaning of the prompt.

Given that Lincare did not provide new or different evidence at

trial on this score, the District Court's well-reasoned explanation for

rejecting Lincare's defense at the summary judgment stage still

applies:

> Whether a one-year probationary period—which arguably
> does not affect the license itself, but only future
> misconduct—is a 'current' disciplinary action is not clear.
> Simply, the imposition of a probationary period did not
> affect the license or Plaintiff's ability to practice under
> such license; instead it could only potentially affect the
> license if some future misconduct occurred. ('The BOARD
> is empowered ... to revoke, or suspend a license, refuse to
> issue or renew a license, or impose a fine, reprimand, or
> place on probation the holder of a license ....') As this
> language makes clear, the imposition of a probationary
> period is not against the license, but against the holder of
> a license.

*Balderson*, 2020 WL 6051266, at *9 (citations omitted).

The District Court did not renounce this reasoning in its bench

opinion. Nor did it ever expressly find that the disclosure was

required by the application. Instead, the bench opinion is simply

silent on this point, which confirms the lack of evidence in the record

69

showing that disclosure of the probationary period was required in the first place. Thus, Lincare's after-acquired evidence defense must also fail for want of *any* misconduct, much less "sever[e]" or "serious wrongdoing" that is required, if those terms are to have any meaning.

\*    \*    \*

The District Court properly applied the after-acquired evidence doctrine on summary judgment in a well-reasoned opinion, and the evidence Lincare presented at trial did not materially change. *Balderson*, 2020 WL 6051266, at *8–9. The District Court's decision holding that Lincare proved the doctrine at trial, which resulted in a drastic reduction in Ms. Balderson's lost wages, was the result of the District Court's misapplication of the doctrine's legal elements and the complete lack of evidence to satisfy the elements as properly understood.

## CONCLUSION

For the foregoing reasons, this Court should reverse and remand the District Court's judgment regarding the application of the after-acquired evidence doctrine, and affirm the judgment in all other respects.

70

# STATEMENT ON ORAL ARGUMENT

Oral argument is unnecessary because this is a fact-bound appeal of findings and conclusions entered by a District Court sitting in diversity following a bench trial of a single claim arising under West Virginia law, with no new or significant principles of law.

November 1, 2021        Respectfully submitted,

                    /s/ J. Zak Ritchie
                    J. Zak Ritchie
                    Ryan McCune Donovan
                    Andrew C. Robey
                    HISSAM FORMAN DONOVAN RITCHIE PLLC
                    P.O. Box 3983
                    Charleston, WV 25339
                    681-265-3802 *office*
                    304-982-8056 *fax*

                    *Counsel for Appellee/Cross-Appellant*

## CERTIFICATE OF COMPLIANCE

1.     This document complies with type-volume limits because,

excluding the parts of the document exempted by Fed. R. App. P.

32(f) (cover page, disclosure statement, table of contents, table of

citations, statement regarding oral argument, signature block,

certificates of counsel, addendum, attachments):

This document contains <u>13,524</u> words.

2.     This document complies with the typeface requirements because:

This document has been prepared in a proportional spaced

typeface using <u>Microsoft Word</u> in <u>14 point Century

Schoolbook</u>.

Dated:  November 1, 2021    Respectfully submitted,

<u>/s/ J. Zak Ritchie</u>
J. Zak Ritchie
Ryan McCune Donovan
Andrew Carver Robey
HISSAM FORMAN DONOVAN RITCHIE PLLC
P. O. Box 3983
Charleston, WV 25339
(681) 265-3802

*Counsel for
Appellee/Cross-Appellant*