NOS. 21-1753(L), 21-1765 (XAP)

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

CHANDRA BALDERSON,

Plaintiff-Appellee,

v.

LINCARE INC.,

Defendant-Appellant.

On Appeal From The United States District Court For
The Southern District of West Virginia
Case No. 2:19-cv-00666 (Chief Judge Thomas E. Johnston)

**LINCARE'S REPLY BRIEF AND CROSS-APPELLEE'S BRIEF**

David B. Goroff
Andrew Gresik
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 3000
Chicago, Illinois 60654
Tel: (312) 832-4500
Fax: (312) 832-4700
dgoroff@foley.com
agresik@foley.com

Lawrence Kraus
FOLEY & LARDNER LLP
111 Huntington Avenue
Suite 2500
Boston, Massachusetts 02199
Tel: (617) 342-4000
Fax: (617) 342-4001
lkraus@foley.com

*Counsel for Defendant-Appellant Lincare Inc.*
*ORAL ARGUMENT REQUESTED*

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS.................................................................i

TABLE OF AUTHORITIES ....................................................iv

I.    INTRODUCTION ...............................................................1

II.   REPLY ARGUMENT ..........................................................5

      A.    Plaintiff Cannot Overcome That She And Brady Were Not
            "Similarly-Situated In All Relevant Respects" ...................5

            1.    Brady Engaged In Different Conduct Than Plaintiff.................7

            2.    Brady Had Materially Different Job Duties Than Plaintiff ......14

      B.    Plaintiff's Discrimination Claim Is Weakened Because
            Pedersen Is Also Female ........................................20

      C.    Lincare Had Legitimate, Non-Discriminatory Reasons For
            Terminating Plaintiff ..........................................22

      D.    The Court Committed Clear Error In Finding Pretext .......................22

            1.    That Pedersen Followed Her Customary Practice In
                  Terminating Plaintiff Did Not Show Pretext ...........................24

            2.    Because Lincare Did Not "Shift Its Explanation"
                  Regarding Why Plaintiff Was Terminated, The Court
                  Erred In Finding This Showed Pretext ....................................26

            3.    Lincare Did Not Have To Report Plaintiff's Compliance
                  Violation To The OIG.............................................31

            4.    Pedersen's Correction Of Her 30(b)(6) Deposition Does
                  Not Show Pretext, Where Plaintiff's Counsel Abruptly
                  Questioned Her On Topics Outside Its Scope ..........................33

E.     This Court Has Reversed Discrimination Determinations Where A Court In A Bench Trial Second-Guesses Discipline For Compliance Violations ........................................................................35

F.     The Court Committed Clear Error In Awarding Punitive Damages .........................................................................................37

1.     Plaintiff Falsely Suggests Lincare Argues For The Wrong Standard For Punitive Damages...................................37

2.     Plaintiff Misstates Record Facts In Trying To Justify Punitive Damages .......................................................40

3.     Because The Licensure Investigation Involved Issues Unrelated To Those Underpinning Plaintiff's Claim, It Cannot Support Punitive Damages ...........................................48

III.    BRIEF RE CROSS-APPEAL..................................................................49

A.     Statement Of Issues Related To Cross-Appeal ...................................49

B.     Statement Of Case As To Cross-Appeal .............................................50

1.     Following Standard Practice, Moreau Investigates Plaintiff's Licensure After Her Termination ...........................50

2.     Moreau Learns That Plaintiff Lied On Her Application ..........51

3.     Lincare's Corporate Representative Testifies That Lincare Would Have Terminated Plaintiff For Lying On Her Application, Had It Known..................................................53

C.     Summary Of Argument As To Cross-Appeal .....................................55

D.     Cross-Appeal Argument.......................................................................56

1.     Standard Of Review ....................................................................56

2.     That Plaintiff Lied On Her Application Was A Terminable Offense Which Lincare Only Discovered After Plaintiff's Termination ...................................................56

IV.    CONCLUSION.................................................................................59

STATEMENT REQUESTING ORAL ARGUMENT ...........................................61

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ....................................62

CERTIFICATE OF SERVICE ....................................................................63

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Anderson v. Westinghouse Savannah River Co.*,
  406 F.3d 248 (4th Cir. 2005) ...............................................................18

*Babby v. City of Wilmington Dep't of Police*,
  614 F. Supp.2d 508 (D. Del. 2009).....................................................25

*Billings v. Lowe's Home Centers, LLC*,
  2019 WL 1869936 (S.D.W. Va. Apr. 24, 2019)..................................38

*Bryan v. Lucent Techs., Inc.*,
  307 F. Supp.2d 726 (D. Md. 2004).......................................................21

*Calvert v. Smith's Food & Drug Centers, Inc.*,
  2007 WL 4207198 (D. Utah Nov. 26, 2007).........................................57

*Cole v. Fam. Dollar Stores of Md., Inc.*,
  811 F. App'x 168 (4th Cir. 2020) ........................................................12

*Colli v. Wirth*,
  1996 WL 442835 (S.D.N.Y. Aug. 6, 1996)..........................................25

*United States ex rel. Complin v. N. Carolina Baptist Hosp.*,
  818 F. App'x 179 (4th Cir. 2020)..........................................................32

*Cooper v. Martek Biosciences Kingtree Corp.*,
  2013 WL 787670 (D.S.C. Jan. 25, 2013), *aff'd sub nom. Cooper v. DSM
  Nutritional Prods. LLC*, 540 F. Appx 206 (4th Cir. 2013)...............12

*E.E.O.C. v. PVNF L.L.C.*,
  487 F.3d 790 (10th Cir. 2007) ...............................................................6

*Forest v. Transit Management of Charlotte, Inc.*,
  245 F. App'x 255 (4th Cir. 2007) ..........................................................6

*Laber v. Harvey*,
  438 F.3d 404 (4th Cir. 2006) ..........................................................22, 23

iv

*Lathem v. Dep't of Children & Youth Servs.*,
   172 F.3d 786 ...........................................................................19

*Lee v Kansas City Southern Ry. Co.*,
   574 F.3d 253 (5th Cir. 2009) .............................................20

*McKennon v. Nashville Banner Co.*,
   513 U.S 352 (1995).................................................56, 57

*Miles v. Dell*,
   429 F.3d 480 (4th Cir. 2005) .............................................21

*Miller v. Mercy Hospital*,
   720 F.2d 356 (4th Cir.1983) .............................................36

*Molloy v. Blanchard*,
   115 F.3d 86 (1st Cir. 1997).................................................6

*Moore v. City of Charlotte*,
   754 F.2d 1100 (4th Cir. 1985) ...............................*passim*

*Oncale v. Sundowner*,
   523 U.S. 75 (1998)......................................2, 20, 21

*Orgain v. City of Salisbury*,
   305 F. App'x 90 (4th Cir. 2008) .......................................21

*Popo v. Giant Foods, LLC*,
   675 F. Supp.2d 583 (D. Md. 2009).............................17, 18

*Pulliam v. Lowe's Cos., Inc.*,
   2019 WL 653006 (W.D.N.C. Feb. 15, 2019) ....................21

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000).............................................22

*Rodgers v. White*,
   657 F.3d 511 (7th Cir. 2011) .............................................18

*Schneider v. Dodson Bros. Exterminating Co.*,
   2021 WL 798865 (S.D. W. Va. Mar. 2, 2021) ....................39

*Shell v. AT&T Corp.*,
    2021 WL 3929916 (11th Cir. Sept. 2, 2021) ......................................................19

*Sneed v. Swarthmore College*,
    2017 WL 3279231 (E.D. Pa. Aug. 2, 2017) ......................................................19

*United States v. The Boeing Co.*,
    825 F.3d 1138 (10th Cir. 2016) ..........................................................................32

*West v. Tyson Foods, Inc.*,
    374 F. App'x 624 (6th Cir. 2010) ...........................................................40, 43, 49

*Westmoreland v. TWC Administration LLC*,
    924 F.3d 728 (4th Cir. 2019) ..............................................................................23

*Williams v. West Virginia Division of Corrections*,
    2020 WL 748873 (S.D. W. Va. Feb. 13, 2020)..................................................39

## State Cases

*Alkire v. First Nat'l Bank of Parsons*,
    475 S.E.2d 122 (W.Va. 1996)...................................................................2, 11, 55

*Constellium Rolled Prods. Ravenswood LLC v. Griffith*,
    775 S.E.2d 90,100 (W.Va. 2015).................................................................38, 41

*Mingo County Equal Employment Opportunity Council v. State Human Rights Comm'n*,
    376 S.E.2d 134 (W.Va. 1988)....................................................................23, 28

*Skaggs v. Elk Run Coal Co.*,
    479 S.E.2d 561 (W.Va. 1996)............................................................................29

*Thomas v. Houck*,
    2016 WL 6780095 (2016)(mem. op.)................................................................40

## State Statutes

Fed. R. Civ. P. 30(b)(6)................................................................................................34

W.Va Code §55-7-29 ..................................................................................................38

W.Va. Code §55-7-29(a)..............................................................................................40

## I.    **INTRODUCTION**

Plaintiff concedes that the Court[1] committed clear error. Plaintiff just is incorrect as to which errors require reversal.

An examination of the record shows that Lincare has it right—the Court's findings that Lincare engaged in gender discrimination and that Lincare's conduct warranted punitive damages were clearly erroneous; while its determination that Lincare would have terminated Plaintiff had it known of after-acquired evidence—that Plaintiff lied on her Application—is correct.

Plaintiff cannot overcome the Court's clear errors in finding that Lincare engaged in gender discrimination, including that:

- Plaintiff's supervisor, Chad Brady, was not a proper comparator. Plaintiff's and Brady's violations materially differed both in kind and magnitude and warranted distinct punishment. He engaged in markedly different conduct than Plaintiff.

- A simple review shows that Good Chart Notes differ materially from cloned notes. Unlike cloned notes, Good Chart Notes cannot just be "plugged" into a patient's order and are not intended to be. Plaintiff caused cloned notes to be included with at least 19 patient orders, while Brady

---

[1] This Reply uses terms defined in Lincare's Opening Brief ("LOB"). "PAB" is Plaintiff-Appellee's Brief.

1

distributed one page of Good Chart Notes as educational material, expecting they would not be used "as is." Plaintiff filled in patient orders and caused diagnoses to be misrepresented. Brady did not. Brady held a materially different position than Plaintiff. Unlike Plaintiff, Brady had no formal sales responsibility and earned no sales commissions.

- Controlling law holds that an inference of discrimination is significantly weakened where, as here, the allegedly discriminatory decision-maker and the plaintiff are in the same protected class. That principle carries even greater weight where, also true here, the plaintiff is replaced by someone in that protected class. *Oncale v. Sundowner*, 523 U.S. 75 (1998)(cited PAB27) leaves these principles intact.

- The law recognizes that it is not pretext to treat different conduct differently and that companies have broad discretion to enforce their compliance policies and exercise their business judgment. Plaintiff ignores *Moore v. City of Charlotte*, 754 F.2d 1100, 1107 (4th Cir. 1985), which so holds. Thus, Lincare could punish the sending of unauthorized educational materials, like Good Chart Notes, differently than the misuse of cloned notes, and that choice does not establish pretext.

- What the Court found to establish pretext does not bear scrutiny. *First,* Pedersen always made clear she terminated any employee who used

cloned notes, including men. *Second*, Lincare did not "shift" from noting that Plaintiff had been leading physicians—it always included this as one of her violations.  Lincare never identified this as her only violation. *Third,* nothing about Pedersen's 30(b)(6) deposition supports pretext. She rightly corrected an answer where Plaintiff's attorney veered into topics outside the deposition's scope, suddenly asking about legal violations instead of compliance violations, as per the Notice. *Fourth*, Lincare's decision not to report Plaintiff's compliance violations to the OIG does not show pretext because FCA and AKS violations require scienter, while violations of Lincare's compliance rules regarding these laws do not.

Because the Court's determination that Lincare was liable to Plaintiff for gender discrimination is clearly erroneous and must be reversed, it necessarily follows that Lincare cannot be liable to Plaintiff for punitive damages. Irrespective, Plaintiff cannot overcome that the District Court committed clear error and abused its discretion in awarding punitive damages because:

- Plaintiff falsely accuses Lincare of citing a superseded standard for punitive damages, *but that standard is cited by the Court in its Opinion* and by Chief Judge Johnston in other recent cases, as well as by the Supreme Court of West Virginia.

- Lincare's employee, Moreau, followed customary practice and did not act "vindictive[ly]" or "retributive[ly]" in advising a regulator about the license of a regulated therapist, especially where the Regulator's primary source verification and information of record indicated Plaintiff had engaged in professional misconduct. While the Court punished Lincare for not correcting statements in response to the Regulator's fax, neither Moreau nor any identified Lincare employee saw that fax until right before trial. Nor did Lincare act with malice in contesting Plaintiff's unemployment compensation, where she was terminated for violating Lincare's Compliance Program.

- Plaintiff suffered no harm from Lincare's contacting the Regulator or Workforce West Virginia, as her license remained intact and she received unemployment compensation.

Finally, Plaintiff's cross-appeal must be rejected. It rests on the false premise that the record includes no proof that Lincare would have terminated Plaintiff had it known she lied on her application. Rather, Andrea Daggett's testimony (A.1021), and other evidence shows this. The Application itself states that misrepresentation could result in "immediate termination." (DX18,A.671). This was a "Major Infraction," which Lincare's Handbook said is serious enough to warrant immediate termination. (A.1021). No evidence suggests that Lincare would have

kept an employee who lied on her Application, especially one, like Plaintiff, whose duties included ensuring that paperwork was truthful.

## II.    <u>REPLY ARGUMENT</u>

Lincare appeals because the Court misapplied controlling law and misconstrued indisputable facts developed at the bench trial. As Plaintiff acknowledges, "this Court may 'reverse a district court's factual finding if, 'on the entire evidence' this Court is 'left with the definite and firm conviction that a mistake has been made.'" (PAB18-19)(citation omitted). The Court made such a mistake here.

### A.    **Plaintiff Cannot Overcome That She And Brady Were Not <u>"Similarly-Situated In All Relevant Respects"</u>**

Plaintiff acknowledges that the Court's decision finding Lincare liable for gender discrimination hinges on its determination that Plaintiff and her supervisor, Brady, were "similarly-situated in all relevant respects," but that she was fired and he was given a final written warning for their respective compliance violations. (PAB14,19-21). Yet Brady and Plaintiff were not similarly-situated in all relevant respects—their conduct substantially differed both in kind and magnitude. Moreover, they had materially different positions and job responsibilities.

Controlling authority holds that a key factor in determining whether a person outside a protected class is a proper comparator is whether that person and plaintiff engaged in the same offending conduct. *See* LOB42-43 (*citing, e.g., Cole v. Fam.*

*Dollar Stores of Md., Inc*., 811 F. App'x 168, 173 (4th Cir. 2020)(others with

unexcused absences were different from plaintiff's no call/no show absences);

*Cooper v. Martek Biosciences Kingtree Corp*., 2013 WL 787670, *8 (D.S.C. Jan.

25, 2013)(conduct of asserted comparator did not involve falsification of test

results."), *aff'd sub nom. Cooper v. DSM Nutritional Prods. LLC*, 540 F. Appx 206

(4th Cir. 2013)).[2] Plaintiff's cases rely on a similar standard. *See E.E.O.C. v. PVNF*

*L.L.C.*, 487 F.3d 790, 801 (10th Cir. 2007)(cited PAB21)("Individuals are

considered 'similarly-situated' when they deal with the same supervisor, are

subjected to the same standards governing performance evaluation and discipline,

*and have engaged in conduct of 'comparable seriousness*.'")(citation

omitted)(emphasis added); *Molloy v. Blanchard*, 115 F.3d 86, 92 (1st Cir.

1997)(cited PAB21)(male police officers and plaintiff, a female officer, had

engaged in conduct "of comparable seriousness" where each interfered with a

murder investigation involving a police officer, yet plaintiff was suspended, while

male officers were not).

---

[2] This Circuit has emphasized that "[t]o establish a prima facie case under Title VII, a plaintiff must demonstrate that his prohibited conduct was comparable in seriousness to the misconduct of other employees." *Forest v. Transit Management of Charlotte, Inc*., 245 F. App'x 255, 256 (4th Cir. 2007); *Moore*, 754 F.2d at 1107 (to establish a prima facie case under Title VII, a plaintiff must provide evidence of prior employee incidents that were sufficiently similar "in light of the harm caused or threatened to the victim or society, and the culpability of the offender.")(reversing bench trial decision for plaintiff).

### 1. **Brady Engaged In Different Conduct Than Plaintiff**

Plaintiff cannot overcome the facts establishing that Brady was not a proper comparator because his conduct and Plaintiff's differed in both kind and magnitude.

Plaintiff's position requires this Court to accept that Good Chart Notes and cloned notes are indistinguishable. Yet this is incorrect. As the Court acknowledged, CMS, by Guidance, specifically cautions about the risks associated with cloned notes, especially with claims for reimbursement. (LOB11n.7,19)(citing A.972,998,1118). There is no equivalent Guidance regarding Good Chart Notes or other materials used to educate physicians.

Cloned notes are expected to be used "as is" with individual patient records.[3] They can be "plug[ged] and played," in Brady's words. (A.853,861). Good Chart Notes, by contrast, must be modified before being used. (A.850-52,861-62).

Brady's Good Chart Notes consisted of three examples on one typed page, intended to educate physicians about coverage criteria. The cloned notes were handwritten and appended to medical records which were otherwise electronic;

---

[3] Accordingly, Plaintiff's assertion that she did not manipulate the cloned notes excuses nothing. (PAB8). What makes a note "cloned" is that it is a generic statement not created for an individual patient but is added to an individual patient's record. (LOB16,n.16).

unlike the Good Chart Note examples, the cloned notes were clearly to be used with individual patient charts.[4]

While Plaintiff notes that certain physicians added Good Chart Note language to patient files in substantially similar form,[5] that was not conduct attributable to Brady. Brady did not expect them to use it "as is." Nor did he direct any physician to do so. He did not reference any specific patient to use these with. By contrast, Plaintiff told a physician "I need the attached statement added or the progress note signed, dated and timed with the patient's name and DOB added, also." That physician followed her request.[6]

Plaintiff possessed and used cloned notes. (A.880). She admitted using these for 1½-2 years before her termination. (A.936-937). She kept 17 templates of cloned notes in a binder in her car's trunk.[7] She instructed physicians to use cloned language with ventilator orders to facilitate approval and caused cloned notes to be

_____

[4] The Appendix includes both the Good Chart Notes and cloned notes. *Compare* DX13,A.656, *and* DXs9-11,A.609-650). A comparison shows there is more than a "semantic distinction" between them. (PAB22)(citing A.1125).
[5] PAB9(citing A1100,1120).
[6] DX12,A.653 (cited LOB16).
[7] (A.916-919,929).Plaintiff admits that "during Lincare's investigation, Balderson provided Pedersen with 'template' progress notes that matched the handwritten notes Lincare uncovered during the audit." (PAB6-7). Plaintiff notes that these contained "only a generic statement of medical necessity" and "did not contain any patient information or physician signatures." (PAB7)(citing A609-31,1117). This makes them "cloned notes."

added to 19 patient orders.[8] Since any use of cloned notes violates Lincare's Compliance Program, it is baffling that Plaintiff asserts "Lincare presented *no evidence* to even suggest that the templates were used for improper purposes…." (PAB9)(emphasis in original).[9]

While Plaintiff notes that physicians' offices "created" the cloned notes(PAB7), this ignores that it violated Lincare's Compliance Program both to possess cloned notes and to cause them to be used, irrespective of how created. (LOB21)(citing A.965-966,970-973).[10]

Plaintiff admitted she actually filled in information on patient orders. (DX12;Dkt.135,65,A.883, cited Op.6,A.1117). Brady did nothing similar. He never asked a provider to sign a document for inclusion in a patient's file or used cloned notes. (A.854,939,1004).

Plaintiff caused erroneous diagnoses to appear in patient records. She wrote to a doctor "I need face-to-face notes within the last 6 months that mention her

---

[8] (A.609-627,795-96,¶¶7,12;DX35,A.803-804,¶¶7,12). By contrast, Brady's final written warning resulted from one document. Lincare advised Brady "you wrote information on a fax to physicians that could be considered coaching or leading information." (A.666).

[9] Plaintiff admits that "Lincare discovered that similar handwritten progress notes appeared in multiple patient orders; specifically, the body of each note contained nearly identical statements of medical necessity." (PAB6).

[10] That the offices created the cloned notes and gave them to Plaintiff to keep shows that Plaintiff was not "provid[ing] exemplar language to physicians." (PAB22). She was causing them to append cloned notes they created to patient records for Lincare orders. Brady did nothing similar.

COPD dx and chronic respiratory failure dx."[11] But the physician's face-to-face exam notes mention neither condition, instead listing a different condition—restrictive ventilatory defect—as the primary diagnosis. (DX12, at LIN000628,A.655;928-930,cited Op.6,A.1117). The patient's medical chart also never mentions chronic respiratory failure. (DX32, at LIN001029,LIN001036,A.765,956-958). DX12 is not, as Plaintiff asserts, an "innocuous" fax; it shows Plaintiff suggesting different diagnoses. (PAB39)(citing A.651).

Similarly, the cloned note Plaintiff caused to be added refers to a BiPap being tried and failed, but the patient's medical records show she used and benefitted from a CPAP machine, and suffered from sleep apnea.[12] (LOB15-17;A.999-1003).

---

[11] This shows the Court erred in finding that "the progress notes were never required by Ms. Balderson," (*see* LOB15,n.15), and disproves Plaintiff's assertion that "[p]hysicians' offices... dictated their use." (PAB7). It further shows the Court erred in stating that "Ms. Balderson did not make the diagnosis [or] ask the physician to otherwise alter the diagnosis." (A.1127,n.4)(*see* PAB39). This also shows the Court erred in finding Plaintiff was "relay[ing] back what information was still needed to complete the order." (*Id.*).

[12] This shows the resulting order *was* incorrect, disproving the Court's finding that "Lincare has not offered any evidence that the physician's diagnosis or order was incorrect or improper." (A.1128)(*See also* PAB12). By contrast, Brady testified that in using Good Chart Notes, he "never tried to manipulate a diagnosis." (A.845).

Plaintiff erroneously argues that Lincare's investigation revealed that, "like Balderson's referral sources, physicians were adding Brady's proposed language to patient files in substantially similar form." (PAB9)(citing A.666,1120). However, unlike Plaintiff, Brady never told physicians "I need" anything added. No physician directly sent any order back to Brady, as a physician did in DX12.[13] Brady did not specify diagnoses that needed to be added to a specific patient's medical record (which in Plaintiff's case proved erroneous).

Similarly, the record does not support Plaintiff's claim that the goal of both Good Chart Notes and cloned notes was to provide physicians with language that, "*if true*," they could use to ensure third party payment for ventilator orders. *First*, the above shows that Plaintiff did not care whether what she told physicians she "need[ed]" added was true. *Second*, Plaintiff cites Brady's testimony, which shows critical differences:

> Q. Now the purpose of sending this [Good Chart Notes] to a physician was to provide physicians with language that, if true, could be used by a physician to order ventilators, right?
>
> A. It was used to show good chart note examples and the level of detail required by insurance to get approval for a ventilator, *but not as a word-for-word copy/paste-type of deal with these notes*.

---

[13] Plaintiff admitted that she was said to have led physicians not only with her cloned notes but "with other language that you provided to doctors." (A.876)(cited PAB22).

(A.844)(cited PAB22)(emphasis added).

Brady never told physicians not to use the Good Chart Notes word for word, but Plaintiff did tell physicians exactly what words to use. (DX12,A.651).

Plaintiff misleadingly asserts that both she and Brady sent physicians a document entitled "Sample documentation for Trilogy/Astral" and that Brady did not dispute this. (JAB22)(citing A.654,860,891). Brady denied this:

> Q.[A]nd if you flip it to…the document…entitled "Sample Documentation for Trilogy/Astral."
>
> ***
>
> Q. And you've sent this to physicians before, haven't you?
>
> A. Not to my knowledge, this single one. My go-to was the three blocks of text that we just previously reviewed. I don't remember sending this one—one block to anybody.

(A.860).

Plaintiff, like the Court, emphasizes both Plaintiff and Brady were found to have led physicians and that Pedersen told Plaintiff she was being fired for this. (PAB22)(citing A.530,840,845,876). However, as in *Cole* and *Cooper* above, the nature of their respective leading differed dramatically.[14] Moreover, the evidence

---

[14] Plaintiff notes that Brady also was found to have provided free equipment in violation of compliance laws. (PAB9). Pedersen testified at her 30(b)(6) deposition that this consisted of one instance when he replaced equipment for a patient who lost equipment in a fire. (A.48). By contrast, Plaintiff admits she was asked by physicians' offices to keep cloned notes with her to aid the physician if out of the office. (PAB7-8). Yet this was the physician's office's responsibility and should not have been done by a Lincare employee. (A.1000).

Plaintiff relies upon makes clear that leading was not her only compliance program violation. *See* PAB22 (citing A.530 (in answer, Lincare states that "Lincare terminated Plaintiff's employment because she violated Lincare's corporate compliance program, *including without limitation* by inappropriately utilizing leading 'templates' for patient set-ups")(emphasis added); A.840 (Regarding the reasons given Plaintiff for her termination at the meeting following the investigation, Brady testified, "I remember the words 'leading a physician *and practicing outside your scope as a therapist*.'"))(emphasis added).

Plaintiff quarrels over whether she was advised she misrepresented a diagnosis, but the evidence proves she did—COPD and chronic respiratory failure are not the same diagnoses as a restrictive ventilatory defect. (A.928-29). And the patient whom Plaintiff said required a ventilator, uses and benefits from a CPAP machine. (LOB16-17).

Plaintiff also ignores that her compliance violations differed in magnitude from Brady's. She caused 19 patient orders to include improper cloned notes. She directed a physician to add information. She filled in patient orders herself. In contrast, Brady sent physicians one page of educational materials, albeit unauthorized. These material differences also disprove Plaintiff's assertion that she and Brady had been "leading" or "coaching" physicians "*in the same way*." (PAB9)(citing A.666,977-78,1119).

13

Despite these material differences, the Court erroneously found Plaintiff and Brady's conduct to be "nearly indistinguishable," and that they were similarly-situated in all relevant respects. (A.1125).

### 2. Brady Had Materially Different Job Duties Than Plaintiff

Plaintiff mischaracterizes Lincare's position in asserting that "Lincare claims that Brady and Balderson are incomparable primarily because they have different job titles." (PAB23). Instead, Lincare emphasizes their different conduct and job duties.

Plaintiff was Parkersburg's only sales representative. Her title was "Sales Representative-Commission." Unlike Brady, her job was to market and sell Lincare services to all referral sources, including physicians and their office staff. As Brady testified, "[s]he was responsible for marketing all the referral sources in our… area. That was her duty…." (A.834).

Plaintiff, unlike Brady, was responsible for providing information to referral sources on Medicare and insurance procedures. (A.568). As Medicare disapproves of the use of cloned notes for purposes of reimbursement, Plaintiff had the responsibility to both know this and educate referral sources about this. She further had responsibility for assuring "clean paperwork," meaning that she processed orders and gathered documentation properly. (A.910). As a commissioned employee, Plaintiff benefitted directly when orders increased, as they dramatically

did while she used cloned notes. (A.874-75). Plaintiff indisputably had incentives to increase orders that Brady did not.

Brady was Plaintiff's supervisor. His title—Center Manager *Without Sales Responsibility*--excluded sales. (DX3,A.570). His essential duties did not include reviewing orders, cultivating referral sources or educating sources about Medicare or insurance procedures. (DX3,A.570-71). He did not receive commissions. He testified that he would only handle orders or substitute for Plaintiff once or twice every two or three months. It was not part of his normal job duties. (A.855).

That Brady described Plaintiff as his "co-worker"(PAB23)(quoting A.832), is completely consistent with their different duties. Merriam-Webster defines "co-worker" as "one who works with another: a fellow worker."[15] Co-workers may still have materially different jobs.

Like the Court, Plaintiff states that Brady described them as having "overlapping responsibilities." (PAB23)(citing A.832). Instead Brady said "[h]er tasks and my tasks *were certainly different*, but we did work together, and there was *some overlap*." (A.832).

Plaintiff likewise exaggerates Brady's testimony that "Brady often also attended these office visits and fielded calls from physicians trying to order ventilators." (PAB23)(citing A.833-84). Instead, regarding visits, Brady testified:

---

[15] https://wwww.merriam-webster.com.

> Q. And, as I understand it, you make visits to physicians'
> offices, Chandra [Plaintiff] does. Now, you attended those
> office visits with her *on occasion*, didn't you?
>
> A. We did. *Sometimes*, we would go together, certainly.

(A.833)(emphasis added).[16]

Nor did Brady testify that he "often" fielded physicians' orders or that this was a regular part of his job, as Plaintiff suggests (PAB23-24)(asserting that "Likewise, Brady accepted, reviewed and processed physician orders"). His testimony was that he "sometimes" did this when Plaintiff was out of the office. (A.834).

That Plaintiff and Brady were subject to the same compliance program and rules proves nothing, as every Lincare employee was.[17] However, Plaintiff miscites the Compliance Program and Code in stating that "violations by Brady or Balderson would result in identical consequences to Lincare." (PAB24)(citing PX15,A.316-26). The document instead emphasizes that different violations may

---

[16] Brady did this in his role as Plaintiff's supervisor. (DX3,A.570-71). As supervisor, Brady followed the same practice with Plaintiff he did with every Parkersburg employee. (A.833)("I would assist anybody in the office with their duties and Chandra was no exception.").

[17] Plaintiff acknowledges that "the same person, Pedersen, was responsible for evaluating both Brady's and Balderson's conduct and levying their respective punishments." (PAB24)(citing A.977,1126). Pedersen was Lincare's national Chief Compliance Officer. She led the investigation of compliance violations at Parkersburg and decided how Brady and Plaintiff would be disciplined for their distinct compliance violations, but did not otherwise "supervise" either individual.

lead to different discipline, stating that "Violation of the Health Care Laws and/or Company Compliance Policies will not be tolerated and will result in discipline ranging *from warnings and reprimand, to discharge* or, where appropriate, the filing of a civil or criminal complaint." (*Id*. at A.323)(emphasis added).

Because Plaintiff's compliance violations differed markedly from Brady's, Lincare validly imposed different punishment. Contrary to Plaintiff's suggestion, (PAB10)(citing A.845,1120), Brady's punishment was nonetheless substantial--a final written warning before termination.

In *Popo v. Giant Foods, LLC*, 675 F. Supp.2d 583 (D. Md. 2009)(cited PAB25), the court found that a white grocery specialist was not similarly-situated to a black grocery manager, a lower position, when only the white worker was fired for their physical altercation. The court noted that "similarly situated employees are alike 'with respect to performance, qualifications and conduct." *Id.* at 589 (citation omitted). It held that "a supervisor and his subordinate are, by definition, not alike in qualifications" and found that plaintiff had failed to make his prima facie case for discrimination. *Id.* Plaintiff incorrectly argues that Lincare omits an "important caveat" by not including the words "in qualifications" in its brief. (PAB25). Plaintiff states that "the *Popo* court proceeded to consider whether the same decision-maker evaluated the two employees' comparative conduct," yet omits that the court found that that issue could not be decided, but that the two

17

employees were not similarly-situated because plaintiff was the alleged comparator's subordinate. 675 F. Supp.2d at 589-90.

Likewise, Plaintiff incorrectly disputes Lincare's statement that *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272-73 (4th Cir. 2005), found that "different positions meant alleged comparators were dissimilar." (PAB25)(citing LOB48). This correctly describes *Anderson,* which held that "[t]he fact that the white employees received promotions and Miss Anderson did not, *when the job requirements and responsibilities for the white employees are different* from Miss Anderson's, does not establish pretext." 406 F.3d at 273 (emphasis added).

By contrast, Plaintiff cites inapposite cases. Plaintiff quotes *Rodgers v. White*, 657 F.3d 511, 518 (7th Cir. 2011)(cited PAB26), which notes that a supervisor and a plaintiff may be proper comparators for purposes of establishing a prima facie case only "when a plaintiff and his supervisor were accused of making similar mistakes," "and" other factors. There, an African-American plaintiff and his white supervisor each improperly endorsed the private use of state-owned equipment, but only plaintiff was fired. The Seventh Circuit found that while a supervisor is usually not a proper comparator to an employee, they can be where their challenged conduct is the same. Here, the relevant conduct was not the same.

*Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999(PAB26) also does not support Plaintiff, as the Eleventh Circuit has distinguished *Lathem* where conduct and positions differed. In *Shell v. AT&T Corp.,* 2021 WL 3929916 (11th Cir. Sept. 2, 2021), the Court held:

> Shell's reliance on *Lathem* is misplaced. In that case, the employer accused the employees *of the same conduct*—having a relationship with a minor client and failing to cooperate in the subsequent investigation—but disciplined them differently by transferring one and firing the other. …Here, …Toledo did not admit to engaging in acts of physical violence against Shell, which would have violated BellSouth's COBC. By contrast, Shell admitted to pushing Toledo against the hood of Toledo's car…. Moreover Shell and Toledo *maintained different positions in BellSouth with different responsibilities*….In light of Shell's admissions and the differences between the positions occupied by Shell and Toledo, Shell and Toledo are not similarly-situated in all material respects.

*Id.* at *7 (emphases added).

In *Sneed v. Swarthmore College*, 2017 WL 3279231 (E.D. Pa. Aug. 2, 2017)(PAB26), the court found that the duties of plaintiff, a sergeant in defendant college's public safety department, "were 'not much more… than a regular patrol officer." *Id.* at *1 (citation omitted). That plaintiff's additional managerial duties, unlike Brady's, were limited to supervising the single officer assigned to each shift he worked. *Id.* at *2. Here, Brady's supervisory position as Center Manager far exceeded Plaintiff's responsibilities.

In *Lee v Kansas City Southern Ry. Co.,* 574 F.3d 253, 261-62 (5th Cir.

2009)(PAB26), the court found that plaintiff's fellow employee, Bickham, was an

appropriate comparator where both were fired for the same type and number of

moving violations but only Bickham was reinstated.  There is no close similarity

here.

### B.    Plaintiff's Discrimination Claim Is Weakened Because Pedersen Is Also Female

Plaintiff cannot dispute that Pedersen, who decided to terminate Plaintiff, is

female, as were a) her direct reports, b) those who assisted with Pedersen with the

Parkersburg investigation and c) the individual hired to replace Plaintiff. Under

controlling law, this should have weakened any inference of discrimination from

Pedersen's conduct, yet the Court ignored this principle.

Plaintiff mischaracterizes Lincare as arguing "that a female, Pedersen, could

*never* discriminate against another female, Balderson." (PAB27) (emphasis

original). Instead, Lincare stated "[t]he Court ignored that plaintiff's gender

discrimination claim *is weakened* because the decision-maker was also female."

(LOB48)(cleaned up)(italics added).

Plaintiff notes that the Supreme Court's decision in *Oncale,* 523 U.S. 75

(1998), "makes clear that [same group] evidence does not, on its own, render

unreasonable an inference of discriminatory intent" (PAB27), but Lincare does not

argue otherwise. Plaintiff admits that *Oncale* "does not categorically prohibit consideration of same group evidence." (PAB27).

This Court has made clear that "although the fact that a decision-maker is a member of the same class as the plaintiff does not preclude a successful discrimination claim, it substantially weakens any inference of discrimination." *Orgain v. City of Salisbury*, 305 F. App'x 90, 103 (4th Cir. 2008)(citation omitted) *See also Pulliam v. Lowe's Cos., Inc*., 2019 WL 653006, *5 (W.D.N.C. Feb. 15, 2019)(same); *Bryan v. Lucent Techs., Inc*., 307 F. Supp.2d 726, 729 (D. Md. 2004)(same).

Proper application of this weakened inference, together with the fact that *no* evidence showed gender was the motivating factor for disciplining Brady and Plaintiff differently, requires judgment for Lincare.

Similarly, Plaintiff argues that the fact that the person hired to replace Plaintiff at Lincare—Tiffanie Mitchem-Craven, is "beside the point" because Pedersen terminated Plaintiff, while Brady hired Mitchem-Craven. But Lincare is the defendant and the law does not draw this distinction. Rather, this Court has held that while hiring a member of the same protected class as the plaintiff is not conclusive evidence of nondiscrimination, it "ordinarily gives rise to an inference that the defendant did not [discriminate]." *Miles v. Dell*, 429 F.3d 480, 488 (4th Cir. 2005).

21

### C. Lincare Had Legitimate, Non-Discriminatory Reasons For Terminating Plaintiff

As the Court recognized (A.1126), Plaintiff's compliance violations gave Lincare a legitimate, non-discriminatory reason for terminating her. (LOB49-50). Plaintiff does not dispute this. Therefore, Plaintiff was obligated to prove that Lincare's stated reason for terminating her was a pretext for gender discrimination. The Court clearly erred in finding Plaintiff met that burden.

### D. The Court Committed Clear Error In Finding Pretext

To establish pretext, Plaintiff had to show that Lincare's stated reason for disciplining Brady and Balderson differently—that their different offending conduct warranted different discipline—was untrue, and was instead a pretext for gender discrimination against her.

As Lincare noted in its Opening Brief, to establish pretext, a plaintiff must show more than that the articulated reason was false, but also "that the employer discriminated against h[er] on the basis of [sex]." (LOB50)(quoting *Laber v. Harvey*, 438 F.3d 404, 430-31 (4th Cir. 2006)). Plaintiff incorrectly suggests that in relying upon *Laber*, Lincare is urging a "pretext-plus" standard, which *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133 (2000) rejected. (PAB40 n.9). Rather, Lincare's point is that a court cannot find pretext where, as here, Plaintiff failed to establish her prima facie case, irrespective of falsity. *Laber* relies on *Reeves* for that holding, finding that "in some cases, however, proof that the

employer's reason is false is sufficient to show age discrimination *when combined with the plaintiff's prima facie case*. *See Laber*, 438 F.3d at 430-31 (citing *Reeves*, 530 U.S. 147–48) (emphasis added); *see also Westmoreland v. TWC Administration LLC*, 924 F.3d 728, 728 (4th Cir. 2019)(cited PAB40).[18] Thus, even if Plaintiff could cite some falsity by Lincare (and she cannot), she cannot establish pretext because her prima facie case fails, as she cannot show a proper comparator or overcome the inference of non-discrimination because Plaintiff's replacement and Pedersen are female.

Lincare also noted in its Opening Brief that courts will not find pretext where an employer reasonably believed that an employee violated its policies. (LOB50-51). The West Virginia Supreme Court so held in *Mingo County Equal Employment Opportunity Council v. State Human Rights Comm'n*, 376 S.E.2d 134 (W.Va. 1988), in reversing the WVHRC's finding of pretext, which Plaintiff ignores. Applying *Mingo* means that if Lincare reasonably determined that Plaintiff's violations of Lincare's policies were different than Brady's, this precludes a finding of pretext.

---

[18] In *Westmoreland*, besides providing evidence suggesting the employer's reason for termination was implausible, plaintiff "presented additional evidence that permitted a reasonable inference of discriminatory intent." (*Id*.)

The Court found pretext based on its finding that Brady and Plaintiff were punished for "nigh indistinguishable" conduct. (A.1126). Because this was incorrect, Plaintiff's prima case failed and it was clear error to consider pretext.

### 1.    That Pedersen Followed Her Customary Practice In Terminating Plaintiff Did Not Show Pretext

Plaintiff cannot overcome that Pedersen testified that she always terminates those who possess or use cloned notes and had discharged employees for cloned notes after prior investigations, including men. (A.1005,1007). She testified she had never made any exception. (A.1007)("For the type of infractions that Ms. Balderson had, I have never not terminated anyone for that.").[19] That Pedersen followed her longstanding procedure precludes pretext.

Unable to rebut this, Plaintiff addresses a subsidiary point—that Pedersen testified that she "discharged a male [in] pretty close proximity in time to when Ms. Balderson was discharged." (A.1005). Plaintiff admits that there is no contrary evidence, but, like the Court, minimizes the testimony as concerning a "mystery male character." (PAB29) Yet, Pedersen had already testified that she had previously terminated individuals (including men) for using cloned notes, and her

---

[19] Indeed, the Court asked Pedersen if she had the discretion not to terminate an employee for such offenses and Pedersen said that, while she had that discretion, "I've never not [terminated such an employee]." (A.1007). The Court then asked if it would play a role in her decision that the employee had a good faith belief they were not violating company policy; she answered it would not. (A.1007-1008).

so-called "mystery man" example was merely further proof of her unwavering
practice. What was relevant was Pedersen's discussion of her own practice; the
name, age or location of the former male employee was immaterial. Indeed, that is
likely why Plaintiff's counsel neither objected to this testimony at the time nor
cross-examined Pedersen about this when given that opportunity shortly thereafter.
(*See* A.1008-1009). Plaintiff cannot claim prejudice because she did not know
details about this male employee, when her counsel elected not to ask about these.
The Court, too, had previously questioned Pedersen about other topics (A.992), but
not this. The Court incorrectly found that Pedersen provided "absolutely no detail"
about this man. (A.1133,n.7).  Pedersen, again, was testifying about her personal
conduct, and noted the person was a) male b) fired for cloned notes c) in the same
approximate time-period as Plaintiff. Pedersen was also testifying about her
personal decision.[20] Nothing further was necessary.[21]

---

[20] Plaintiff states that Lincare had not referenced this "mystery man" in prior
witness disclosures (PAB30), yet the "witness"—Pedersen—was disclosed. Again,
Pedersen was describing *her own practice*—what *she* had recently done. Plaintiff's
counsel also deposed Pedersen, where she testified that she decided to terminate
Plaintiff "based on standard practices of violation of the compliance program."
(A.40). Plaintiff's counsel did not explore that issue further there either. (*See
generally* A.35-50).

[21] Plaintiff mistakenly suggests that Pedersen's right to testify about the "mystery
man" was a "theory" which Lincare waived by not disclosing it in the pre-trial
order. Rather, it is additional testimony which reinforces Pedersen's testimony that
she always terminates employees who use cloned notes. Both *Babby v. City of
Wilmington Dep't of Police*, 614 F. Supp.2d 508 (D. Del. 2009), and *Colli v. Wirth*,

Regardless, the evidence is undisputed that Pedersen always discharged those who used cloned notes, including males. That alone disproves pretext.

> **2. Because Lincare Did Not "Shift Its Explanation" Regarding Why Plaintiff Was Terminated, The Court Erred In <u>Finding This Showed Pretext</u>**

Plaintiff notes that the Court found pretext in Lincare's purported "shifting explanation and its own inconsistent practices." (PAB31)(*see also* A.1127). Lincare's position never shifted. Lincare's reasons for terminating Plaintiff have always been that she violated its Compliance Program by using and possessing cloned notes. When her counsel questioned her at trial, Plaintiff admitted that she was told this when she was terminated:

> Q. Do you recall a meeting with Lincare executives on the day you were terminated.
>
> A. I do.
>
> Q. And in that meeting did they tell you the reason for your termination?
>
> A. They told me that I was being fired for leading physicians, for providing leading information to physicians.
>
> Q. And how did they indicate that you were providing that leading information?
>
> A. With the certain language that was being used.
>
> Q. With your progress notes?

---

1996 WL 442835 (S.D.N.Y. Aug. 6, 1996)(cited PAB30,n.5), concerned new legal theories.

A. Yes.

Q. And with other language that you provided to the doctors?

A. Yes.

(A.876).

Pedersen's testimony was fully consistent with Plaintiff's admissions. Pedersen testified that cloned notes are leading, but explained they are more than this:

Q. I mean, would they be characterized as leading information to physicians?

A. *They would be characterized as leading and* actually providing information to a physician to put in a medical record.

(A.971-72) [22](emphasis added).[23]

Even though Brady did not use cloned notes or instruct physicians how to complete orders, Plaintiff argues that because both Plaintiff and Brady engaged in

---

[22] Plaintiff erroneously argues that there is an inconsistency between Lincare's stating that Pedersen, as Chief Compliance Officer for two decades, *would* know what constituted misrepresenting a diagnosis for purposes of the Compliance Program she oversees, but *would not* know whether Plaintiff violated federal law because she is not a lawyer and this is not part of her job. (PAB36,n.7). There is none.

[23] Well before trial, Lincare made this clear, including in its summary of material facts and theories of defense in the Pre-Trial Order. (A.124-27)(noting that Plaintiff's conduct which led to Lincare's termination included use of cloned notes and requesting that specific templates and statements be added to individual patient's records).

forms of leading, Lincare could not legitimately punish them differently based on their different conduct. *Mingo* holds otherwise. Because Brady and Plaintiff's conduct was materially different, the Court clearly erred in finding it to be "nigh indistinguishable." (A.1126).

The Court likewise found pretext solely because the label of "leading" was used in communications with both Plaintiff and Brady in connection with their respective punishment, disregarding that a company can properly determine there are different forms of leading (or leading violations of different magnitude) which warrant different penalties. Thus, even assuming Plaintiff had not violated other compliance rules besides leading (which she did), Lincare still had legitimate grounds for terminating her, while disciplining Brady with a final written warning for his different leading violation.

The Court and Plaintiff also disregard that Lincare always had relied on DX12 to support its termination of Plaintiff. (LOB53-54;DX12,A.651-655). DX12 showed that Plaintiff directed a physician what to say in an order, which was inconsistent with the patient's medical record. Plaintiff told a physician to add a cloned note that stated that a patient was being treated for COPD when the patient's medical record showed a different diagnosis, and said that Plaintiff needed a ventilator when, to this date, she benefits from a CPAP, a different device. (A.1001-1002). The physician did what Plaintiff asked.  Plaintiff thus not

only led the physician, but also patently misrepresented a diagnosis and caused documents to be false.[24] Yet, Plaintiff asks this Court to believe that by maintaining at trial that Plaintiff not only led physicians but *also* misrepresented a diagnosis and falsified documents—additional categories of compliance violations—this evidenced gender discrimination and not Lincare's sincere belief. No evidence supports this.

Plaintiff incorrectly states that "on the day she was fired, and for months after, Lincare represented that Balderson had been terminated for 'leading' physicians." (PAB32). Again, Plaintiff's testimony shows she was told more than this. (A.876).[25]

Like the Court, Plaintiff cites Lincare's answers to interrogatories as purported evidence that Lincare "shifted" its explanation for Plaintiff's termination, but it shows the opposite. As Plaintiff admits, Lincare did not limit its

---

[24] Plaintiff notes that the Court found that the "simplest explanation" is that in DX12 she was "simply help[ing] a trusted physician complete a presumptively valid order." (PAB40)(citing A.1128). However, telling a physician to refer to conditions that are self-evidently not in a patient's record and stating that the patient needs a device she did not are not "helping a physician." Irrespective, the test for pretext is not whether Pedersen or Lincare erred in believing Plaintiff misrepresented a diagnosis here, but whether they acted for an illicit reason. *See Skaggs v. Elk Run Coal Co.*, 479 S.E.2d 561 (W.Va. 1996). No evidence shows this.

[25] Plaintiff admits that she was told she was terminated because of "other language that you provided to doctors." (A.876).This is consistent with misrepresenting a diagnosis even if that precise term was not used.

explanation to leading, but said she was terminated "because she violated Lincare's corporate compliance program, *including without limitation* by inappropriately utilizing leading 'templates' for patient set-ups." (PAB32)(citing A.530)(emphasis added).

Plaintiff also errs in stating that Lincare's statement to Workforce—prepared by its third party vendor—that "this individual was discharged for a violation of company policy" and "the claimant was discharged for a compliance violation" – was "knowingly false on its own terms." (PAB33). Plaintiff irrefutably *was* discharged for violation of a company policy and a compliance violation. Nothing is inconsistent with Lincare believing that Plaintiff improperly a) led physicians; b) misrepresented a diagnosis;[26] c) caused false documents to be submitted, and d) offered services to a source in exchange for a referral, which all are company policy and compliance violations.

Plaintiff suggests incorrectly that Lincare first mentioned misrepresenting a diagnosis specifically after she sought to amend her complaint to add a gender discrimination claim. (PAB32-33). Again, Lincare always noted it had reasons

---

[26] Plaintiff falsely claims that Lincare "now asserts that Balderson's alleged misrepresentation was the critical factor in her termination." (PAB33). Rather, her keeping of 17 cloned notes, causing cloned notes to be added to 19 patient orders, use of cloned notes for 1½-2 years; filling in portions of patient orders; directing physicians to add language; causing false language to be added which misrepresented patient diagnoses, and performing services for physicians that their offices should have done are collectively the "critical factor" in her termination.

besides leading for terminating Plaintiff, and DX12 and other evidence of a

misrepresentation of diagnosis have always been in the record. Nor did Lincare

need to add additional grounds for termination to distinguish between Brady and

Plaintiff. Even if leading had been the only reason for her termination (and it was

not), the nature and magnitude of Plaintiff's leading were irrefutably different than

Brady's.

### 3.    Lincare Did Not Have To Report Plaintiff's Compliance Violation To The OIG

Plaintiff emphasizes that the Court also found pretext because Lincare did

not report Plaintiff's use of cloned notes to the OIG, as Lincare was required to do

under its CIA if it believed a probable violation of federal law occurred. (PAB33).

But Lincare did not terminate Plaintiff for violating federal law; it terminated her

for violating its Compliance Program. Pedersen explained that there could be

circumstances where an employee's conduct could violate the Compliance

Program but not federal law and vice versa. (LOB34,n.24). Plaintiff argues that

"[i]f Lincare sincerely believed that Balderson violated various healthcare laws by

submitting fraudulent orders, those suspected violations should have been reported

under the CIA." (PAB34). Again, Lincare did not conclude that Plaintiff "violated

various healthcare laws," but rather *its Compliance Program*.

Plaintiff posits a false dichotomy by stating that not reporting Plaintiff's

violations to the OIG "could mean one of two things:" either Lincare breached its

duty to the OIG or it did not genuinely believe Plaintiff misrepresented a diagnosis. (PAB35). Plaintiff ignores the third and actual reason why Lincare did not report—it did not determine that Plaintiff committed a probable violation of federal law, and did not need to find this to conclude she violated its Compliance Program.

Plaintiff does not dispute that scienter is required for a violation of the FCA or AKS but argues that it must exist here because Lincare has never argued that her misrepresentations were accidental. (PAB37-38). This misunderstands the standards for scienter. *See United States ex rel. Complin v. N. Carolina Baptist Hosp.*, 818 F. App'x 179, 183, 184 (4th Cir. 2020) (plaintiff failed to plead scienter, which could not be inferred from defendant's regulatory violation because the FCA does not punish regulatory violations arising from honest mistakes or incorrect claims submitted through negligence.); *United States v. The Boeing Co.*, 825 F.3d 1138, 1149 (10th Cir. 2016) ("But the relators haven't shown the requisite scienter necessary to establish FCA liability. The relators must show more than a falsehood—they must show that Boeing knowingly presented a false claim for payment.").

Lincare did not need to determine whether Plaintiff acted with scienter; as that is not required to find a compliance violation warranting termination. As Pedersen testified, she would have terminated an employee for using cloned notes even if the employee believed in good faith this was permitted. (A.1007-1008).

The Court itself determined "there has been no evidence of any evil intent of Ms. Balderson," identifying the same issues of scienter. (A.1127-1128,n.4).[27] However, there indisputably was evidence that Plaintiff violated Lincare's Compliance Program, which provided sufficient grounds for termination.

### 4. Pedersen's Correction Of Her 30(b)(6) Deposition Does Not Show Pretext, Where Plaintiff's Counsel Abruptly Questioned Her On Topics Outside Its Scope

Plaintiff largely ignores and thus concedes the facts that show Pedersen reasonably corrected an error in her deposition as a 30(b)(6) witness. This cannot show pretext.

Whether Lincare believed Plaintiff violated federal healthcare laws was not an enumerated topic for the deposition. Plaintiff erroneously attempts to suggest otherwise. (PAB36)(citing A.30). A review of the relevant questions confirms that the topic concerned *compliance policies* violated by Plaintiff and Brady, and not whether each violated federal law. Topic 8 asked:

> *Specific to the policies supposedly violated by Plaintiff and Mr. Brady*, information pertaining to Lincare's employee handbook, company policies, guidelines and compliance programs, including: i) any statutory or regulatory basis *for those policies*; ii) what would and

---

[27] The Court's conclusion that Plaintiff lacked evil intent also shows why Plaintiff errs in arguing that "Lincare cannot credibly contend that Balderson's alleged conduct was not, at least, a "probable" violation reportable under the CIA" (PAB38), as without the requisite state of mind, there is no "probable" FCA or AKS violation. Lincare did not determine or need to determine Plaintiff's state of mind.

> would not qualify as a violation *of said policies*; iii) how
> violations are reported and investigated and
> iv): disciplinary measures for such violations.

(A.30)(emphasis added).

Plaintiff also notes that if Lincare objected to questioning Pedersen about topics outside the scope of the Rule 30(b)(6) notice, Lincare's lawyer should have raised this. He did – twice.  First, Lincare's counsel objected when Plaintiff's counsel stated that Lincare was "claiming that Ms. Balderson potentially violated one of a number of federal statutes." (A.77, at p.12:14-18). Next, he objected to counsel's question regarding whether "these examples [from Lincare's compliance program] track the actual language in the anti-kickback statute and false claims act?" (A.78 at 15:20-23).

Plaintiff disregards that from pages 9-15 of that deposition, Plaintiff's counsel asked Pedersen about *what prohibitions in the Compliance Program* Plaintiff potentially or actually violated. (A.77-78). Counsel used Lincare's Code to guide this discussion. Counsel's references to pages 1161 (p.9), 1153 (p.9, 14-15), 1152 (pp.10 13), 1155 (p.10), were to Code pages. Page 1153 contains bullet-point examples of conduct which violates Code provisions regarding the FCA. (A.77-78). On page 15, Plaintiff's counsel notes that "[s]o those four bullet points that we discussed on page 1153, those are the only potential or actual violations from Ms. Balderson?" which Pedersen confirmed was correct. Counsel then asked

34

"And those were the basis for her termination," and she confirms they were. (A.78). As noted in Lincare's Opening Brief, after confirming that compliance violations were "the basis for her [Plaintiff's] termination," Plaintiff's counsel shifted from questions about violations of the Code and Compliance Program-- which were relevant and noticed topics--to questions about whether Plaintiff violated the law, which were not.

These undisputed facts show why Pedersen rightfully made corrections in her errata sheet, changing her answers regarding whether conduct "would" violate the law to whether it "could." Lincare then gave Plaintiff the opportunity to depose Pedersen a second time on this subject on September 10, 2020, wherein Plaintiff explained why she stood by her errata, but Plaintiff omits this.

It was clear error for the Court to have inferred pretext from an improper question asked of Pedersen, about an unnoticed and factually irrelevant topic.

In sum, there was no basis for finding pretext. Rather, the Court improperly substituted its judgment for Lincare's rightful exercise of business judgment in enforcing its Compliance Program.

### E. This Court Has Reversed Discrimination Determinations Where A Court In A Bench Trial Second-Guesses Discipline For Compliance Violations

As *Moore* shows, this Court has reversed a judgment in favor of a plaintiff for discrimination—there, race discrimination—following a bench trial where, as

35

here, a plaintiff fails to make a prima facie case. Like here, in *Moore* the question concerned differences in how two employees were punished for compliance violations. *Moore* emphasized the importance that offenses be similar:

> The most important variables in the disciplinary context, and the most likely sources of different but nondiscriminatory treatment, are the nature of the offenses committed and the nature of the punishments imposed. The purpose of the prima facie requirement is therefore served and the requirement met upon a showing (1) that plaintiff engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin, and (2) that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person.

754 F.2d at 1105-1106. Like here, the plaintiff in *Moore* presented no direct evidence of discriminatory intent in the disciplinary decisions or evidence of a pattern of discriminatory bias at his employer. Rather, plaintiff's prima facie case rested upon his claim that he was treated less favorably than white officers who engaged in similar misconduct. As here, the district court found for plaintiff after a bench trial.

This Court reversed, holding: "[t]hese findings, however, rest on an unprincipled conception of 'similarity' and 'comparability,' a structural flaw that renders the fact-finding process "clearly erroneous" under the reasoning of *Miller v. Mercy Hospital*, 720 F.2d 356, 361 (4th Cir.1983)." *Id*. This Court then found that close examination of the decisions that plaintiff claimed showed racial bias

instead reflected dissimilar circumstances. The Court found that Moore alone "abus[ed] his position in an attempt to persuade government officials to forebear prosecution of a criminal trial." *Moore*, 754 F.2d at 1110. Accordingly, because "Moore's violations were as singular as his punishment," the inference of discriminatory intent based solely on the uniqueness of his demotion was clearly erroneous. *Id*. at 1110-11. Here, like circumstances also require reversal.

### F.    The Court Committed Clear Error In Awarding Punitive Damages

The Court awarded punitive damages against Lincare for sharing with the WV Board its good faith belief that Plaintiff might be engaging in professional misconduct, based on "information of record" and "primary source verification" from that Regulator's own website. (DX21,A.679). The Court also faulted Lincare for not acting in response to a fax from the WV Board, even though the Lincare employee responsible for communicating with it never saw that fax until preparing for trial. Plaintiff cannot overcome the reasons why the Court's award was clearly erroneous and an abuse of discretion.

#### 1.    Plaintiff Falsely Suggests Lincare Argues For The Wrong Standard For Punitive Damages

Plaintiff erroneously accuses Lincare of applying the wrong standard for finding actual malice for purposes of punitive damages, suggesting it requires "outrageous indifference" rather than criminal indifference, and that Lincare is

relying upon authority which was decided after W.Va Code 55-7-29 was issued. (PAB41-43).

First, Lincare relies on *Constellium Rolled Prods. Ravenswood LLC v. Griffith*, 775 S.E.2d 90,100 (W.Va. 2015), which was decided by the West Virginia Court on June 10, 2015, two days **AFTER** W.Va. Code §55-7-29 became law (June 8, 2015), not before, as Plaintiff implies. (PAB42).[28]

The case Plaintiff relies on, *Jordan*, was not a discrimination case and does not reject or address the standard of criminal indifference, but instead adopts an "outrageous indifference" standard. As discussed below, decisions applying West Virginia law after W.Va. Code §55-7-29 use these terms interchangeably and many refer to a criminal indifference standard.

Moreover, the Court's footnote is inconsistent with its text articulating the standards for punitive damages in West Virginia, which is laid out at A.1140-1141. At A.1141, the Court cites *Billings v. Lowe's Home Centers, LLC* as articulating the "guidance" for when punitive damages are available in West Virginia. This includes criminal indifference:

> Although published before the enactment of West Virginia Code §55-7-29(a), the West Virginia Supreme Court has previously provided guidance as to when punitive

---

[28] In a footnote, the Court also stated that "Lincare also appears to rely on an outdates (sic) legal standard of 'criminal indifference' which had been articulated by the West Virginia Supreme Court prior to the enactment of W.Va Code §55-7-29 in 2015," (Op.,A.1144), yet this was incorrect

> damages are available to a plaintiff. Under West Virginia
> law, punitive damages are not appropriate in cases of
> "simple negligence, … but are instead reserved for
> "actions of tort [] where gross fraud, malice, oppression or
> wanton or willful or reckless conduct *or criminal*
> *indifference to civil obligations affecting the rights of*
> *others appear[.]*.

(Op.,A.1141)(quoting *Billings v. Lowe's Home Centers, LLC*, 2019 WL 1869936,

*5 (S.D.W. Va. Apr. 24, 2019)(italics added, brackets and ellipses original), in

turn, quoting *Alkire v. First Nat'l Bank of Parsons*, 475 S.E.2d 122, 129 (W.Va.

1996). Thus, Chief Judge Johnston himself recognized that criminal indifference

remains an appropriate standard for punitive damages.

Chief Judge Johnston acknowledged this again in a 2020 opinion, ruling: "In

West Virginia, punitive damages, 'may be awarded 'in actions of tort, where gross

fraud, malice, oppression or wanton, willful or reckless conduct *or criminal*

*indifference to civil obligations affecting the rights of others appear*.'" *Williams v.*

*West Virginia Division of Correction*s, 2020 WL 748873 (S.D. W. Va. Feb. 13,

2020)(quoting *Harris v. Kenan Advantage Grp, Inc.*, 2018 WL 61823, *2 (S.D. W.

Va. Nov. 27, 2018), in turn citing *Lawson Heirs Inc. v. Skyway Towers, LLC*, 2018

WL 3381411 (S.D.W. Va. July 11, 2018)(emphasis added).[29]

---

[29] Other West Virginia district courts have recently noted that "criminal
indifference to civil obligations affecting the rights of others" is a basis for punitive
damages. *See Schneider v. Dodson Bros. Exterminating Co*., 2021 WL 798865, *5
(S.D. W. Va. Mar. 2, 2021)(WVHRA case).

Even after W.Va. Code §55-7-29(a) was passed, the West Virginia Supreme Court has left intact a punitive damages award which included criminal indifference in its standard. In *Thomas v. Houck*, 2016 WL 6780095 (2016)(mem. op.), the Supreme Court upheld an order granting plaintiff punitive damages, and denied defendant's motion for new trial, stating:

> [T]he circuit court made the finding that there was sufficient evidence in the record to justify submission of punitive damages to the jury, because "the jury could conclude that [Mr. Thomas] was aware of [Mr.Houck's] prescriptive easement and that the erection of the fence was intentional, reckless and harmful, *and/or that it exhibited criminal indifference to civil obligations*."

*Id.* at *2 (brackets in original, italics added).

### 2. Plaintiff Misstates Record Facts In Trying To Justify Punitive Damages

The record shows that far from engaging in "vindictive and retributive" conduct in investigating Plaintiff's licensure and contesting her application for unemployment compensation, Lincare's responsible employee—Moreau— followed her customary practice. (A.1070). No evidence shows Plaintiff's gender played any role. (Moreau is also female). *See West v. Tyson Foods, Inc.*, 374 F. App'x 624, 636 (6th Cir. 2010)(noting that malice must pertain to the "federally protected[30] rights of an aggrieved individual.").

---

[30]Plaintiff mocks Lincare's argument that punitive damages in this case should be read consistent with principles of federal law under Title VII because the HRA

Based on primary source verification provided by the WV Board, Moreau reasonably believed Plaintiff's respiratory therapist license had expired, reasonably advised the WV Board that Plaintiff was holding herself out as a respiratory therapist in West Virginia when it had been advised this had expired, and reasonably advised the WV Board about Plaintiff's prior Consent Agreement with Ohio. Likewise, based on the West Virginia primary source information, Lincare reasonably advised Workforce that Plaintiff appeared to be holding herself out as a respiratory therapist despite an expired license as a secondary reason to oppose her claim for unemployment (which Plaintiff received anyway). While Plaintiff, like the Court, emphasizes the WV Board's fax to Lincare's West Virginia office, *that fax indisputably did not reach Moreau* and *no evidence* identifies any Lincare employee who saw it. While the Court found actual malice in Lincare's failure to "correct" the information it previously provided the WV Board (based on its primary source verification) and Workforce, neither Moreau nor any individual at Lincare could know to "correct" statements that they did not know were incorrect.

---

adopts Title VII standards. (PAB51-52). However, because punitive damages turn on whether protected rights under a statute are aggrieved, the West Virginia Supreme Court in *Constellium* considered Title VII standards for this purpose. 775 S.E.2d at 99 & n.5.

By awarding Plaintiff punitive damages against Lincare on these facts, the Court essentially held Lincare to a strict liability standard. This alone requires reversal of that award.

Plaintiff notes that Lincare had not previously attempted to verify her licensure before she was terminated, even though she noted her licensure on her Application. (PAB10,44). Yet, Plaintiff ignores this was because she was hired as a Sales Representative and not a clinician. (A.1090). Moreau was unaware that Plaintiff was a licensed clinician until June 3, 2019, when they met in Parkersburg during the Investigation. (A.1088-1091,1096). Moreau then noticed that Plaintiff wore a name badge identifying herself as a licensed respiratory therapist and included this information on her business card. (PAB44) (citing A.1069-70,1141). Because Plaintiff held herself out to referral sources as a clinician, Moreau followed her customary practice when a clinician was terminated and proceeded to verify her status. (LOB27)(citing A.1070-71,1088-89). Moreau followed the same practice she would have followed for any other Lincare employee. (A.1104).

Plaintiff exaggerates this effort, stating Moreau spent "weeks scouring various licensure registries." (PAB10). The Court, too, concluded that Lincare "investigated her licensure status for several weeks." (A.1141-42). The record shows instead that Moreau began investigating Plaintiff's licensure on June 4,

42

201,9 and transmitted Lincare's Complaint Form to the WV Board eleven days later. (PX7,A.204).

The Court faults Lincare for "repor[ting] erroneous information to the [WV] Board." (A.ll42). But the erroneous information—that Plaintiff's West Virginia License had expired—*was a fact Lincare only learned from the primary source verification of the WV Board itself dated June 4, 2019*. (DX21,A.679). This indisputably stated that Plaintiff's West Virginia license had expired December 31, 2018, six months before. (*Id*.). The WV Board's document states in all caps:

> THIS DOCUMENT SERVES AS "PRIMARY SOURCE VERIFICATION" AND REFLECTS INFORMATION OF RECORD MAINTAINED BY THE [WV] BOARD OF RESPIRATORY CARE THIS DATE OF: 6/4/2019.

(*Id*). Moreau stated that she regularly relies on primary source verification as a business practice. (A.1072). Moreau acted reasonably in accepting the accuracy of the Regulator's "INFORMATION OF RECORD" and "PRIMARY SOURCE VERIFICATION."

Plaintiff notes that Moreau did not call the WV Board to confirm its website's accuracy (PAB10), but because it was reasonable to assume the Regulator was correct, no call was necessary. Indeed, the purpose of websites is to convey information more efficiently than phone or written correspondence. Moreau also followed her customary practice in not telephoning Plaintiff or Brady about the Regulator's "information of record." Again, it was not Moreau's

43

customary practice to verify by telephone whether a regulator's information of record was accurate. Moreau indisputably followed her customary practice. (A.1070-1071,1104).[31]

Plaintiff states that Lincare lodged a "formal complaint, accusing Balderson of misrepresenting her status." (PAB10,44). Moreau noted that after reviewing all information and in consultation with Lincare's Human Resources and Legal Departments she believed Plaintiff might have been misleading in wearing a badge representing herself as a respiratory therapist if her license had expired. (A.1081-1082). Based on her understanding from the primary source document that she reviewed and her review of regulations (both found on the WV Board's website), Moreau thought there might be some type of professional misconduct which was important to bring to its attention. (A.1082-1083). Moreau completed and submitted the WV Board's form used for this purpose. This is called a "Complaint Form," but Lincare sought no relief. (PX7,A.203).

It cannot be disputed that it is reasonable to provide information to a Regulator about a person it regulates concerning the subject of that regulation. Moreau indisputably believed it important to advise the WV Board about potential professional misconduct. (A.1092,1094).

---

[31] Plaintiff notes that the Court believed that the search was motivated by animus toward Plaintiff and not standard practice, (PAB45), but no record fact supports this.

Similarly, Plaintiff notes the Court faulted Moreau for "gratuitous[ly]" advising the WV Board that Lincare had learned that Plaintiff's Ohio License had been subject to a consent agreement in 2015. (PAB46)(citing A.1142, citing A.203). This was not gratuitous. Moreau testified she believed it was important to share this information with the WV Board. (A.1092). No evidence disputes her sincerity. Plaintiff presents no authority that it is "vindictive" to provide accurate information to a government licensing entity about a licensed person's related license in another jurisdiction, especially information about discipline related to that other license.

Like the Court, Plaintiff emphasizes that after receiving Lincare's information, the WV Board appears to have sent a fax to Lincare's site in West Virginia stating that its website information concerning Plaintiff's licensure status was inaccurate. *However, Moreau never received this or knew it existed until after this litigation began*. (A.1083-84). The letter was not sent to Lincare's Florida headquarters, where Moreau worked or where her fax to the WV Board originated from. (PX8,A.206).[32] No one from Lincare's Parkersburg Center sent her that document. (A.1084). Therefore, while Lincare as a company may have received the letter (PAB10), neither Moreau nor any other identified Lincare employee

---

[32] Indeed, Plaintiff admits it was sent to *where Plaintiff had worked*. (PAB47).

knew this.[33] Lincare cannot be said to have acted with "actual malice" in not

correcting its Complaint Form to the WV Board when neither the individual

responsible for this form nor any other identified Lincare employee had actual

knowledge of the WV Board's fax, or knew of the WV Board's error or of any

need to correct anything.

Likewise, Plaintiff notes that "despite the mailed and faxed letters from the

Respiratory Board, Lincare went on to oppose Balderson's application for

unemployment benefits on the basis of the licensure information it now knew to be

false." (PAB11)(citing A.210,212,215,895-96,1122). To the contrary, Moreau

testified she did not know this information "until preparation for this trial,"

(A.1094), but, in any case, was not involved in communicating with Workforce.

(A.1088).[34] Plaintiff highlights that Lincare wrote Workforce several days after the

WV Board's fax (PAB11,48), but the fact remains that neither Moreau nor any

identifiable Lincare employee knew the WV Board's information was incorrect.

(PAB11)(comparing A.206 *with* A.215;A.212,1122).[35]

---

[33] Plaintiff noted the Court stated there was "some debate" at trial as to who at
Lincare received this. (PAB10)(citing A1121,1083-84). Rather, the evidence was
undisputed that Moreau never received it. (A.1083-1084).

[34] Despite this unrebutted testimony, the Court found that "Lincare has not put
forth any evidence, convincing or otherwise, that no one saw the letter." (PAB47
(citing A.1143).

[35] Plaintiff's counsel argued that Moreau "knew it by at least August 10," This is
plainly August 10, 2020, the date Lincare filed its motion for summary judgment.
(Dkt.,A.2-11).

Likewise, Plaintiff notes the Court found Lincare originally argued that Moreau had a legal duty to review Plaintiff's licensure, but allegedly then shifted positions. (PAB46)(citing A.1070,1089,1094-95,1142-43). However, this finding constituted error. Rather, Moreau testified that she began her practice of verifying licensure *in general* when a clinical licensed employee was terminated because this was required in some states. (A.1070). She corrected Plaintiff's counsel when counsel suggested she had said she had a legal duty:

> Q. Do you believe that you were under a legal obligation? Because I am just confused. I thought you testified in response to Ms. Kowalkowski's questions that you believed you did this because you had a legal duty to do so?
>
> A. *No. I did not say it was a legal duty.* This is a process that I do as part of our clinical policies, procedures and protocols and part of my job description is to monitor the clinical licenses for our healthcare professionals, our employees.

(A.1089)(emphasis added).

Plaintiff also ignores that Lincare rightfully objected to Plaintiff receiving unemployment because she was terminated for cause for violating Lincare's compliance program, which she did. Whether Lincare had additional grounds is immaterial.[36]

---

[36] Contrary to Plaintiff's assertion, the Workforce letter does not refer to Plaintiff's licensure *as a reason for termination*. (PAB48)(citing PX12,A.215). Rather, in one sentence, the letter notes she was terminated for compliance violations. In a second

Irrespective, Plaintiff received her unemployment compensation. The WV Board took no action against her. She suffered no harm from any of this. Punitive damages should not be awarded where a plaintiff suffers no injury. As Plaintiff acknowledges, the Supreme Court has held that "[a] defendant should be punished *for the conduct that harmed the plaintiff*." (PAB50)(quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003)(emphasis added).

### 3. Because The Licensure Investigation Involved Issues Unrelated To Those Underpinning Plaintiff's Claim, It <u>Cannot Support Punitive Damages</u>

Lincare does not argue, as Plaintiff suggests, that post-termination conduct can never support punitive damages. (PAB53). Rather, here it cannot because the reasons for investigating her licensure have nothing to do with the reasons for her termination. Moreau only learned that Plaintiff was holding herself out as a clinician when she met her during the Investigation, but her practice of investigating licensure is one she follows with all terminated clinical employees. It had nothing to do with attempting to discipline Plaintiff for compliance violations or how she was treated relative to Brady—the bases for Plaintiff's discrimination claim.

---

sentence, it notes she failed to notify her Respiratory license had lapsed. (PX12,A.215).

Moreover, Moreau, while responsible for investigating licensure, was not the decision-maker as to termination. Plaintiff cites *West*, 374 F.App'x at 636 (PAB51), to contend otherwise, but it is distinguishable. There, a plaintiff who was constructively discharged by a campaign of sexual harassment was found entitled to punitive damages because a supervisor did not report plaintiff's harassment complaint to Human Resources. Unlike here, the conduct was engaged in by plaintiff's supervisor and directly related to the harassment.

## III.    BRIEF RE CROSS-APPEAL

### A.    Statement Of Issues Related To Cross-Appeal

1. Whether the Court correctly determined that Lincare established its "after-acquired evidence" defense to Plaintiff's gender discrimination claim, limiting Plaintiff's salary recovery to one day's back pay where, one day after Plaintiff's termination for compliance violations, Lincare first learned that Plaintiff had lied on her Application to Lincare—stating that her respiratory therapist license was under no restriction or discipline, when her Ohio License was under probation—and a) Lincare's corporate representative testified that Lincare would have terminated her for this;  b) the Application expressly stated that misrepresentation was cause for immediate termination and c) such lying was a "Major Infraction" serious enough to result in immediate termination.

### B.     Statement Of Case As To Cross-Appeal

#### 1.     Following Standard Practice, Moreau Investigates Plaintiff's Licensure After Her Termination

Plaintiff is a licensed respiratory therapist. While at Lincare she wore a name tag that said "RRT"—Registered Respiratory Therapist—and included that information on her business card. (A.900-901).

Moreau did not know Plaintiff was a licensed clinician until they met on June 3, 2019, during the on-site Investigation. (A.1088-1091,1096).

After a clinical licensed employee of Lincare is terminated, it is common practice at Lincare to ensure they are licensed and to review the rules and regulations of the state they are licensed in. Some states require employers to report a change in a clinical employee's status, and Lincare does this as part of its process of following all rules and regulations. Moreau completes this process in conjunction with Lincare's Legal and Human Resources Departments. (A.1070-1071). She does so as part of Lincare's clinical policies, procedures and protocols and because her responsibilities include monitoring the clinical licenses of employees who are healthcare professionals. (A.1089). Moreau followed the same practice with Plaintiff that she would with any other employee. (A.1104).

Plaintiff, while in a sales role, had represented herself to physicians as a respiratory therapist. (A.1016-17). Because of this, on June 4, 2019, the day after her termination, Moreau reviewed the status of her licensure, both with West

Virginia, as noted above, and with Ohio, since Parkersburg borders Ohio. (A.1072-1074).

### 2.    Moreau Learns That Plaintiff Lied On Her Application

Moreau learned from the Ohio Board's website that Plaintiff's Ohio License was expired, but also that it had been the subject of disciplinary action. (A.1075-1077). On that website, Moreau saw what was entered at trial as DX20. (DX20,A.674-676). This showed that Plaintiff entered into a consent agreement with the Ohio Board dated April 22, 2015 ("Consent Agreement"). The Ohio Board reprimanded her, placing her on one year of probation starting then. (DX20,A.674-678;A.1077-1078).

Plaintiff admitted that she had not been honest with the Ohio Board. (A.902). When she applied for her Ohio respiratory care license, the form asked "Have you EVER been found guilty of, pled guilty to, pled no contest to…. for a criminal conviction (felony or misdemeanor) in any state, in violation of any federal, state or municipal court ordinance, excluding travel offenses." (DX20;A.903). Plaintiff had been charged with public intoxication—a misdemeanor-- some years before and was fined for this. (A.869;DX19,A.672-673). However, Plaintiff omitted this from her application for her Ohio License, and the Ohio Board placed her on probation for one year beginning April 9, 2015.

(A.870,905-906). She believes she should have reported that to the Ohio Board. (A.870).

The Ohio Board found that Plaintiff, by omitting her misdemeanor Public Intoxication charge on her Ohio application, had provided "false and/or misleading information in an application" which violated the Ohio Revised Code. (DX20,A.675). Plaintiff admits that being reprimanded and put on probation by the Ohio Board was a disciplinary action. (A.905,907-908). The Consent Order expressly sets forth "Agreed Disciplinary Conditions." (DX20,A.676).[37]

From the list of Parkersburg employees Moreau received before traveling there, she knew Plaintiff was hired in October 2015, and therefore Plaintiff still would have been on probation with the Ohio Board at that time. This led Moreau on June 4, 2019 to request Plaintiff's employment file from Human Resources to review whether she had disclosed a respiratory therapist's license when she was hired. Moreau's request was typical of her usual practice. (A.1078-1079).

Moreau reviewed Plaintiff's Application on June 4, 2019. (A.1078-79). This showed that Plaintiff applied to Lincare for employment on October 19, 2015. (A.906;DX18,A.667-671). This was within one year of April 9, 2015, and thus within her probation period. Page 2 of the Application asks an applicant to "List

---

[37] This belies Plaintiff's claim that "there were no 'current restrictions or disciplinary actions'" pending against her Ohio license when she applied to Lincare. (PAB67).

any valid licenses or certifications that you currently hold, including the type of license/certification and whether there are any current restrictions or disciplinary actions against the license/certification." (DX18,A.668). It provided space to list the license and a box to check "yes" or "no" regarding whether it was subject to "Current Restrictions or Disciplinary Actions." It provided lines to provide "Details of any restrictions of disciplinary actions." (DX18,A.668). Plaintiff listed that she had an Ohio Respiratory Care Practitioner License but checked "No" as to whether it was subject to a current restriction or disciplinary action. (DX18,A.668).

### 3. Lincare's Corporate Representative Testifies That Lincare Would Have Terminated Plaintiff For Lying On Her Application, Had It Known

The Application, directly above Plaintiff's signature line, states "If hired, I understand that false or misleading information or omissions given in my application or interview(s) may result in my immediate discharge." (DX18,A.671). Plaintiff knew that any misrepresentation or omission on the Application could be grounds for discharge if Lincare learned of it. (A.906-907).

Based on Plaintiff's Application statement that her Ohio License was not subject to discipline or restriction when it was, Moreau concluded that Plaintiff may have provided false information in her employment Application. (A.1081-82).

Lying on an employment application implicates several Lincare compliance policies. It provides false information on a document, which is identified as Major

Infraction number 11 in Lincare's employee Handbook. (DX5,A.584). The Handbook states that that a major infraction "may result in discharge without written notice and without prior warning or progressive discipline." (DX5,A.584). It would implicate compliance policies accompanying healthcare laws. (A.1021).

Lincare's corporate witness on this issue, Andrea Daggett, testified that lying on an application is "absolutely prohibited by Lincare. It's considered a serious infraction and relevant to immediate termination at whatever time that would be discovered." (A.1021). Daggett added "the accuracy or the false information *is considered a violation serious enough to result in immediate termination*. (A.1021)(emphasis added).[38] Plaintiff ignores this testimony.

Even Plaintiff admits that "[i]f an employment application contains false information, then Lincare's policies certainly provide for, among other disciplinary measures, termination." (PAB60). Yet the Application only mentions termination and no other discipline.[39]

---

[38] Plaintiff suggests that the Court only referenced an earlier page of Daggett's testimony (PAB60), but Daggett's testimony cited here proves that Lincare would have terminated Plaintiff for this misconduct.

[39] Plaintiff misleadingly suggests that Lincare discussed the after-acquired evidence doctrine in "only two short paragraphs" of its 76 pages of proposed findings and conclusions. (PAB58). She ignores that in that section, Lincare incorporated four pages of factual support for this defense. (Doc.141 at 66 (incorporating ¶¶85-96)).

### C.    <u>Summary Of Argument As To Cross-Appeal</u>

Plaintiff's cross-appeal is factually and legally baseless.

As to facts, Plaintiff indisputably lied on her Application. She checked the box stating that her Ohio License was subject to no restriction when five months before she had agreed to entry of a Consent Order putting her license on probation for one year. The Consent Order was entered because the Ohio Board learned that in her application for her Ohio License, Plaintiff had falsely concealed that she had been guilty of a criminal misdemeanor.

It is undisputed that Lincare first discovered that Plaintiff lied on her Application on June 4, 2019, after her termination. This, therefore, indisputably was after-acquired evidence.

While Plaintiff tries to dispute whether Lincare would have terminated her for this had it known about it at the time, the facts demonstrate it would have. *First*, Daggett was unequivocal that this "is considered serious enough to result in immediate termination." *Second*, the Application specifically states that such conduct "may result in immediate discharge." (DX18,A.671). *Third*, such a misrepresentation would have been a Major Infraction, [40] which the Handbook specifies supports immediate discharge. (DX5,A.584).

---

[40] That Plaintiff committed a "Major Infraction" belies Plaintiff's assertion that her lie was not serious and only presented a "credibility" issue. (PAB63-64).

Plaintiff cannot cite any reason why Lincare would have applied a lesser punishment for her lying than termination, especially when termination is the listed discipline on the Application itself. (DX18,A.671). Particularly since Plaintiff's duties included ensuring "clean paperwork" (DX2,A.568)—accurate and compliant orders—no evidence suggests Lincare would have tolerated such misrepresentation.

Therefore, as the Court correctly recognized, the circumstances that *McKennon v. Nashville Banner Co.,* 513 U.S 352, 362-63 (1995), cited for when the doctrine applies exist here. The Court also correctly limited Plaintiff to one day's back pay and no front pay for this.

### D.    Cross-Appeal Argument

#### 1.    Standard Of Review

As Plaintiff admits, the Court's fact findings may be reversed only if clearly erroneous, while its conclusions of law are examined de novo. (PAB18).

#### 2.    That Plaintiff Lied On Her Application Was A Terminable Offense Which Lincare Only Discovered After Plaintiff's Termination

Under the after-acquired evidence doctrine, a plaintiff's damages for front pay are inappropriate and back pay is only appropriate from the date of the unlawful discharge to the date the new information was discovered. (PAB55). The doctrine applies where the employer proves that the newly discovered wrongdoing "was of such severity that the employee in fact would have been terminated on

56

those grounds alone if the employer had known of it at the time of the discharge."
*McKennon*, 513 U.S. at 361-63 (cited PAB16).

Plaintiff indisputably lied on her Lincare Application. She falsely stated that her license at the time was not subject to any restriction or discipline. In fact, her license in Ohio was in the middle of a one-year probationary period with the Ohio Department because she had not disclosed in that license application that she had been convicted of a crime.

Lincare indisputably did not know Plaintiff lied in her Application prior to her termination. It thus was after-acquired evidence that fell squarely within the doctrine. *Calvert v. Smith's Food & Drug Centers, Inc*., 2007 WL 4207198, *7 (D. Utah Nov. 26, 2007)(revelation that plaintiff failed to disclose criminal history in employment application limited damages in FMLA claim).

Plaintiff argues that the lie was immaterial because Plaintiff was not being hired for a clinical position where licensure was necessary, but the Application makes clear that ANY misrepresentation is cause for immediate termination. Lincare's Application expressly states that a misrepresentation of its contents can lead to "immediate termination." No record evidence suggests that Lincare ever did or would have made an exception for this reason.

Plaintiff argues that Lincare has not shown that Lincare "would" have terminated Plaintiff for this violation, only that it "could" have. (PAB16). The unrebutted evidence at trial showed otherwise. (A.1021).

Plaintiff says she committed "at worst a trivial" infraction. (PAB17). But Lincare applicants are explicitly put on notice that any misrepresentation on an application is cause for immediate termination. And the misrepresentation itself was not trivial—she misrepresented that the Ohio Department had disciplined her. The basis for that discipline was also significant and troubling—Plaintiff falsely stated she had never been convicted of a crime. Again, on an important question, Plaintiff was dishonest with her Regulator.

Plaintiff challenges Lincare's belief that this evidence impacted Plaintiff's general credibility (PAB17). But lying to an employer and to a regulator, which resulted in discipline and restriction of her license, irrefutably compromised Plaintiff's credibility. Credibility means the quality of being trusted and believed in. One who lies in important submissions is neither.

Plaintiff argues that the Court "reversed course" because it had denied summary judgment on this question. (PAB16). Plaintiff notes that for summary judgment purposes, the Court determined that Plaintiff's lie was not an omission because the Application did not require disclosure regarding licensure. Yet at trial, the Court heard from witnesses and received additional evidence and argument.

Had the Court maintained its position at summary judgment, this would have been error, first, because the Application asks about licensure and does not provide the answer is optional. Second, Plaintiff elected to answer the question anyway, and did so falsely. Regardless of requirements, once Plaintiff made a representation on the Application, she was obligated to do so truthfully or else face immediate termination.

Because Lincare acquired evidence of Plaintiff's lying on her Application only after her termination, she forfeited any back pay after that time. Therefore, even if she were entitled to any compensation (and she was not), she only had a right to back pay before Lincare learned this. That amounts to one day's back pay, or $141.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court's judgment finding Lincare liable for sex discrimination and awarding punitive damages should be reversed, while Plaintiff's cross-appeal should be rejected.

Dated: December 1, 2021

Respectfully submitted,

By: /s/ David B. Goroff

David B. Goroff
Andrew Gresik
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 3000
Chicago, Illinois 60654
Tel: (312) 832-4500
Fax: (312) 832-4700
dgoroff@foley.com
agresik@foley.com

Lawrence Kraus
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, Massachusetts 02199
Tel: (617) 342-4000
Fax: (617) 342-4001
lkraus@foley.com

*Counsel for Defendant-Appellant Lincare Inc.*

## STATEMENT REQUESTING ORAL ARGUMENT

Lincare believes that oral argument in this case will assist this Court in addressing the issues presented and will give the parties the opportunity to address any questions the Court may have regarding the numerous trial exhibits and extensive trial record and the way the District Court applied existing Fourth Circuit precedent to the evidence. Accordingly, Lincare believes the Count's consideration will be assisted by oral argument.

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,940 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010, 14 point Times New Roman font.

Dated: December 1, 2021                 */s/ David B. Goroff*
                                        *David B. Goroff*

                                        *Counsel for Defendant-Appellant*
                                        *Lincare Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 1 2021, the foregoing Brief of Defendant-Appellant was filed electronically with the Court, and counsel of record will receive a copy of the foregoing Brief through electronic notification of such filing.

Dated: December 1, 2021        */s/ David B. Goroff*
                               *David B. Goroff*

                               *Counsel for Defendant-Appellant*
                               *Lincare Inc.*